**THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JONATHAN N. WATERS | ) | Case No. 14 CV 1704 |
| 5299 Harbor Pointe Drive | ) | |
| Galena, Ohio  43201 | ) | Judge James L. Graham |
| | ) | |
| Plaintiff, | ) | Magistrate Judge Terence P. Kemp |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL V. DRAKE, M.D., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION OF DEFENDANTS MICHAEL V. DRAKE, M.D., JOSEPH E. STEINMETZ,
Ph.D.  AND THE OHIO STATE UNIVERSITY FOR JUDGMENT ON THE PLEADINGS**

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, defendants President Michael V. Drake, M.D. ("President Drake"), Provost Joseph E. Steinmetz, Ph.D. ("Provost Steinmetz") and The Ohio State University ("Ohio State") respectfully move this Court to dismiss the claims of plaintiff Jonathan N. Waters ("plaintiff" or "Mr. Waters") on the grounds that no material issue of fact exists and defendants are entitled to judgment as a matter of law. The grounds for this Motion are set forth in the accompanying Memorandum in Support.

MICHAEL DeWINE
ATTORNEY GENERAL OF OHIO


By:    /s/ Michael H. Carpenter           
        Michael H. Carpenter (0015733)
        Timothy R. Bricker (0061872)
        Caitlin E. Murphy (0090665)
        CARPENTER LIPPS AND LELAND LLP
        280 Plaza, Suite 1300
        280 North High Street
        Columbus, OH 43215
        E-mail:carpenter@carpenterlipps.com
                bricker@carpenterlipps.com
                murphy@carpenterlipps.com

        Special Counsel for Defendants Michael V. Drake,
        Joseph E. Steinmetz, and The Ohio State University

**COMBINED TABLE OF CONTENTS AND SUMMARY**
**PURSUANT TO LOCAL RULE 7.2(a)(3)**

I.     INTRODUCTION ........................................................................................  1

II.    FACTUAL BACKGROUND ......................................................................  3

A.     Mr. Waters Was An Unclassified, At-Will Employee Whose Employment Could Be Ended At Any Time By Either Him Or Ohio State ...........................................  3

B.     Mr. Waters Spent His Entire Adult Life Entrenched In The Band's Culture, Including Holding Leadership Positions In The Band For Over Twelve Years ..  3

C.     The Band Is An Academic Class Within The School Of Music For Which Students Receive Credit And Grades, Not An Independent Entity Run By Its Members Or Its Alumni ...........................................................................  5

D.     In The Fall Of 2013, Mr. Waters Denied As "Rumors" Reports Of Culture Issues In The Band .................................................................................  5

E.     On May 23, 2014, Ohio State Received Information That Required An Investigation Into The Band's Culture Pursuant To Ohio State Policy And Federal Law ..........................................................................................  6

F.     The Title IX Complaints Were Investigated By Professionals And Mr. Waters Was Immediately Made Aware Of The Complaints And Given The Opportunity To Be Heard ...........................................................................................  8

G.     The Title IX Investigation Into The Band's Culture Uncovered Overwhelming Evidence Of Inappropriate Conduct And A Highly Sexualized Culture .............  12

H.     Plaintiff Was Terminated From His Unclassified, At-Will Employment By Ohio State On July 24, 2014 .............................................................................  17

I.     After Mr. Waters Was Terminated, Additional Inappropriate Conduct He Had Failed To Disclose Was Discovered .........................................................  18

J.     Mr. Waters Was Offered The Opportunity For A Name-Clearing Hearing, But Declined, Preferring To Present His Case To The Public Through A Public Relations Campaign .................................................................................  19

III.   LAW AND ARGUMENT ..........................................................................  21

Mr. Waters' claims should be dismissed because no material issue of fact exists and defendants are entitled to judgment on the pleadings.

*JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577 (6th Cir. 2007) ....................... 21
*Bassett v. Nat'l Coll. Athl. Ass'n*, 528 F.3d 426 (6th Cir. 2008)................................. 21
*Weiner v. Klais & Co.*, 108 F.3d 86 (6th Cir. 1997) ................................................ 21
*Whittiker v. Deutsche Bank Nat. Trust Co.*, 605 F. Supp. 2d 914 (N.D. Ohio 2009) ... 21

**A.    Mr. Waters' Procedural and Substantive Due Process Claims Against President Drake and Provost Steinmetz Fail**..........................................................................  22

> **1.    Mr. Waters' Procedural Due Process Claim Fails Because, As An Unclassified, At-Will Employee, He Did Not Have a Constitutionally Protected Property Interest In His Employment**.......................................  22

An at-will employee is subject to dismissal at any time and without cause; consequently, an at-will employee cannot effectively claim a protectable property interest in his or her job. Here, the express terms of Mr. Waters' employment establish that he was an at-will employee, whose employment with Ohio State could be ended at any time by either him or Ohio State.  As such, Mr. Waters cannot establish a protectable property interest in his employment.

*Slyman v. City of Piqua*, 494 F. Supp. 2d 732 (S.D. Ohio 2007) ............................... 22,23
*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) ........................................................ 23
*Christophel v. Kukulinsky*, 61 F.3d 479 (6th Cir.1995) .......................................... 23
*Breeden v. HCA Physician Services, Inc.*, 834 F. Supp. 2d 616 (W.D. Ky. 2011)...... 23
*Bishop v. Wood*, 426 U.S. 341 (1976)................................................................ 24
*McClain v. NorthWest Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320 (6th Cir. 2006)
.......................................................................................................... 24

> **2.    Because Mr. Waters Declined The Public Name-Clearing Hearing He Was Offered, He Cannot Claim To Have Been Deprived Of Procedural Due Process**............................................................................................  24

A plaintiff must both request a name-clearing hearing ***and*** be denied this hearing before he has suffered a deprivation of his liberty interest without due process of law. Here, Ohio State offered Mr. Waters a name-clearing hearing at an open forum on Ohio State's main campus, a fact Mr. Waters admits in his Complaint.  Mr. Waters' counsel was asked to contact Ohio State to confirm the date, location and other logistical details, but chose not to do so.  Because Mr. Waters failed to respond to Ohio State's offer of a name-clearing hearing, he cannot prove he has suffered a deprivation.

*Brown v. City of Niota, Tennessee*, 214 F.3d 718 (6th Cir. 2000)............................ 24, 26
*Gunasekera v. Irwin*, 678 F. Supp. 2d 653 (S.D. Ohio 2010)................................. 25, 26
*Chilingirian v. Boris*, 882 F. 2d, 200 (6th Cir. 1989) ............................................ 25, 27
*Gunasekera v. Irwin*, 551 F.3d 461 (6th Cir. 2009)............................................... 25, 26
*Ludwig v. Bd. of Trs. of Ferris State Univ.*, 123 F.3d 404 (6th Cir. 1997)................. 24, 26
*Cross v. Metro. Govt. of Nashville/Davidson Cty.*, M.D.Tenn. No. 3-12-1109, 2013 WL 1899169 (May 7, 2013)...................................................................................  27

**3.**     **Mr. Waters' Termination Does Not Implicate A Fundamental Right Or Shock The Conscience, And Accordingly, He Has Not Been Deprived Of Substantive Due Process**............................................................................  28

The Sixth Circuit recognizes two types of substantive due process claims. The first relates to the denial of a fundamental right secured by the Constitution or by federal statute, other than procedural claims under the Fourteenth Amendment.   Mr. Waters' termination from an unclassified, at-will job does not fit within the definition of a fundamental right enumerated by the Supreme Court.  The test for the second recognized type of substantive due process claim is whether the conduct complained of shocks the conscience of the court.   The Sixth Circuit is reluctant to apply the "shock the conscience" standard outside the realm of physical force, which is absent here.   Additionally, absent a deprivation of a fundamental right, even if conduct "shocks the conscience," it cannot rise to the level of a substantive due process deprivation.

*Mertik v. Blalock*, 983 F.2d 1353 (6th Cir.1993)........................................................28, 29
*Charles v. Besler*, 910 F.2d 1349 (6th Cir. 1990)............................................  28
*Washington v. Glucksberg*, 521 U.S. 702 (1997) .........................................  28
*Loving v. Virginia,* 388 U.S. 1 (1967)............................................................  28
*Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535 (1942)...................  28
*Meyer v. Nebraska,* 262 U.S. 390 (1923) ......................................................  28
*Pierce v. Soc'y of Sisters,* 268 U.S. 510 (1925)............................................  28
*Griswold v. Connecticut,* 381 U.S. 479 (1965)..............................................  28
*Eisenstadt v. Baird,* 405 U.S. 438 (1972) .....................................................  28
*Rochin v. California,* 342 U.S. 165 (1952) ....................................................  28
*Bracken v. Collica*, 94 Fed. Appx. 265 (6th Cir. 2004)...............................28, 29
*Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339 (6th Cir. 1992) .............29, 30
*Braley v. City of Pontiac,* 906 F.2d 220 (6th Cir.1990)................................  29
*Webb v. McCullough,* 828 F.2d 1151 (6th Cir.1987)....................................  29
*Gurik v. Mitchell,* 26 Fed. Appx. 500 (6th Cir. 2002) ................................29,30
*Lesinski v. City of Steubenville*, 2:03-CV-932, 2005 WL 1651737 (S.D. Ohio July 13, 2005) ................................................................................................  30

**4.**     **Because Mr. Waters Cannot Identify Any Activity On The Part of President Drake Or Provost Steinmetz That Deprived Him Of Procedural Or Substantive Due Process, His Claims Against Them Should Be Dismissed**..  30

For an individual defendant to be held liable, the liability must be based on the actions of that defendant in the situation that the defendant faced, and not based on any alleged problems caused by the claimed acts and errors of others, either defendants or non-defendants.  Here, Mr. Waters does not, and cannot, allege that President Drake and Provost Steinmetz had any involvement in the Title IX investigation's process, procedures or findings.   Thus, his due process claims against President Drake and Provost Steinmetz should be dismissed.

*Gies v. Flack*, 495 F. Supp. 2d 854 (S.D. Ohio 2007) ................................  30
*Heyerman v. Cnty. of Calhoun*, 680 F.3d 642 (6th Cir. 2012)....................30, 31
*Gibson v. Matthews*, 926 F.2d 532 (6th. Cir. 1991)....................................  31

*Combs v. Sheriff, Hamilton Cnty.*, 1:12-CV-347, 2013 WL 3288160 (S.D. Ohio 2013)  31
*Combs v. Sheriff, Hamilton Cnty.*, 1:12-CV-347, 2013 WL 3835376 (S.D. Ohio 2013)  31
*Colvin v. Caruso*, 605 F.3d 282 (6th Cir. 2010) ..........................................................  31

**B.** **Mr. Waters Was Terminated Because He Failed In His Leadership Of The Band, Not Because He Is A Man, And Therefore, His Title IX Claim Fails** ..................  32

    **1.** **Mr. Waters Has Not, And Cannot, Satisfy The Heightened Pleading Standard For Reverse Discrimination Claims** ...........................................  32

In cases of so-called "reverse discrimination," in addition to stating a *prima facie* case, a plaintiff seeking to state a reverse discrimination claim also must plead, and ultimately prove, the existence of background circumstances supporting the suspicion that the defendant is that unusual employer who discriminates against the majority.  In a reverse discrimination claim on the basis of gender, a court considers whether the decision makers were of the opposite sex. Here, Mr. Waters identifies several individuals in his Complaint he alleges are responsible for his termination.  Each is a man: Chris Glaros; Provost Steinmetz; and President Drake.  As such, he cannot state a claim for reverse discrimination.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir.1992)...............................................  33
*Thomas v. Kmart Corp.*, No. 4:04CV-171-M, 2006 WL 2802266 (W.D. Ky. 2006) ..  33
*Treadwell v. Am. Airlines, Inc.*, 716 F.Supp.2d 721 (W.D. Tenn. 2010) ....................  33
*Turner v. Grande Pointe Healthcare Cmty.*, 631 F. Supp. 2d 896 (N.D. Ohio 2007)..  33

    **2.** **As A Leader, Mr. Waters Failed To Meet Ohio State's Expectations** ......  34

A necessary element to establish a *prima facie* claim of disparate treatment requires Mr. Waters to show that he was qualified for the leadership position of Director of the Band.  He must prove he was performing his job at a level which met his employer's legitimate expectations.  In regard to Ohio State's expectations about the Band's culture, Mr. Waters admits the Band's culture was "offensive," "inappropriate,' "vulgar," and "demeaning," and admits the Band's culture was "not . . .in a 'good place' currently," as of July 14, 2014.  Mr. Waters' technical or musical competence is not enough to satisfy the requirements of his position in regard to Band leadership.

*DeMasellis v. Saint Mary's of Michigan*, No. 10-12138-BC, 2011 WL 5404268 (E.D. Mich. 2011) ........................................................................................................34, 35
*McDonald v. Union Camp Corp.*, 898 F.2d 1155 (6th Cir.1990)...............................34, 35

    **3.** **The Female Cheerleading Coach, Who Also Was Terminated, Was Not Similarly Situated To Mr. Waters** ................................................................  36

As an additional element necessary to establish his *prima facie* case, Mr. Waters must show that he was treated less favorably than a similarly-situated woman. To be deemed "similarly situated," a comparable employee must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct.  Here, one of the

persons Mr. Waters alleges terminated him, President Drake, was not employed by Ohio State until June 30, 2014, and thus, could not have played any role whatsoever in the decision-making related to the termination of the female cheerleading coach which occurred in 2013. Additionally, unlike Mr. Waters, cheerleading coaches do not report to the College of Arts and Sciences or the office of the Provost. Instead, Gene Smith, Ohio State's Athletic Director, is their ultimate supervisor and made the decision to terminate the female cheerleading coach.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir.1992)................................................ 36

*Jones v. St. Jude Med. S.C., Inc.*, 823 F.Supp.2d 699 (S.D. Ohio 2011)...................... 36

*Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789 (S.D. Ohio 1998)............................. 36

*DeBiasi v. Charter Cty. of Wayne*, 537 F. Supp. 2d 903 (E.D. Mich. 2008)............... 36

*Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461 (6th Cir.1995)............................... 37

**4.     The Title IX Investigation Was Not A Pretext For Discriminating Against Mr. Waters Because He Is A Man; The Investigation Was Required As a Matter of Law**............................................................................................... 38

Assuming an employer provides a legitimate business reason for an employment decision, a plaintiff claiming disparate treatment is required to prove that the employer's reason was a pretext for discrimination. Here, Ohio State had a legitimate educational administrative reason for conducting the Title IX investigation and terminating Mr. Waters, *i.e.,* Ohio State received a Title IX complaint that the Band had a sexualized culture and evidence of a sexualized culture was found. Ohio State was required to investigate the Title IX complaint about the Band's culture as a matter of law. Upon learning of the inappropriate culture, Ohio State was then obligated to take efforts to correct the situation. While Mr. Waters may disagree with the corrective action taken by Ohio State, *i.e.*, terminating him, he cannot, as a matter of law, claim it was pretextual.

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)

.............................................................................................................. 38

*Thurman v. Yellow Freight Systems, Inc.,* 90 F.3d 1160 (6th Cir.1996) .................... 38

*St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993) ................................................. 38

20 U.S.C. § 1681...................................................................................................... 38

*Doe v. Univ. of the South*, 687 F.Supp.2d 744, 758 n. 1 (E.D. Tenn. 2009)............... 39

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) . 39

*McDonald v. Union Camp Corp.*, 898 F.2d 1155 (6th Cir.1990)................................ 39

**IV. CONCLUSION** ............................................................................................. 39

<u>MEMORANDUM IN SUPPORT</u>

**I.**      <u>INTRODUCTION.</u>

Jonathan Waters is a former unclassified, at-will employee of Ohio State, who claims to have been deprived of procedural and substantive due process, and terminated because he is a man.  His Complaint attempts to shift the focus from his own conduct and failings as leader of The Ohio State University Marching and Athletic Bands (the "Band"), by attacking President Drake, Provost Steinmetz and Ohio State, as well as another Ohio State employee who oversaw the federally required Title IX investigation into the culture of the Band.  Mr. Waters' Complaint does not, however, deny that the Band's culture was inappropriate and highly sexualized at the time of his termination.  In fact, he admits the opposite.  In *his* Complaint, as well as the written statement which *he* provided to Ohio State during the Title IX investigation, *he* admits that during his twelve years holding leadership positions in the Band, conduct occurred which was "offensive," "inappropriate," "vulgar" and "demeaning," and that the Band's culture was "in dire need of change."  He also admitted on July 14, 2014, *just ten days before his termination*, that the Band's culture was "not . . . in a 'good place' currently."

The first 39 pages of Mr. Waters' Complaint are a thinly veiled press release.  The remaining 6 pages of his Complaint purport to set forth claims for relief.  In actuality, they fail to set forth any legally cognizable claims and should be dismissed for the following reasons:

> **1.**      **Mr. Waters Has Not Been Deprived Of A Property Interest Without Procedural Due Process.**   Unclassified, at-will employees have no constitutionally protected property interest in their employment, and accordingly, cannot state a claim for deprivation of procedural due process related to termination from their employment.  Thus, as an unclassified, at-will employee of Ohio State who was terminated, Mr. Waters cannot state a claim for deprivation of procedural due process.

2. **Mr. Waters Has Not Been Deprived Of A Liberty Interest Without Procedural Due Process.**  To state a claim for deprivation of a liberty interest without procedural due process, a claimant must prove he requested a non-adversarial name-clearing hearing ***and*** was deprived of the opportunity to conduct one.  Here, Mr. Waters demanded a two-day, adversarial hearing at which he and his counsel could cross-examine Ohio State employees and officials.  In response, Ohio State offered Mr. Waters a name-clearing hearing at an open forum on Ohio State's main campus.  Mr. Waters failed to respond to Ohio State's offer.  Under these circumstances, Mr. Waters cannot claim to have been deprived of a name-clearing hearing without procedural due process, and therefore, waived any alleged right to such a hearing.

3. **Mr. Waters Has Not Been Deprived Of Substantive Due Process.**  In order to prove a deprivation of substantive due process, a plaintiff must show he was denied a fundamental right, or, that his termination shocked the conscience.  Termination from unclassified, at-will employment neither implicates a fundamental right nor shocks the conscience.  As an unclassified, at-will employee of Ohio State, Mr. Waters cannot state a claim for deprivation of substantive due process as a result of his termination.

4. **No Title IX Disparate Treatment Occurred.**  To establish a *prima facie* case of disparate treatment, Mr. Waters must show he was a member of a protected class, that he met Ohio State's expectations, and that a similarly-situated, non-protected employee was treated more favorably than he was.  He also must show that Ohio State's reasons for terminating his unclassified, at-will employment, were actually a pretext to discriminate against him because he is a man.  As a man, however, Mr. Waters has failed to meet the heightened standard required for stating a reverse discrimination claim.  Additionally, by his own admission, he failed to meet the expectations of Ohio State related to the culture which existed in the Band.  The female cheerleading coach he claims was similarly situated, but treated differently, actually worked in the Athletics Department, not the School of Music where Mr. Waters was employed, and, in point of fact, ***was terminated by Ohio State***.  Further, Ohio State was required by federal law to conduct the Title IX investigation into the Band's culture.  As a result, Mr. Waters cannot state a *prima facie* case that he was terminated because he is a man.  He also cannot show that Ohio State conducted the federally required Title IX investigation as a pretext to discriminate against him because he is a man.

2

## II.    FACTUAL BACKGROUND.

### A.    Mr. Waters Was An Unclassified, At-Will Employee Whose Employment Could Be Ended At Any Time By Either Him Or Ohio State.

At the time of his termination, Mr. Waters was an unclassified, at-will employee of Ohio State.  *See* Pl.'s Compl. at ¶¶ 1, 16, 23, 141; Answer of Defendants President Michael V. Drake, M.D., Provost Joseph E. Steinmetz, Ph.D. and The Ohio State University ("Defendants' Answer") at ¶¶ 1, 16, 23, 141.  Ex. A (1/30/13 Employment Letter to Mr. Waters).[1]  His employment letter for the Director position said explicitly that his employment could be ended at any time by either him or Ohio State:

> The position offered is an unclassified position, not subject to the provisions of section 124.34 of the Ohio Revised Code. Accordingly, your employment is at-will, and may be ended at any time by either you or the university.

*See* Pl.'s Compl. at ¶¶ 16, 23, 141; Defs.' Answer at ¶¶ 1, 16, 23, 141; Ex. A (1/30/13 Employment Letter to Mr. Waters).  Section 124.34 of the Ohio Revised Code identified in Mr. Waters' Employment Letter specifically provides certain protections for ***classified*** employees.  Mr. Waters' Employment Letter plainly states he is not entitled to these protections in the course of his ***unclassified***, at-will employment.  Mr. Waters was a non-tenured staff member within the School of Music and was terminable at-will and at any time.

### B.    Mr. Waters Spent His Entire Adult Life Entrenched In The Band's Culture, Including Holding Leadership Positions In The Band For Over Twelve Years.

Mr. Waters spent his adult life entrenched in the Band's culture.  As a student, he himself was a member of the Band from 1995 through 1999. *See* Pl.'s Compl. at ¶¶ 1, 23 (referring to Waters as a "former band member"); Defs.' Answer at ¶ 1.  Shortly after graduating, he held

---

[1] Unless otherwise stated, all references to exhibits refer to exhibits attached to Defendants' Answer.

graduate assistant positions with the Band.  *See* Defs.' Answer at ¶¶ 1, 16, 23.  Then, from 2002 through 2014, he held leadership positions in the Band, first as Assistant Director (2002-2012), then Interim Director (2012) and, finally, Director (2012-2014).  *See* Pl.'s Compl. at ¶ 16; Defs.' Answer at ¶ 16.  As such, from 2002 through 2014, Mr. Waters was a member of the "core power structure" of the Band.  *See* Pl.'s Compl. at ¶ 28, n.9, Ex. B to Pl's Compl., Attachment 9, Page ID # 442 (The Ohio State University Marching Band, Statement Of Policies And Procedures); Defs.' Answer at ¶ 1, 16.

As a leader of the Band, and an employee within the School of Music, Mr. Waters was expected to "[i]nstill in the students the highest standard for their personal conduct, on and off the field, and in their interactions with internal and external constituencies." *See* Pl.'s Compl. at ¶¶ 16, 23; Defs.' Answer at ¶¶ 16, 23, Ex. A (1/30/13 Employment Letter to Mr. Waters).  He also was obligated to represent Ohio State, the College of Arts and Sciences, and the School of Music with integrity and professionalism, and comply with all Ohio State rules, regulations and policies, as well as all applicable state and federal laws, including the mandates of Title IX.  *See* Pl.'s Compl. at ¶¶ 16, 23; Defs.' Answer at ¶¶ 16, 23, Ex. A (1/30/13 Employment Letter to Mr. Waters).

Ohio State's sexual harassment policy requires all University staff to "assur[e] that the university maintains an environment for work and study free from sexual harassment." *See* Pl.'s Compl. at ¶ 23; Defs.' Answer at ¶ 23; Exhibit J, at 1 (Ohio State Sexual Harassment Policy 1.15).  The policy specifically includes a "duty to act," which required Mr. Waters to report to the Office of Human Resources all sexual harassment within five working days of awareness. *See* Pl.'s Compl. at ¶ 23; Defs.' Answer at ¶ 23; Exhibit J, at 3 (Ohio State Sexual Harassment Policy 1.15).  The policy includes, as examples of sexual harassment, "[s]ome incidents of

physical assault," "sexual comments or inappropriate references to gender," "[s]exually explicit statements, questions, jokes or anecdotes regardless of the means of communication (oral, written, electronic [email, social media, phone, etc.]," and "inquiries and commentaries about sexual activity, experience or orientation."  Defs.' Answer at ¶ 23; Exhibit J, at 1 (Ohio State Sexual Harassment Policy 1.15).

Similarly, under the U.S. Department of Education's Office for Civil Rights (OCR) guidance, Mr. Waters was required to take "immediate action" to eliminate sexual harassment. *See* Complaint at ¶¶ 16, 23; Defs.' Answer at ¶ 23; Ex. I, at 3 (Ohio State Sexual Harassment Policy 1.15); Ex. L at 12 (Office for Civil Rights, 2001 Revised Sexual Harassment Guidance: Harassment Of Students By School Employees, Other Students, Or Third Parties).

### C. The Band Is An Academic Class Within The School Of Music For Which Students Receive Credit And Grades, Not An Independent Entity Run By Its Members Or Its Alumni.

The Band is not an extracurricular activity or co-educational fraternity, and is not run by its members or alumni.  Instead, it is a class within the School of Music for which Band members receive grades and academic credit. *See* Pl.'s Compl. at ¶ 28, fn. 9, Ex. B, TBDBITL Report, Attachment 9, Page ID 441, 444 (The Ohio State University Marching Band Statement Of Policies And Procedures); Defs.' Answer at ¶ 23.  As such, the Band was subject to the same codes of conduct as all other Ohio State academic programs, and the Band's members were, and are, required to comply with Ohio State's polices and all applicable state and federal laws. *See* Pl.'s Compl. at ¶ 28, fn. 9, Ex. B, TBDBITL Report, Attachment 9, Page ID 441; Defs.' Answer at ¶ 23, Ex. M (Office of Student Life, *Code of Student Conduct*, Section 3335-23-02, at 1).

### D. In The Fall Of 2013, Mr. Waters Denied As "Rumors" Questions Of Culture Issues In The Band.

Mr. Waters denied the Band's culture issues existed in October, 2013.  On October 31,

2013, he e-mailed Gayle Saunders, Assistant Vice President of Media & Public Relations at Ohio State to talk about "concerns" about the Band's culture by administrators and trustees. As Mr. Waters wrote to Mr. Saunders: "I wanted to drop you a note and request to speak with you about the culture within the OSUMB. I had a great conversation with Gary Lewis [from Ohio State's Communications office] this morning and he shared with me that there are perhaps some concerns from the Board of Trustees and Administration regarding a culture within the band. ***I [am] exceptionally surprised about these rumors*** and I would love to have an opportunity to speak to you about them." *See* Pl.'s. Compl. At ¶ 54; Defs.' Answer at ¶ 54; Ex. O (10/31/13 E-mail from Jonathan N. Waters to Gayle Saunders).

Approximately three weeks later, on November 20, 2013, Mr. Waters was called to a meeting with Provost Steinmetz to discuss Mr. Waters' handling of a report by a female Band member that she had been sexually assaulted by a male Band member. *See* Pl.'s Compl. at ¶ 54; Defs'. Answer at ¶ 54. Provost Steinmetz directly asked Mr. Waters if there were culture problems in the Band. *See* Pl.'s Compl. at ¶ 54 Defs'. Answer at ¶ 54. Mr. Waters said such issues ***used to*** exist, but no longer did. *See* Pl.'s. Compl. at ¶ 54; Defs'. Answer at ¶ 54. Mr. Waters went on to state that he believed Ohio State's communications and media office was behind any ***rumors*** about the Band's culture. *See* Pl.'s Compl. at ¶ 54; Defs'. Answer at ¶ 54.

### E.  On May 23, 2014, Ohio State Received Information That Required An Investigation Into The Band's Culture Pursuant To Ohio State Policy And Federal Law.

In May of 2014, two Title IX complaints concerning the Marching Band were lodged with Ohio State's Office of University Compliance and Integrity. *See* Pl.'s Compl. at ¶¶ 57-58; Defs.' Answer at ¶ 57, Ex. H (July 22, 2014 Investigation Report, at 3, fn. 2). First, on May 22, 2014, a female Band member and her parent reported retaliation by Mr. Waters because the

female Band member had reported that she had been sexually assaulted by a male Band member several months earlier. *See* Pl.'s Compl. at ¶¶ 57-58; Defs.' Answer at ¶¶ 57-58, Ex. H (July 22, 2014 Investigation Report, at 3, fn. 2).   The alleged retaliation constituted a complaint under Title IX.  *See* Pl.'s Compl. at ¶ 58; Defs.' Answer at ¶¶ 57-58, Ex. H (July 22, 2014 Investigation Report, at 3).   The underlying sexual assault was the same one which had caused Provost Steinmetz to call Mr. Waters into his office on November 20, 2013, to inquire about the Band's culture. *See* Pl.'s Compl. at ¶ 53-54; Defs'. Answer at ¶ 54.   As indicated above, at that time, Mr. Waters claimed reports about the Band's culture were "rumors."  *See* Pl.'s Compl. at ¶ 54; Defs'. Answer at ¶ 54, Ex. O (October 31, 2013 Email from Jonathan N. Waters to Gayle Saunders).

The next day, the parent came back to the Compliance Office to share additional (and broader) concerns the parent harbored that the Band's culture was inappropriately sexualized. *See* Pl.'s Compl. at ¶ 57; Defs.' Answer at ¶¶ 3, 57, Ex. H (July 22, 2014 Investigation Report, at 3).   The parent specifically described an annual tradition, called Midnight Ramp, in which certain members of the Band march into Ohio State's stadium and onto the football field in their underwear, under the supervision of Band staff, including Mr. Waters. *See* Pl.'s Compl. at ¶ 57; Defs.' Answer at ¶¶ 3, 57, Ex. H, at 3 (July 22, 2014 Investigation Report).   This report of a sexually hostile environment in the Band constituted a second Title IX complaint.  *See* Pl.'s Compl. at ¶¶ 57-58; Defs.' Answer at 57.

Pursuant to Ohio State's sexual harassment policy and Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, Ohio State was required to investigate both complaints. *See* Pl.'s Compl. at ¶ 60; Defs.' Answer at ¶¶ 4, 60, Ex. L, at 15 (Office for Civil Rights, 2001 Revised Sexual Harassment Guidance: Harassment Of Students By School

Employees, Other Students, Or Third Parties).  The investigation was undertaken by Ohio State's

Compliance Office.  *See* Pl.'s Compl. at ¶¶ 4, 60; Defs.' Answer at ¶¶ 4, 95-96 Ex. H (July 22,

2014 Investigation Report, at 3).

> **F.**    **The Title IX Complaints Were Investigated By Professionals And Mr. Waters Was Immediately Made Aware Of The Complaints And Given The Opportunity To Be Heard.**

On May 27, 2014, Mr. Waters was given notice of the complaints about retaliation and

the Band's culture and was informed that a Title IX investigation into both complaints would be

conducted. *See* Pl.'s Compl. ¶ 93; Defs.' Answer at ¶ 93.  Mr. Waters then actively participated

in the investigation, was given multiple opportunities to be heard, both in person and in writing,

and was informed several times that he could have legal counsel:

- **June 5, 2014.**  A labor and employment partner with a Columbus law firm called the Associate Vice President and Deputy General Counsel with the Ohio State Office of Legal Affairs, and stated he was calling on Mr. Waters' behalf to inquire about the investigation, although the attorney stated he had not been retained by Mr. Waters. *See* Pl.'s Compl. at ¶ 95; Defs.' Answer at ¶ 95.  The Deputy General Counsel told the attorney that Mr. Waters could have legal representation during the investigation and was free to call the Office of Legal Affairs with any questions he had about the investigation process. *See* Pl.'s Compl. at ¶ 95; Defs.' Answer at ¶ 95.

- **June 12, 2014.**  Mr. Waters was interviewed in person in the presence of Jessica Tobias. *See* Pl.'s Compl. at ¶ 95; Defs.' Answer at ¶¶ 95-96.  Mr. Waters asked whether he could retain and have legal representation related to the investigation and was told that he could.  *See* Pl.'s Compl. at ¶ 95; Defs.' Answer at ¶ 95.  During the interview, Mr. Waters was asked if he wanted the investigators to speak with anyone about the issues related to the Band's culture. *See* Pl.'s Compl. at ¶ 95; Defs.' Answer at ¶ 95.  He responded they should speak with Chris Hoch and Mike Smith, who were Associate and Assistant Band Directors, respectively.  *See* Pl.'s Compl. at ¶ 95; Defs.' Answer at ¶ 95.

- **June 13, 2014.**  At Mr. Waters' request, a copy of the questions asked of him at the previous day's in-person interview were e-mailed to him. *See* Pls.' Compl. at ¶ 95; Defs.' Answer at ¶ 95.

- **June 20, 2014.**  Chris Hoch, Associate Director, was interviewed, as Mr. Waters had asked.  *See* Pls.' Compl. at ¶ 95; Def's. Answer at ¶ 95, Ex. H (July 22, 2014 Investigation Report, at 3).

- **June 23, 2014.** Mike Smith, Assistant Director, was interviewed, as Mr. Waters had asked.  *See* Pls.' Compl. at ¶ 95; Def's. Answer at ¶ 95, Ex. H (July 22, 2014 Investigation Report, at 3).

- **July 1, 2014.**  Mr. Waters was interviewed in person for a second time.  *See* Pl.'s Compl. at ¶ 96; Defs.' Answer at ¶ 96.  He promised to provide a list of the efforts he had made to address the Band's culture.  *See* Pl's. Compl. at ¶ 97; Defs.' Answer at ¶¶ 96-97.  Later that same day, at his request, he was e-mailed a list of the questions he had been asked during the interview. *See* Pl.'s Compl. at ¶¶ 96- 97; Defs.' Answer at ¶ 96.

- **July 2, 2014.**

  o  The labor and employment partner with a Columbus law firm called the Deputy General Counsel for a second time.  *See* Pl.'s Compl. at ¶ 95; Defs.' Answer at ¶¶ 95.  The Deputy General Counsel confirmed for the partner what Mr. Waters had been told previously, *i.e.* that the Title IX investigation was related to two issues: the claimed retaliation and the Band's culture.  *See* Pl.'s Compl. at ¶ 95; Defs.' Answer at ¶¶ 95.  The partner asked the Deputy General Counsel if she would speak to Mr. Waters.  *See* Pl.'s Compl. at ¶ 95; Defs.' Answer at ¶ 96.  She reiterated that Mr. Waters was welcome to call.  *See* Pl.'s Compl. at ¶ 96; Defs.' Answer at ¶ 96.

  o  Mr. Waters then called the Deputy General Counsel and complained about the number of times he had been interviewed, the length of the interviews, and the number of questions he had been asked. *See* Pl.'s. Compl. at ¶ 28, fn. 9, Ex. B, at Page ID # 156-57; Defs.' Answer at ¶ 96.  Mr. Waters also asked if he should get an attorney and was told he was free to do so.  *See id.*

  o  Next, Mr. Waters called one of the investigators and inquired if he could submit written answers to the interview questions. *See* Pl.'s Compl. at ¶ 96; Defs.' Answer at ¶ 96.  He was told he could. *See id.*  Mr. Waters never submitted written answers to the questions. *See id.*

- **July 3, 2014.**  One of the interviewers e-mailed Mr. Waters to follow-up about the promised list of things he had done to address the Band's culture, which Mr. Waters had yet to forward. *See* Pl.'s Compl. at ¶ 96; Defs.' Answer at ¶ 96.

- **July 11, 2014.** Mr. Waters was interviewed for a third time by telephone about a Songbook investigators had learned about, ***but which Mr. Waters had failed to disclose in prior interviews***. *See* Pl's. Compl. at ¶ 37; Defs.' Answer at ¶ 96. Mr. Waters acknowledged in the call he knew of a Songbook, but denied seeing it as a staff member of the Band. *See* Pl's. Compl. at ¶ 37; Defs.' Answer at ¶ 37, Ex. H (July 22, 2014 Investigation Report, at 10). He said he had last seen it when he was a student. *See* Pl's. Compl. at ¶ 37; Defs.' Answer at ¶ 37, Ex. H (July 22, 2014 Investigation Report, at 10). During the call, he was again asked about the list he had not yet provided of cultural changes he had purportedly implemented. *See* Pl's. Compl. at ¶ 96-97; Defs.' Answer at ¶ 96. Mr. Waters claimed his computer had malfunctioned and he did not have the list. *See* Pl's. Compl. at ¶ 96; Defs.' Answer at ¶ 96.

- **July 14, 2014.** Mr. Waters met with Provost Steinmetz to discuss the allegations in the Title IX investigation, including the allegations about the Band's culture. *See* Pl's. Compl. at ¶ 98; Defs.' Answer at ¶ 98. He was cautioned there should be no retaliation against the Title IX complainant or her parent, and he was instructed to order an immediate end to all inappropriate activities. *See* Pl's. Compl. at ¶ 98; Defs.' Answer at ¶ 98. Additionally, he was told that further personnel actions, including actions related to him, may be forthcoming. *See* Pl's. Compl. at ¶ 98; Defs.' Answer at ¶ 98.

- **July 14, 2014.** On the same day as his meeting with Provost Steinmetz, and 13 days after he said he would provide it, Mr. Waters finally forwarded a written statement related to the Band's culture. *See* Pl's. Compl. at ¶ 97; Defs.' Answer at ¶ 97, Ex. F (July 14, 2014 Title IX Statement of Jonathan N. Waters Entitled, "An Analysis & Review of Cultural Changes in The Ohio State University Marching & Athletic Band Program). In that statement, Mr. Waters admitted that the Band's culture was "not . . . in a 'good place' currently." *Id.* Additionally, despite now claiming in his Complaint that he was provided no "notice [or] meaningful opportunity to be heard on the contents" of the Title IX investigation report into the Band's culture, *see* Pl.'s Compl. at ¶ 102, ***the written statement Mr. Waters provided expressly addressed the issues ultimately raised in the Title IX report related to the Band's culture, including, the Band's "caste system," hazing, bus behavior, alcohol issues during social functions and away game trips, nicknames, Midnight Ramp and sexual harassment***. *See* Pl's. Complaint at ¶ 97; Defs.' Answer at ¶ 97, Ex. F (July 14, 2014 Title IX Statement of Jonathan N. Waters Entitled, "An Analysis & Review of Cultural Changes in The Ohio State University Marching & Athletic Band Program). Mr. Waters' statement was reviewed by Ohio State's Compliance Office and is referred to in the Title IX investigation report. *See* Pl's. Compl. at ¶ 97; Defs'. Answer at ¶ 97; Ex. H to Defs.' Answer (July 22, 2014 Investigation Report, at 19).

- **July 18, 2014.** David Axelrod, plaintiff's attorney, contacted the Office of Legal Affairs to ask, among other things, about Mr. Waters' employment status and was informed plaintiff was an at-will employee. *See* Plaintiff's Compl. at ¶ 100-102; Defs' Answer *at* ¶ 96; Ex V (July 18, 2014 E-mail from David Axelrod to Alexandra Schimmer).

The Title IX investigation into the two complaints was overseen by experienced personnel with the Compliance Office. Each interview was led by Compliance Investigator, Jessica Tobias, who has conducted numerous investigations since joining the University in the fall of 2013. *See* Pls' Compl. at ¶ 95-96; Defs.' Answer at ¶¶ 95-96. Previously, Ms. Tobias worked for the Ohio State Bar Association, investigating misconduct by attorneys and judges for prosecution in the Supreme Court of Ohio. *See* Pls' Compl. at ¶ 95; Defs.' Answer at ¶ 95. Ms. Tobias also served as staff counsel to the Joint Task Force to Review the Administration of the Death Penalty in Ohio. *See* Pls' Compl. at ¶ 95; Defs.' Answer at ¶ 95. Ms. Tobias has had extensive investigations training. *See* Pls' Compl. at ¶ 95; Defs.' Answer at ¶ 95.

Ms. Tobias was joined in each interview by Rebecca Dickson who carefully kept a second set of notes about each witness. *See* Pls' Compl. at ¶ 95-96; Defs.' Answer at ¶ 95-96. Ms. Dickson serves as the Program manager for the Compliance Office's Title IX and Clery Act compliance work. *See* Pls' Compl. at ¶ 95-96; Defs.' Answer at ¶ 95. Previously, she worked in the University's Office of Legal Affairs and for the City of Columbus as Paralegal and Legal Investigator. *See* Pls' Compl. at ¶ 95; Defs.' Answer at ¶ 95. Ms. Dickson has had extensive Title IX and related Clery Act professional development, including investigations training. *See* Pls' Compl. at ¶ 95; Defs.' Answer at ¶ 95.

The investigation was overseen by Chris Glaros, Assistant Vice President for Compliance Operations and Investigations. *See* Pl.'s Compl. at ¶¶ 4, 60. He has conducted multiple complex and sensitive investigations since joining the University. Previously, Mr. Glaros served as First

11

Assistant Attorney General for the Ohio Attorney General, where he oversaw multiple criminal and civil investigations. *See* Pls' Compl. at ¶ 4; Defs.' Answer at ¶ 4.  While an attorney with Jones Day, Mr. Glaros assisted with corporate investigations.  *See* Pls' Compl. at ¶ 4; Defs.' Answer at ¶ 4.

The investigation was ultimately overseen by Gates Garrity-Rokous, Vice President and Chief Compliance Officer at Ohio State. *See* Pls' Compl. at ¶ 4; Defs.' Answer at ¶ 4.  Mr. Garrity-Rokous was previously Chief Compliance Officer at GE Capital and was responsible for numerous investigations there.  *See* Pls' Compl. at ¶ 4; Defs.' Answer at ¶ 4. He also previously served as an Assistant U.S. Attorney with the United States Department of Justice. *See* Pls' Compl. at ¶ 4; Defs.' Answer at ¶ 4.  In that position, he directed all federal healthcare fraud investigations, both civil and criminal, in the state of Connecticut.  *See* Pls' Compl. at ¶ 4; Defs.' Answer at ¶ 4.

>   **G.    The Title IX Investigation Into The Band's Culture Uncovered Overwhelming Evidence Of Inappropriate Conduct And A Highly Sexualized Culture.**

The Title IX investigation into the Band's culture revealed a long list of inappropriate and grossly sexual acts and practices within the Band.  *See* Pl.'s Compl. at ¶¶ 25, 32, 36-38; Defs'. Answer at ¶¶ 36-38, 92; Exhibit H (July 22, 2014 Investigation Report).  All of the acts and practices occurred during Mr. Waters' twelve years in leadership positions with the Band.  *See* Pl.'s Compl. at ¶¶ 25, 32, 36-38 (confirming that "Trip Tic" persisted until 2012; the Songbook was published in 2006 and republished thereafter; "Rookie Mid-Terms" were given until at least 2011; inappropriate nicknames and "Midnight Ramp" persisted through the 2013-2014 academic year); Defs.' Answer at ¶¶ 32-33, 36-38, 92, Ex. F (July 14, 2014 Title IX Statement of Jonathan N. Waters Entitled, "An Analysis & Review of Cultural Changes in The Ohio State University

Marching & Athletic Band Program), Ex. H (July 22, 2014 Investigation Report).

Among other things, it was discovered the following had occurred during the twelve

years Mr. Waters held leadership positions with the Band:

1) Members of the Band published and republished a Songbook entitled the "Unofficial OSU Marching Band School Songs." *See* Pl.'s Compl. at ¶37 (admitting that the Song Book was published while Mr. Waters was Assistant Director); Defendant's Answer at ¶ 37. Ex. C (2006 Version of "Unofficial OSU Marching Band School Songs"). It contained songs which are grossly sexual, homophobic, anti-Semitic, and include violence against women and men. Typical songs and lyrics included the following:

- **Hi Ho**: "Please wash your butt you f***ing slut . . . Please get me hard you tub of lard."
- **You Slut, You Whore**: "Turn around b**** cause I'm gonna – stick it there. It's up to me, You Slut, You Whore."
- **Incest**: "Have your sister suck your d***, Oh, isn't incest nice."
- **Pieces of Baritone S***: "Get on your knees and tell me how the megaphone fits up your mother-f***ing ass YOU GAY F***!"
- **The Hitler Song**: "Oh, he's short and he's fat and he kills the Jews…. Kill the Jews all night, Kill the Jews all day."
- **Ten Tons of Titty**: "A sliced off scrotum in formaldehyde, Syphilitic semen shot in your eye, Eating the p**** of a girl that's died"
- **Tribute to Old S-Row:** "Rip, rip, rip went her hymen, Drip, drip, drip went the blood…Grow, grow, grow went the fetus… Clamp, clamp, clamp went the doctor, Stretch, stretch, stretch went her crack, 'Oh my God,' said my honey, As she looked at her embryo sack. Suck, suck, suck went the vacuum, Out her crack came the goop, 'Oh my God,' said my honey, 'It looks like vegetable soup.'"
- **Silent Night**: "She must be a virgin and I'm her first guy. I think I'll pull out and c** right in her eye…Blood is streaming from her little spl**…Trapped in her p****, I'll never get far. What I wouldn't give to have a crowbar…"

2) New Band members were given a "Rookie Midterm" on bus trips. *See* Pl.'s Compl. at ¶ 81 (confirming that the Midterm was used on bus trips while Mr. Waters was Interim and Assistant Director); Defs.' Answer at ¶ 91, Ex. H (July 22, 2014 Investigation Report, at 8-9). The Rookie Midterm contained grossly sexual content, including, but not limited to:

- Instructions to "draw female reproductive organs with arrows detailing what each part is used for." *See* Pl.'s Compl. at ¶ 81; Defs' Answer at ¶ 81, Ex. D (Rookie Midterm, at 13).

- A "Boner Question: List all of the Members of ___ Row in descending order from deepest box to largest penis. Explain your reasoning in 2 to 3 sentences;" *See* Pl.'s Compl. at ¶ 81; Defs' Answer at ¶ 81, Ex. D (Rookie Midterm, at 3).
- Fill-In The Blank Section, including "Dirty Sanchez – 'he gave her a dirty sanchez and she never had anal sex again.'" *See* Pl.'s Compl. at ¶ 81; Defs' Answer at ¶ 81, Ex. D (Rookie Midterm, at 14-15).
- Fill-In The Blank Section, including "Cleveland Steamer – 'I was afraid of breaking up with Jen face to face, so I gave her a cleveland steamer after she fell asleep and ditched.'" *See* Pl.'s Compl. at ¶ 81; Defs' Answer at ¶ 81; Ex. D (Rookie Midterm, at 15).
- Fill-In The Blank Section, including "Piston Fisting – 'A double fisting that incorporates both anal and vaginal penetration. Fists are then pumped in and out in manner similar to that of pistons in a engine.'" *See* Pl.'s Compl. at ¶ 81; Defs' Answer at ¶ 81; Ex. D (Rookie Midterm, at 15).
- Fill-In The Blank Section, including "Tossing Salad – 'the act of placing your tongue in a male or female ass, and probing all around the circumference of the asshole, while aiding the person in masturbation.'" *See* Pl.'s Compl. at ¶ 81; Defs' Answer at ¶ 81; Ex. D (Rookie Midterm, at 16).

3) The publication of a "Trip Tic" newsletter for away game trips that included sexually explicit content and identified sexual conduct occurring between Band members. *See* Pl.'s Compl. at ¶ 32; Defs.' Answer at ¶ 32, Ex. H (July 22, 2014 Investigation Report, at 9).

4) The occurrence of Midnight Ramp, a Band activity in which certain Band members were in their underwear while marching into the stadium. Mr. Waters oversaw and watched Midnight Ramp in 2012 and 2013 as both Interim Director and Director. *See* Pl.'s Compl. at ¶ 38 (acknowledging Midnight Ramp continued in 2012 and 2013); Defs.' Answer at ¶ 38, Ex. F (Title IX Statement of Jonathan N. Waters Entitled, "An Analysis & Review of Cultural Changes in The Ohio State University Marching & Athletic Band Program, at 6). Upon seeing it in 2013, newly-hired Assistant Director Mike Smith stated, "I don't believe I just witnessed that." *See* Pl.'s Compl. at ¶ 38; Defs.' Answer at ¶ 38, Ex. H (July 22, 2014 Investigation Report, at 5).

5) In September, 2013, Ohio State played California in football in Berkeley, California (known as "the Cal game."). *See* Pl.'s Compl. at ¶ 31, Ex. B, Attachment 9, at Page ID 431; Defs.' Answer at ¶ 31, Ex. H (July 22, 2014 Investigation Report, at 11, 17-18). During the Title IX investigation, plaintiff denied misconduct occurred during that Band trip to Berkeley. *See* Pl.'s Compl. at ¶ 99; Defs.' Answer at ¶ 99, Ex. H (July 22, 2014 Investigation Report, at 11). A physical therapist from Student Wellness, who also was a long-time volunteer for the Band, accompanied the Band on the trip. *See* Pl.'s Compl. at ¶ 31; Defs.' Answer at ¶ 31, Ex. H (July 22, 2014 Investigation

14

Report, at 11, 17-18). During the trip, she reported to Mr. Waters inappropriate conduct, including misconduct on the bus. *See* Pl.'s Compl. at ¶ 31, Ex. B, Attachment 9, at Page ID 431; Defs.' Answer at ¶ 31, Ex. H (July 22, 2014 Investigation Report, at 11, 17-18). Due to the extent of the conduct, and her belief Mr. Waters would not take action to stop it, she resigned her position with the Band, that she had for eighteen years. *See* Pl.'s Compl. at ¶ 31; Defs.' Answer at ¶ 31, Ex. H (July 22, 2014 Investigation Report, at 11, 17-18). Among other things, students were performing "Flying 69's" on at least one bus and consuming large amounts of alcohol. *See* Pl.'s Compl. at ¶ 31, Ex. B, Attachment 9, at Page ID 431; Defs.' Answer at ¶ 31, Ex. H (July 22, 2014 Investigation Report, at 11, 17-18). A "Flying 69" consisted of Band members posing in a "69" position while holding themselves in the air from luggage racks. Mr. Waters was on the bus where this conduct occurred. *See* Pl.'s Compl. at ¶ 31; Defs.' Answer at ¶ 31, Ex. H (July 22, 2014 Investigation Report, at 11, 17-18).

6) The use of nicknames for new Band members. Nicknames included Ballsacagawea, Bater, Captain Dildo, Fleshlight, Jizzy, Pat Fenis, Testicles, Triple Crown, Twat Thumper, and Twinkle Dick. *See* Pl.'s Compl. at ¶ 36 (admitting nicknames were offensive and continued to exist while Mr. Waters was Director); Defendant's Answer at ¶ 36, Ex. H (July 22, 2014 Investigation Report, at 5-7), Ex. F (Title IX Statement of Jonathan N. Waters Entitled, "An Analysis & Review of Cultural Changes in The Ohio State University Marching & Athletic Band Program, at 5 (admitting nicknames are "tremendously offensive")). When asked in the investigation to estimate how many then-current nicknames were sexual or offensive (meaning, nicknames in the 2013-2014 academic year), Mr. Waters estimated that 50% were sexual. *See* Pl.'s Compl. at ¶ 36; Defendant's Answer at ¶ 36, Ex. H (July 22, 2014 Investigation Report, at 5-7). When asked by the investigators whether he thought such nicknames are appropriate, Mr. Waters answered, "No." *See* Pl.'s Compl. at ¶ 36; Defendant's Answer at ¶ 36, Ex. H (July 22, 2014 Investigation Report, at 5-7). When asked why he therefore tolerates such sexual nicknames, Mr. Waters replied, "Good point." *See* Pl.'s Compl. at ¶ 36; Defendant's Answer at ¶ 36, Ex. H (July 22, 2014 Investigation Report, at 5-7).

7) The use of "Rookie Introductions." These occurred at the front of a moving bus enroute to away games and often included sexually explicit questioning and sexual jokes. *See* Defs.' Answer at ¶ 31, Ex. H (July 22, 2014 Investigation Report, at 15).

8) "Tricks" were performed in connection with nicknames, such as:

- A male student, whose nickname was Captain Dildo, chanting, "haaaay, we want some p****aay." *See* Pl.'s Compl. at ¶ 30, Ex. B, at Page ID 145; Defs.' Answer at ¶ 30, Ex. H (July 22, 2014 Investigation Report, at 7).

- A student, whose nickname was Barker, would act as if he was outside a strip club soliciting clientele, saying "girls, girls, we have these types of girls." *See* Pl's. Compl. at ¶ 30; Defs.' Answer at ¶ 30, Ex. B, at Page ID 145, Ex. H (July 22, 2014 Investigation Report, at 7).
- A female student, whose nickname was Squirt, would sit on laps and pretend to orgasm. *See* Pl's. Compl. at ¶ 30, Ex. B, at Page ID 145; Defs.' Answer at ¶ 30, Ex. H (July 22, 2014 Investigation Report, at 7). This included sitting on the lap of her younger Band member brother. *See* Pl's. Compl. at ¶ 30, Ex. B, at Page ID 145; Defs.' Answer at ¶ 30, Ex. H (July 22, 2014 Investigation Report, at 7).
- A male student, whose nickname was Jizzy, conducting a full-body demonstration of a flaccid penis becoming erect and spitting candy. *See* Pl's. Compl. at ¶ 30, Ex. B, at Page ID 145; Defs.' Answer at ¶ 30, Ex. H (July 22, 2014 Investigation Report, at 7). This trick was also occasionally performed with another female student who pretended to stimulate the male student. *See* Pl's. Compl. at ¶ 30, Ex. B, at Page ID 145; Defs.' Answer at ¶ 30, Ex. H (July 22, 2014 Investigation Report, at 7).

Unfortunately, but not surprisingly, given the sexualized culture of the Band, it also was noted that two female Band members had reported being harassed or sexually assaulted by male Band members in 2013:

a. In March 2013, a female member of the Athletic Band reported to Mr. Waters an incident of sexual assault by a male Athletic Band member. *See* Pl's. Compl. at ¶ 51; Defs.' Answer at ¶ 51. Mr. Waters' decision was to punish ***both*** the female and male Band members by preventing them from traveling on a Band trip. *See* Pl's. Compl. at ¶ 51; Defs.' Answer at ¶ 51, Ex. H (July 22, 2014 Investigation Report, at fn. 7). Ohio State's Office of Legal Affairs and its Compliance Office had to intervene to prevent Mr. Waters from punishing the female student for reporting sexual harassment, which would have violated Title IX. *See* Pl's. Compl. at ¶ 51; Defs.' Answer at ¶ 51, Ex. H (July 22, 2014 Investigation Report, at fn. 7).

b. In October 2013, a female Band member reported she had been sexually assaulted by a male Band member. *See* Pl's. Compl. at ¶ 58; Defs.' Answer at ¶ 58. The male Band member who had perpetrated the assault was expelled. *See* Pl's. Compl. at ¶ 58; Defs.' Answer at ¶ 58.

The Title IX investigation also revealed verbally abusive conduct by Mr. Waters, which Mr. Waters denied ever occurred. *See* Pl's. Compl. at ¶ 40; Defs.' Answer at ¶ 40, Ex. H (July 22, 2014 Investigation Report at 20). In particular, an audio recording was discovered which

16

involved Mr. Waters berating a student with threatening and profane language the week of September 23, 2013.  *See* Pl.'s Compl. at ¶ 40; Defs.' Answer at ¶ 40, Ex. H (July 22, 2014 Investigation Report at 20, fn. 9).  Mr. Waters can be heard on the recording yelling at the student, "[y]ou f***ing better realize who you're dealing with . . . . We tell you to stand on your head . . . you'll stand on your Godd*** head."  *Id.*

### H. Plaintiff Was Terminated From His Unclassified, At-Will Employment By Ohio State On July 24, 2014.

On July 23, 2014, Mr. Waters met with Provost Steinmetz and was told he could resign as Director of the Band or face termination by 5:00 pm.  *See* Pl.'s Compl. at ¶ 100; Defs.' Answer at ¶ 100.  Mr. Waters' attorney, David Axelrod, was present at this meeting.  *See* Pl.'s Compl. at ¶ 100; Defs.' Answer at ¶ 100.  Mr. Waters and Mr. Axelrod were given copies of the Title IX investigation report into the Band's culture.  *See* Pl's. Compl. at ¶ 100; Defs.' Answer at ¶ 100.  As to that Title IX complaint, the report concluded that the Band's culture created a sexually hostile environment for students, in violation of the requirements of Title IX and Ohio State's policies. *See* Pl.'s Compl. at ¶¶ 9, 100; Defs.' Answer at ¶ 100.  At Mr. Axelrod's request, the deadline to resign was extended.  *See* Pl.'s Compl. at ¶ 100; Defs.' Answer at ¶ 100.

As to the Title IX complaint that Mr. Waters had retaliated against a female Band member for reporting a sexual assault by a male Band mate, it was determined that the claim of retaliation could not be substantiated.  *See* Pl.'s Compl. at ¶ 4; Defs.' Answer at ¶ 4; Ex. H (July 22, 2014 Investigation Report at fn. 2); Ex. K (July 22, 2014 Letter from Christopher Glaros to Jonathan Waters).  The same person who oversaw the culture investigation, oversaw the retaliation investigation. *See* Pl's Compl. at ¶ 4, 60; Defs.' Answer at ¶ 4, 60, Exs. L, M (July 22, 2014 Letters from Christopher Glaros to Jonathan Waters).  Mr. Waters, interestingly, does not criticize Mr. Glaros' finding that a claim of retaliation could not be substantiated.

Ultimately, Mr. Waters chose not to resign and was, therefore, terminated.  *See* Pl.'s Compl. at ¶ 101; Defs.' Answer at ¶ 101.  A letter dated July 24, 2014 confirmed that his unclassified, at-will employment with Ohio State had been terminated. *See* Pl's. Compl. at ¶ 101; Defs.' Answer at ¶ 101, Ex. E (July 24, 2014 Termination Letter Sent to Mr. Waters).

**I.    After Mr. Waters Was Terminated, Additional Inappropriate Conduct He Had Failed To Disclose Was Discovered.**

Additional evidence demonstrating the sexualized culture of the Band was discovered after Mr. Waters' termination.  For example, pages from a calendar depicting almost-nude male Band members, in what Mr. Waters' Complaint describes as "seductive poses," were discovered in the personal, on-campus office Ohio State provided to Mr. Waters. *See* Pl.'s Compl. at ¶ 33; Defs.' Answer at ¶ 33, and Ex. N (Boys of T Row Calendar).  During the Title IX investigation, Mr. Waters failed to disclose that the calendar existed at all. *See* Pl.'s Compl. at ¶33; Defs.' Answer at ¶ 33.  The first page of the calendar reads ***"for Jon Waters' eyes only."*** *See* Pl.'s Compl. at ¶ 33; Defs.' Answer at ¶ 33 and Ex. N (Boys of T Row Calendar) (emphasis added).

Also discovered after Mr. Waters' termination were videos shown at various Fesler Nights, a Band sanctioned event overseen by Mr. Waters and staff and at which students and staff were present. *See* Pl.'s Compl. at ¶ 28, n. 9, Ex. B to Pl.'s Compl. at Attachment 9, Page ID # 430 (Squad Leaders' Statement); Defs.' Answer at ¶ 33.  These videos include scenes showing such things as: (1) in 2010 and 2013, male H and T-Row members virtually nude, with strategically placed band equipment, and in sexually suggestive poses, much like the 2007 calendar found in Mr. Waters' office; (2) in 2012, a topless female Band member opening the door for an unsuspecting pizza deliveryman; (3) in 2011, a video involving inappropriate nicknames and partial nudity being presented for approval to Mr. Waters, who himself appeared in the video; and (4) in 2010, a female Band Member on her knees in front of two male Band

members simulating performing oral sex on them, while singing "Hang on Sloopy." *See* Pl.'s Compl. at ¶ 28, n. 9, Ex. B to Pl.'s Compl. at Attachment 9, Page ID # 430 (Squad Leaders' Statement); Defs.' Answer at ¶ 33. Mr. Waters did not disclose the existence of these videos during the Title IX investigation.  *See* Pl.'s Compl. at ¶ 28, n. 9, Ex. B to Pl.'s Compl. at Attachment 9, Page ID # 430 (Squad Leaders' Statement); Defs.' Answer at ¶ 33.

It also was discovered that on January 22, 2014, Mr. Waters received a complaint from a female student that she felt harassed by the conduct of certain male Band members during a sexual harassment training session. *See* Pl.'s Compl. at ¶ 48; Defs.' Answer at ¶ 48.

Additional and more recent versions of the Songbook were discovered after Mr. Waters' termination. The 2010 version of the Songbook includes a song actually titled, ***"Jon Waters,"*** sung to the tune of Green Acres.  *See* Pl.'s Compl. at ¶ 37; Defs.' Answer at ¶ 37, Ex. B (2010 Version of "Unofficial OSU Marching Band School Songs," at 25).

Finally, a 2012 report of a female member of the Band being sexually assaulted by a male member of the Band came to the attention of the Compliance Office. *See* Pl.'s Compl. at ¶ 51; Defs.' Answer at ¶ 51.  This was the third alleged instance of a male Marching and/or Athletic Band member sexually assaulting a female Marching and/or Athletic Band member.  *See* Pl.'s Compl. at ¶ 51; Defs.' Answer at ¶ 51.

**J.     Mr. Waters Was Offered The Opportunity For A Name-Clearing Hearing, But Declined, Preferring To Present His Case To The Public Through A Public Relations Campaign.**

After he was terminated, Mr. Waters demanded, and continues to demand in his Complaint, a name-clearing hearing at which he claims Ohio State should be required to:

> (1) Provide him with two eight-hour days to present evidence and testimony;
> (2) Make OSU officials, including President Drake, available to testify and for cross-examination;

19

(3) Limit "any statements made by OSU during the duration of the name-clearing hearing strictly to the confines of the hearing;"
(4) Provide notice of the hearing to all local and national media; and
(5) Make available such resources as are necessary for the live broadcasting and recording of the hearing.

*See* Pl.'s Compl. at ¶ 104, Prayer For Relief subparagraph (b); Defs.' Answer at ¶ 104, Ex. U (August 27, 2014 Letter from David Axelrod).  Pre-suit, Ohio State indicated that while Mr. Waters was not entitled to an adversarial, two day hearing, it would provide him a public name-clearing hearing at an on-campus forum. *See* Pl.'s Compl. at ¶ 106; Defs.' Answer at ¶ 106, Ex. V (September 11, 2014 Letter to David Axelrod).  ***Mr. Waters acknowledges, but never responded to, Ohio State's offer.*** *See* Pl.'s Compl. at ¶ 106; Defs.' Answer at ¶ 106.

Despite not accepting Ohio State's offer of a name-clearing hearing, Mr. Waters did present his point of view to the public on multiple occasions, both on campus and off, without interference by Ohio State.  For example, he appeared on the nationally broadcast "Today Show" and "Good Morning America" on or about August 5, 2014.  *See* Pl.'s Compl. at ¶106; Defs.' Answer at ¶ 106 (available at http://www.today.com/video/today/55800789 (last visited October 13, 2014); https://gma.yahoo.com/former-ohio-state-band-director-slams-universitys-inaccurate-121908454--abc-news-topstories.html (last visited October 13, 2014)).  He and his attorney, David Axelrod, also made themselves available and were interviewed by the press and on television locally and throughout Ohio on multiple occasions.  *See* Pl's. Compl. ¶¶ 112-113, 116-117.  Additionally, during Band Alumni weekend, he spoke at St. John's Arena, on the Ohio State campus, and marched with the Band in Ohio Stadium.  *See* Pl.'s Compl. at ¶106; Defs.' Answer at ¶ 106.  Further, on the day he filed suit, he and his attorneys announced and held a press conference at his attorneys' offices.  *See* Pl.'s Compl. at ¶106; Defs.' Answer at ¶ 106.

Related to his public relations campaign, Mr. Waters references several newspaper articles he claims were part of "The Avalanche of Negative Publicity" put out by Ohio State. *See* Pl.'s Compl. at Heading F, pg. 35.  Of the nine articles cited by plaintiff, however, he and/or his attorney, David Axelrod, were themselves quoted in four. *See* Pl's. Compl. ¶¶ 112-113, 116-117.

## II.   LAW AND ARGUMENT.

A Rule 12(c) motion should be "granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581-82 (6th Cir. 2007).  In deciding a motion for judgment on the pleadings, "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true." *Id.* (quoting *Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 479 F.2d 478, 480 (6th Cir.1973)).  The court may take into account "the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Coll. Athl. Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).  Additionally, documents may be considered without converting the motion to a Rule 56 motion if the attached documents are referred to in the plaintiff's complaint and are central to his claim.  *See Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) ("[A] defendant may introduce certain pertinent documents if the plaintiff fails to do so.); *see also Whittiker v. Deutsche Bank Nat. Trust Co.*, 605 F. Supp. 2d 914, 924-25 (N.D. Ohio 2009).  "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which [he] relied." *Weiner*, 108 F.3d at 89.

Here, Mr. Waters' Complaint, and the documents he attaches and refers to in it, together with defendants' Answer and attachments, make clear that, first, he was an unclassified, at-will

employee, who was not denied due process rights. Second, he was offered a name-clearing hearing, but declined it and instead chose to engage in a public relations campaign, including on Ohio State's campus. And three, Mr. Waters was not terminated because he was a man, but instead, because he was the leader of, but failed to correct, a Band culture he himself admitted was "in dire need of change" and "not . . . in a 'good place' currently" in his July 14, 2014 culture statement. President Drake, Provost Steinmetz and Ohio State are entitled to judgment on the pleadings as a matter of law.

A. **Mr. Waters' Procedural and Substantive Due Process Claims Against President Drake and Provost Steinmetz Fail.**

The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. amend. XIV, § 1. Despite admitting he was given immediate notice of the Title IX investigation and participated in it with the advice and presence of counsel, and despite failing to accept Ohio State's offer of a name-clearing hearing, Mr. Waters claims to have been deprived of his property and liberty without due process by President Drake and Provost Steinmetz. *See* Pl.'s Compl. at ¶¶ 94-97, 102-103, 131. He also claims that his termination from his unclassified, at-will position violated substantive due process. *See* Pl.'s Compl. at ¶ 131, 135. His due process claims have no basis in well settled United States Supreme Court or Sixth Circuit law, however, and should be dismissed.

1. **Mr. Waters' Procedural Due Process Claim Fails Because, As An Unclassified, At-Will Employee, He Did Not Have a Constitutionally Protected Property Interest In His Employment.**

"To establish a procedural due process claim, a plaintiff must show that [he] had a property interest of which [he] was deprived without due process of law." *Slyman v. City of Piqua*, 494 F. Supp. 2d 732, 735 (S.D. Ohio 2007), *aff'd*, 518 F.3d 425 (6th Cir. 2008). To have

a property interest, "a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *See Slyman*, 494 F. Supp. 2d at 735 (quoting *Hamby v. Neel*, 368 F.3d 549, 557 (6th Cir.2004)); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  "[U]nclassified civil servants have no property right to continued employment." *Christophel v. Kukulinsky*, 61 F.3d 479, 482 (6th Cir.1995) (citing *Vodila v. Clelland,* 836 F.2d 231, 232 (6th Cir.1987)).  Similarly, "[a]n at-will employee is subject to dismissal at any time and without cause; consequently, an at-will employee cannot effectively claim a protectable property interest in his or her job."  *Breeden v. HCA Physician Servs., Inc*., 834 F. Supp. 2d 616, 619-20 (W.D. Ky. 2011) (citing *Bailey v. Floyd Cnty. Bd. of Educ.,* 106 F.3d 135, 141 (6th Cir.1997)).

Here, the express terms of Mr. Waters' employment establish that he was an unclassified, at-will employee, whose employment with Ohio State could be ended at any time by either him or Ohio State:

> The position offered is an unclassified position, not subject to the provisions of section 124.34 of the Ohio Revised Code. Accordingly, your employment is at-will, and may be ended at any time by either you or the university.

*See* Pl.'s Compl. at ¶¶ 16, 23, 141 ("former employee"); Defs.' Answer at ¶ 16, 23, Ex. A (1/30/13 Employment Letter to Mr. Waters).  As such, he cannot establish a protectable property interest in his employment.  *See Christophel*, 61 F.3d at 482; *Breeden*, 834 F. Supp. 2d at 619-20.  Standing alone, this requires that his procedural due process claim be dismissed.  *See Slyman*, 494 F. Supp. 2d at 735.

Related to this issue, Mr. Waters alleges that "[t]hrough policies, practices, and procedures of OSU, [he] has a constitutionally protected property interest in his employment by OSU."  *See* Pl.'s Compl. at ¶ 130.  This conclusory allegation does not rescue his claim.  The

United States Supreme Court has held that employer provided procedural rights do **not** provide an at-will employee with a constitutionally protected property interest in his employment.  *See Bishop v. Wood*, 426 U.S. 341, 345-347 (1976) (at-will police officer had no property interest in his job even though he was entitled to certain procedural rights by the city which employed him); *see also McClain v. NorthWest Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 330-32 (6th Cir.2006) (rejecting claim that Ohio Dept. of Corrections regulation which required due process created a property interest for an at-will employee).

In short, Mr. Waters had no property interest in his at-will employment and therefore cannot claim to have been deprived of procedural due process.

> **2.    Because Mr. Waters Declined The Public Name-Clearing Hearing He Was Offered, He Cannot Claim To Have Been Deprived Of Procedural Due Process.**

Mr. Waters alleges a second procedural due process violation by claiming President Drake and Provost Steinmetz deprived him of a liberty interest in his good name without providing a "constitutionally sufficient" name-clearing hearing.  *See* Pl.'s Compl. at ¶ 106.  This allegation fails as a matter of law.  The Sixth Circuit has "identified five elements that must be satisfied to establish that a plaintiff was deprived of a liberty interest such that he is entitled to a name-clearing hearing:

> 'First the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment; Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance; Third, the stigmatizing statements or charges must be made public; Fourth, the plaintiff must claim that the charges made against him were false; Lastly, the public dissemination must have been voluntary.'"

*Brown v. City of Niota, Tennessee*, 214 F.3d 718, 722-23 (6th Cir. 2000) (quoting *Ludwig v. Bd. of Trs. of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir. 1997)).

Even assuming, *arguendo*, a name-clearing hearing is required, it "is not an adversarial proceeding." *Gunasekera v. Irwin*, 678 F. Supp. 2d 653, 663 (S.D. Ohio 2010). Cross-examination is not required, nor may employees or officials of the employer be compelled to provide statements or responses. *See Chilingirian v. Boris*, 882 F. 2d 200, 206 (6th Cir. 1989) (cross-exam not required as "a name-clearing hearing need only provide an opportunity to clear one's name and need not comply with formal procedures to be valid"); *Gunasekera*, 678 F. Supp. 2d at 664 ("Compelling the testimony of University officials and allowing Dr. Gunasekera, through counsel, to cross-examine them would transform the entitlement of notice and an opportunity to be heard into something resembling a full-blown trial, designed to determine whether the University properly disciplined Dr. Gunasekera. This is not the purpose of a name-clearing hearing"). Instead, a name-clearing hearing need "only provide an opportunity to clear one's name and need not comply with formal procedures to be valid." *Gunasekera v. Irwin*, 551 F.3d 461, 469 (6th Cir. 2009).

A name-clearing hearing with the following parameters was deemed sufficient for purposes of due process in a case involving a tenured professor:

> (1) The hearing would last two hours, during which the plaintiff professor, who had been terminated for plagiarism, would be permitted to make a statement, allow others to speak, and disclose documents under his attorney's direction;
> (2) The proceeding would take place in a room open to the public on campus;
> (3) Ohio University would provide a moderator to open the meeting but the person would not be required to make statements regarding the University's position;
> (4) Ohio University would notify six media outlets, including the Athens News and the Columbus Dispatch; and
> (5) Ohio University was not required to offer any witnesses for the professor to cross-examine.

*Gunasekera*, 678 F. Supp. 2d at 663.

Here, Mr. Waters, a non-tenured, at-will, former employee, demanded pre-suit a name-

clearing hearing that manifestly exceeded what the law requires. He demanded that Ohio State:

> (1) Provide him with two eight-hour days to present evidence and testimony;
> (2) Make OSU officials, including President Drake, available to testify and be cross-examined;
> (3) Limit "any statements made by OSU during the duration of the name-clearing hearing strictly to the confines of the hearing;"
> (4) Provide notice of the hearing to all local and national media; and
> (5) Make available the resources necessary for the live broadcasting and recording of the hearing.

*See* Pl.'s Compl. at ¶ 106, Prayer For Relief subparagraph (b); Defs.' Answer at ¶ 104, Ex. U (August 27, 2014 Letter from David Axelrod). Such a demand is not on terms recognized as viable under clear Sixth Circuit law. *See Gunasekera*, 551 F.3d at 469; *Chilingirian*, 882 F.2d at 206; *Gunasekera*, 678 F. Supp. 2d at 664.

Despite Mr. Waters' improper demand, however, Ohio State responded and offered Mr. Waters a name-clearing hearing on Ohio State's main campus, a fact Mr. Waters admits in his Complaint. *See* Pl.'s Compl. at ¶ 106; Defs.' Answer at ¶ 106, Ex. V (September 11, 2014 Letter From Alexandra Schimmer). Mr. Waters' counsel was asked to contact Ohio State to confirm the date, location and other logistical details, ***but chose not to do so***. *See* Pl.'s Compl. at ¶ 106; Defs.' Answer at ¶ 106, Ex. V (September 11, 2014 Letter From Alexandra Schimmer). The name-clearing hearing Mr. Waters was offered comports with what was deemed sufficient in *Gunasekera*.

Because Ohio State offered Mr. Waters a name-clearing hearing, and he failed to respond to that offer, he cannot prove he has suffered a deprivation. A plaintiff must both "request a name-clearing hearing ***and be denied this hearing*** before [he has] suffered a deprivation of [his] liberty interest without due process of law . . . ." *Brown v. City of Niota, Tenn.*, 214 F.3d at 723; *see also Ludwig*, 123 F.3d at 411 (where plaintiff had not clearly stated his desire for a name-clearing hearing, he had not been denied a name-clearing hearing and suffered no deprivation of

due process); *Cross v. Metro. Govt. of Nashville/Davidson Cty.*, No. 3-12-1109, 2013 WL 1899169 (M. D. Tenn. May 7, 2013) ("The Sixth Circuit also requires that a plaintiff raising this claim must show that he requested a name-clearing hearing after he was fired and was denied that hearing").

It is evident that Mr. Waters' refusal to accept the name-clearing hearing offered by Ohio State was a choice, not a deprivation.  Rather than conduct the name-clearing hearing, he chose to orchestrate a media campaign.  Since his termination, Mr. Waters has appeared on numerous televisions programs, including the nationally broadcast "Today Show" and "Good Morning America."  *See* Pl.'s Compl. at ¶ 106; Defs.' Answer at ¶ 106 (available at http://www.today.com/video/today/55800789 (last visited October 13, 2014); https://gma.yahoo.com/former-ohio-state-band-director-slams-universitys-inaccurate-121908454--abc-news-topstories.html (last visited October 13, 2014)).  He and his attorney, David Axelrod, also made themselves available and were interviewed by the press and on television locally and throughout Ohio on multiple occasions.  *See* Pl.'s Compl. ¶¶ 112-113, 116-117.  Additionally, during Band Alumni weekend, he spoke at St. John's Arena, on the Ohio State campus, and marched with the Band in Ohio Stadium.  *See* Pl.'s Compl. at ¶ 106; Defs.' Answer at ¶ 106.  Further, on the day he filed suit, he and his attorneys announced and held a press conference at his attorneys' offices.  *See* Pl.'s Compl. at ¶ 106; Defs.' Answer at ¶ 106.

Mr. Waters' decision to engage in a media campaign, in lieu of accepting the offer of a name-clearing hearing, was his alone and was made with the advice of counsel.  It does not change the inescapable fact that Ohio State offered him the opportunity for such a hearing.  In short, "no more process is required."  *Chilingirian*, 882 F.2d at 206.

**3.    Mr. Waters' Termination Does Not Implicate A Fundamental Right Or Shock The Conscience, And Accordingly, He Has Not Been Deprived Of Substantive Due Process.**

Mr. Waters also claims to have been deprived of substantive due process.  This is not so. The Sixth Circuit recognizes two types of substantive due process claims.  *See Mertik v. Blalock*, 983 F.2d 1353, 1367 (6th Cir.1993).   The first relates to the denial of a fundamental right "secured by the Constitution or by federal statute[,] other than procedural claims under 'the Fourteenth Amendment.'"  *Id.*; *see also Charles v. Besler*, 910 F.2d 1349 (6th Cir. 1990).  In *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997), the Court stated the "fundamental rights" protected by substantive due process include the specific freedoms protected by the Bill of Rights; the right to marry, *Loving v. Virginia,* 388 U.S. 1 (1967); the right to have children, *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535 (1942); the right to direct the education and upbringing of one's children, *Meyer v. Nebraska,* 262 U.S. 390 (1923); *Pierce v. Soc'y of Sisters,* 268 U.S. 510 (1925); the right to marital privacy, *Griswold v. Connecticut,* 381 U.S. 479 (1965); the right to use contraception, *ibid.; Eisenstadt v. Baird,* 405 U.S. 438 (1972); and the right to bodily integrity, *Rochin v. California,* 342 U.S. 165 (1952).

Plainly, Mr. Waters' termination from an unclassified, at-will job does not fit within the definition of one of the fundamental rights enumerated by the Supreme Court.  As discussed above, because he was an unclassified, at-will employee, Mr. Waters had no constitutional property interest in his continued employment.  *See supra* at Section II.A.1.  Consistent with this, the termination of an at-will employee does not implicate or violate substantive due process protections. *See Bracken v. Collica*, 94 Fed. Appx. 265, 269 (6th Cir. 2004) ("[A]t-will employment hardly seems the sort of fundamental interest protected by substantive due process."); *see also Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1351 (6th Cir. 1992)

("Absent the infringement of some 'fundamental' right, it would appear that the termination of public employment does not constitute a denial of substantive due process").

The second recognized type of substantive due process claim "is directed at official acts which may not occur regardless of the procedural safeguards accompanying them." *Mertik*, 983 F.2d at 1367. The test for this type of substantive due process claim is whether the conduct complained of 'shocks the conscience' of the court." *Id.*  The Sixth Circuit is reluctant to apply the "shock the conscience" standard outside the realm of physical force. *See Braley v. City of Pontiac,* 906 F.2d 220, 225 (6th Cir.1990) ("applying the 'shock the conscience' test in an area other than excessive force, however, is problematic . . . [w]e doubt the utility of such a standard outside the realm of physical abuse"); *Webb v. McCullough,* 828 F.2d 1151, 1158 (6th Cir.1987) ("substantive due process is concerned with violations of personal rights of privacy and bodily security" . . . the question is "whether the force applied caused injury so severe, and was so inspired by malice or sadism . . . that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.").  Mr. Waters' claims do not involve physical force.

Additionally, absent a deprivation of a fundamental right, even if conduct "shocks the conscience," it cannot rise to the level of a substantive due process deprivation.  *See Bracken*, 94 Fed. Appx. at 268-69 (holding that because no fundamental right was violated, the court need not decide whether plaintiff's discharge shocks the conscience); *Gurik v. Mitchell,* 26 Fed. Appx. 500, 505 (6th Cir. 2002) ("a public employee's termination does not 'shock the conscience' in this court if it was not based on the violation of some fundamental right.").  Consistent with this, an unclassified, at-will employee's termination cannot "shock the conscience" such that it constitutes a deprivation of substantive due process.  *Mertik*, 983 F.2d at 1367 (holding it is not enough to plead that public officials dismissed an employee and published stigmatizing

statements to third parties, as such conduct does not rise to the level of shocking the conscience); *Sutton*, 958 F.2d at 1351; *Gurik*, 26 Fed. Appx. at 505; *Lesinski v. City of Steubenville*, 2:03-CV-932, 2005 WL 1651737, *5 (S.D. Ohio July 13, 2005) ("In this case, because Plaintiff's termination did not infringe on a fundamental right, his substantive due process claim must fail").  Although perhaps upsetting to Mr. Waters and those members of TBDBITL Alumni Group who wish to force Ohio State to reinstate him, his termination is not enough to "shock the conscience" as a matter of law.

> **4.    Because Mr. Waters Cannot Identify Any Activity On The Part of President Drake Or Provost Steinmetz That Deprived Him Of Procedural or Substantive Due Process, His Claims Against Them Should Be Dismissed.**

Recognizing that the Eleventh Amendment makes Ohio State immune from a due process claim in federal court, Mr. Waters instead names President Drake and Provost Steinmetz. *See Gies v. Flack*, 495 F. Supp. 2d 854, 861 (S.D. Ohio 2007) ("It is well established that, absent consent, suit against a state or one of its instrumentalities in federal court is barred by the Eleventh Amendment.").  As an unclassified, at-will employee, however, Mr. Waters did not have a constitutionally protected property interest by virtue of his employment with Ohio State, and he cannot, therefore, state a cause of action for deprivation of due process.  *See supra* Section II.A. 1-3.  His due process claims additionally fail because he fails to identify any independent activity on the part of President Drake or Provost Steinmetz that deprived him of procedural or substantive due process.  Mr. Waters' due process claims should be dismissed.

"Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior." *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012).  For an individual defendant to be held liable, the liability "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused

by the errors of others, either defendants or non-defendants." *Gibson v. Matthews*, 926 F.2d 532, 535 (6th. Cir. 1991); *Combs v. Sheriff, Hamilton Cnty.*, 1:12-CV-347, 2013 WL 3288160, at * 3 (S.D. Ohio June 28, 2013), *report and recommendation adopted sub nom. Combs v. Sheriff, Hamilton Cnty.*, 1:12CV347, 2013 WL 3835376 (S.D. Ohio July 24, 2013) (Dismissal warranted where plaintiff's complaint failed to allege that defendant was personally involved in any unconstitutional actions or had any authority to authorize such actions.).  Liability also cannot be premised on a theory of *respondeat superior* or the right to control employees.  *Heyerman,* 680 F.3d at 647 (quoting *Hays v. Jefferson Cnty.,* 668 F.2d 869, 874 (6th Cir.1982)); *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010) (summary judgment and dismissal of § 1983 claim proper where defendant was not "actively involved" in any unconstitutional behavior.).

Here, Mr. Waters alleges generically that President Drake and Provost Steinmetz had an obligation to provide him with a "fundamentally fair and reliable investigation process" which met "constitutional due process;" that he was entitled to "adequate notice of the charges affecting his reputation and livelihood;" that he was entitled to be "heard in a meaningful way" before the investigation was determined and published; and that he was entitled to a name-clearing hearing. *See* Pl.'s Compl. at ¶¶ 127-128, 133.  He does not, however, allege anywhere in his Complaint that President Drake and Provost Steinmetz had any involvement in the investigation's process, procedures or findings.  Rather, he claims the investigation was conducted by the Compliance Office.  *See* Pl.'s Compl. at ¶¶ 4, 93-97.

Likewise, Mr. Waters does not allege – nor can he – that President Drake and Provost Steinmetz denied him a name-clearing hearing.  Rather, he alleges he requested a name-clearing hearing from ***Ohio State's*** counsel, not President Drake or Provost Steinmetz.  *See* Pl.'s Compl at ¶ 104.  He further alleges that ***Ohio State*** initially denied him a name-clearing hearing through

31

its Assistant Vice President of Media & Public Relations, but later did offer him a name-clearing hearing.  *See* Pl.'s Compl at ¶ 105-106.  Finally, he alleges **Ohio State**, not President Drake or Provost Steinmetz, "has still not offered [him] a constitutionally sufficient name clearing hearing."  *See* Pl.'s Compl. at ¶ 106.

Thus, Mr. Waters not only fails to allege that President Drake and Provost Steinmetz committed any of the conduct that allegedly caused due process violations, he, himself, affirmatively pleads that the alleged conduct at issue was performed by others.  For this further reason, his due process claims against President Drake and Provost Steinmetz should be dismissed.

**B.** **Mr. Waters Was Terminated Because He Failed In His Leadership Of The Band, Not Because He Is A Man, And Therefore, His Title IX Claim Fails.**

In Count Two of his Complaint, Mr. Waters alleges Ohio State discriminated against him because he is a man and, "[b]ut for his gender, he would have been permitted to continue working under the terms of a performance improvement program, in accordance with existing OSU policy." *See* Pl.'s Compl. at ¶ 144.  This claim is so wholly groundless as to border on frivolous.  To establish such a claim, Mr. Waters must initially state a *prima facie* case for disparate treatment under the heightened standards used in reverse discrimination cases.  He also must then allege and show that the entire Title IX investigation process, findings and report, which took place in response to a Title IX complaint, were actually a pretext to terminate him because he is a man.  He can do neither.

**1.** **Mr. Waters Has Not, And Cannot, Satisfy The Heightened Pleading Standard For Reverse Discrimination Claims.**

To establish a *prima facie* case of disparate treatment, a plaintiff must show (1) that he was a member of a protected class; (2) that he was discharged or subject to an adverse

employment decision; (3) that he was qualified for the position; and (4) that he was replaced by a person outside of the protected class or that similarly situated non-protected employees were treated more favorably. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir.1992); *Thomas v. Kmart Corp.*, No. 4:04CV-171-M, 2006 WL 2802266 (W.D. Ky. Sept. 28, 2006). Absent proving all of these elements, a claimant fails to state a *prima facie* case of disparate treatment. *See Mitchell*, 964 F.2d at 584.

"In cases of so-called 'reverse discrimination,' where a member of the majority is claiming discrimination, the Sixth Circuit [] has adopted a heightened standard of proof for plaintiffs." *Treadwell v. Am. Airlines, Inc.*, 716 F.Supp.2d 721, 728 (W.D. Tenn. 2010), *aff'd*, 447 Fed. Appx. 676 (6th Cir. 2011).  Thus, in addition to stating a *prima facie* case, a plaintiff seeking to state a reverse discrimination claim also must plead, and ultimately prove, the existence of "background circumstances support[ing] the suspicion that the defendant is that unusual employer who discriminates against the majority." *Id.* (quoting *Sutherland v. Michigan Dep't of Treasury,* 344 F.3d 603, 614 (6th Cir.2003)).

Mr. Waters fails to plead any of the well-recognized circumstances tending to show Ohio State is the unusual employer who discriminates against the majority.  Nor can he.  In a reverse discrimination claim on the basis of gender, a court considers whether the decision makers were of the opposite sex.  *See, e.g. Turner v. Grande Pointe Healthcare Cmty.*, 631 F. Supp. 2d 896, 911 (N.D. Ohio 2007).  Here, Mr. Waters identifies in his Complaint several individuals he alleges are responsible for his termination.  ***Each is a man***: Mr. Glaros, *see* Pl.'s Compl. at ¶¶ 4-5; Provost Joseph Steinmetz, *id.* at ¶ 11, and President Michael Drake *id.* at ¶¶ 4, 9.  Mr. Waters identifies no decision makers who were women.

Under the heightened pleading standard required for reverse discrimination claims, Mr. Waters has failed to plead any facts establishing that Ohio State is that "unusual employer" who discriminates against men.

**2.  As A Leader, Mr. Waters Failed To Meet Ohio State's Expectations.**

The third element necessary to establish a *prima facie* claim of disparate treatment requires Mr. Waters to show that he was qualified for the leadership position of Director of the Band.  To do so, he must prove "he was performing his job at a level which met his employer's legitimate expectations." *DeMasellis v. Saint Mary's of Michigan*, No. 10-12138-BC, 2011 WL 5404268 (E.D. Mich. Nov. 7, 2011) (quoting *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir.1990)).  In regard to Ohio State's expectations about the Band's culture, he must show that his leadership in failing to eliminate what he now admits were "offensive," "inappropriate," and "demeaning" activities, met Ohio State's expectations. *See* Pl.'s Compl. at ¶¶ 25, 33, 36-37.  He cannot make this showing.  He, himself, admits that despite ten years as an Assistant Band Director and approximately two as Interim Director and Director, he failed to eliminate activities which "were demeaning and created a hierarchy among band students." *See, e.g.,* Pl.'s Compl. at ¶ 25 (Mr. "Waters **began** in earnest to address and shape the culture to address these lingering issues."), ¶ 36 ("Discussions with squad leaders yielded **fewer** inappropriate nicknames."); ¶ 38 (Mr. Waters permitted Midnight Ramp up through 2013)).  He also admitted, **ten days before his termination**, that the Band's culture was "not . . . in a 'good place' currently." *See* Pl.'s Compl. at ¶ 97; Defs.' Answer at ¶ 97, Ex. F (July 14, 2014 Title IX Statement of Jonathan N. Waters Entitled, "An Analysis & Review of Cultural Changes in The Ohio State University Marching & Athletic Band Program," at 1).

Ohio State Sexual Harassment Policy 1.15 — and Title IX — prohibit the sexualized and inappropriate culture that existed in the Band and necessitated that it be immediately eradicated. Pl.'s. Compl. at ¶ 4; Defs.' Answer at ¶ 4, Ex. I, at 4 (Ohio State Sexual Harassment Policy 1.15); Ex. G (September 11, 2014 Letter From OCR to President Drake ("Under established OCR policy, a sexually hostile environment violates Title IX.")).  Rather than take immediate action to eliminate the conduct, Mr. Waters instead allowed it to continue, and even tried to attribute it to unfounded "rumors."  *See* Pl.'s Compl. at ¶ 54; Defs.' Answer at ¶ 54, Ex. O (October 31, 2013 E-mail from Jonathan N. Waters to Gayle Saunders).  This failure to eradicate, and the denial and attempt to conceal the problems, could not meet Ohio State's legitimate expectations.

Furthermore, Mr. Waters engaged in verbal abuse towards students.  As he stated to a Band member in September, 2013:

> You f***ing better realize who you're dealing with . . . .  We tell you to stand on your head . . . you'll stand on your Godd*** head."

*See* Pl.'s Compl. at ¶ 40; Defs.' Answer at ¶40, Ex. H (July 22, 2014 Investigation Report, at 20, fn. 9).  Here too, his verbal abuse failed to meet Ohio State's legitimate expectations.

Significantly, it is not enough for Mr. Waters to show that his technical or musical skills met Ohio State's expectations.  In *DeMasellis*, the court concluded that even where the employee's review identified his skills as "superior," he was not qualified for the job at issue because his employer was dissatisfied with his people skills, not his technical skills.  *DeMasellis*, 2011 WL 5404268, at *10 ("Although Plaintiff is correct that the record contains evidence that he was a technically proficient—indeed, a superior—registered nurse, his technical skills were not the subject of the disciplinary actions. As in *McDonald*, Defendant was dissatisfied with Plaintiff's "people problems.").  In regard to Mr. Waters, he was terminated because Ohio State was dissatisfied with his leadership and culture-shaping, not his musical skills as the Band

Director.  *See* Pl.'s Compl. at ¶¶ 2, 24, 98.  He cannot satisfy the third element for stating a *prima facie* case of disparate treatment.

> **3.  The Female Cheerleading Coach, Who Also Was Terminated, Was Not Similarly Situated To Mr. Waters.**

To meet the fourth element necessary to establish his *prima facie* case, Mr. Waters must show that he was treated less favorably than a similarly-situated woman. *See Mitchell*, 964 F.2d at 582.  He attempts to meet this element by alleging he was treated differently than a female cheerleading coach who also was terminated. *See* Pl.'s Compl. at ¶ 146.  "[T]o be deemed 'similarly situated,' a comparable employee 'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Jones v. St. Jude Med. S.C., Inc.*, 823 F. Supp. 2d 699, 732 (S.D. Ohio 2011), *aff'd*, 504 Fed. Appx. 473 (6th Cir. 2012) (emphasis added); *Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789, 797 (S.D. Ohio 1998) (rejecting the argument that women's field hockey coach and men's basketball coach were similarly situated where the coaches engaged in different conduct and did not report to the same supervisor during the applicable time period). "[S]imilarly situated" requires that the person making the employment decision be the same for both individuals.  *See, e.g. DeBiasi v. Charter Cty. of Wayne*, 537 F. Supp. 2d 903, 920 (E.D. Mich. 2008) ("What matters is not who supervised them prior to promotion, but whether the person who considered them for promotion was the same person.").

Mr. Waters and the cheerleading coach were not similarly situated in any respect.  He and the female cheerleading coach were not supervised or terminated by the same individuals.  *See* Pl.'s Compl. at ¶¶ 2, 147; Defs.' Answer at ¶¶ 2, 147, Ex. E (July 24, 2014 Termination Letter Addressed to Jonathan N. Waters), Ex. W (November 25, 2013 Termination Letter from Eugene

Smith to Lenee Buchman). Mr. Waters reported to the College of Arts and Sciences, and ultimately to the office of the Provost, who terminated him. *See* Pl.'s Compl. at ¶ 2, 100; Defs.' Answer at ¶ 2, 100; Ex. E (July 24, 2014 Termination Letter Addressed to Jonathan N. Waters). The cheerleading coach, on the other hand, was ultimately supervised and terminated by Gene Smith, Ohio State's Athletic Director. *See* Pl.'s Compl. at ¶ 147; Defs.' Answer at ¶ 147, Ex. W (November 25, 2013 Termination Letter from Eugene Smith to Lenee Buchman), Ex. X (Athletics Department Organizational Chart).

In fact, it is a temporal impossibility that the persons Mr. Waters claims made the decision to terminate him in 2014, also made the decision to terminate the female cheerleading coach in 2013. This is because, one of the persons Mr. Waters alleges terminated him, President Drake, was not employed by Ohio State until June 30, 2014, and thus, could not have played any role whatsoever in any 2013 decision-making regarding the cheerleading coach's employment. *See* Pl.'s Compl. at ¶ 17, 136; Defs.' Answer at ¶ 17.

Finally, the same-actor inference holds that "[a]n individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class." *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir.1995). When Provost Steinmetz was Executive Dean of the College of Arts and Sciences, he oversaw the School of Music and announced the decision to name Mr. Waters as Director of the Band. *See* Pl.'s Compl. at ¶¶ 1, 18; Defs.' Answer at ¶¶ 1, 18. It is unsupportable that in the approximately eighteen months after approving the hiring of Mr. Waters as Director of the Band, knowing him to be a man, Provost Steinmetz developed a discriminatory animus against him because he is a man. The same actor inference applies here.

**4.    The Title IX Investigation Was Not A Pretext For Discriminating Against Mr. Waters Because He Is A Man; the Investigation Was Required As a Matter of Law.**

Assuming a plaintiff has met his burden of production and established a *prima facie* case of discrimination, the burden of production shifts to the employer to establish a legitimate, nondiscriminatory reason for the employment decision.  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  If the employer satisfies this burden, the presumption raised by plaintiff's *prima facie* case is rebutted. *Thurman v. Yellow Freight Systems, Inc.,* 90 F.3d 1160, 1166 (6th Cir.1996).  The ultimate burden of persuasion remains with the plaintiff to prove that the employer's reasons were a pretext for discrimination and that the employer intended to discriminate on the basis of gender. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993).

The notion that Ohio State's Title IX investigation of the Band was a pretext for discriminating against Mr. Waters because he is a man is meritless.  The investigation was not a pretext for anything.  Rather, it was compelled by law.  Ohio State received two Title IX complaints.  These required a Title IX investigation as a matter of law.  *See* 20 U.S.C. § 1681 *and regulations promulgated thereunder*,  Office for Civil Rights 2001 Revised Sexual Harassment Guidance: Harassment Of Students By School Employees, Other Students, Or Third Parties, Ex. L at 15 ("[T]he school must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation.").  The Title IX investigation determined a sexualized and harassing culture existed. *See* Pls.' Compl. at ¶ 4; Defs.' Answer at ¶ 4, Ex. H at 1(July 22, 2014 Investigation Report).  Accordingly, the burden shifts back to Mr. Waters to establish that Ohio State conducted the Title IX investigation, and took steps to end the

sexualized culture, as a pretext to discriminate against him because he is a man. *See St. Mary's Honor Ctr*, 509 U.S. at 507-508.

Courts applying Title IX clearly provide that Ohio State was required to investigate the Title IX complaint about the Band's culture as a matter of law. *See Doe v. Univ. of the South*, 687 F.Supp.2d 744, 758 n. 1 (E.D. Tenn. 2009) ("The pertinent regulation of the United States Department of Education, promulgated pursuant to Title IX, states that each recipient of federal funds . . . shall designate at least one employee to coordinate its efforts to comply with ***and carry out its responsibilities, including the investigation of any complaint***"). (emphasis added). Upon learning of the inappropriate culture, Ohio State was obligated by law to investigate and take efforts to correct the situation. *See Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643-644 (1999). While Mr. Waters may disagree with the corrective action taken by Ohio State, *i.e.*, terminating him, he cannot, as a matter of law, claim it was pretextual. *See McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir.1990) ("[T]he fact that McDonald disagrees with Union Camp's assessment of his performance as manufacturing manager does not render Union Camp's reasons pretextual").

## IV.    <u>CONCLUSION</u>.

Since his termination in July, 2014, Mr. Waters has orchestrated a public relations campaign disparaging Ohio State for conducting a federally mandated investigation into a Title IX complaints about the Band's culture. As a result of that Title IX investigation, the sexualized culture of the Band began to be revealed, and the stewardship of Mr. Waters was determined not to be in the best interests of future student members. The culture of hazing, intimidation, and sexualized behavior within the Band needed to be stopped for the safety and well-being of the student members who had been led to believe it was proper to haze and be the victims of hazing.

39

Though publicly claiming that his lawsuit seeks to vindicate the reputation of the Band, Mr. Waters in fact seeks in excess of a million dollars from President Drake, Provost Steinmetz and Ohio State for terminating his unclassified, at-will employment.  His complaint is without legal basis.  This Court should grant defendants' motion for judgment on the pleadings and enter judgment in their favor.

<div style="margin-left: 40%;">

MICHAEL DeWINE
ATTORNEY GENERAL OF OHIO


By:    /s/ Michael H. Carpenter            
        Michael H. Carpenter (0015733)
        Timothy R. Bricker (0061872)
        Caitlin E. Murphy (0090665)
        CARPENTER LIPPS AND LELAND LLP
        280 Plaza, Suite 1300
        280 North High Street
        Columbus, OH 43215
        E-mail:carpenter@carpenterlipps.com
                bricker@carpenterlipps.com
                murphy@carpenterlipps.com

        Special Counsel for Defendants Michael V. Drake, Joseph E. Steinmetz, and The Ohio State University

</div>

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed electronically on October 23, 2014.  Notice was also sent by operation of the Court's electronic filing system to all other counsel who have entered an appearance and any parties who have entered an appearance through counsel.  The parties may access this filing through the Court's ECF system.

/s/ Michael H. Carpenter
One of the Attorneys for Defendants
Michael V. Drake, Joseph E. Steinmetz,
and The Ohio State University

599240

41