**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JONATHAN N. WATERS,                          Case No. 2:14-cv-1704

       Plaintiff,                          Judge Graham

  v.

                                        Magistrate Judge Kemp

MICHAEL V. DRAKE, M.D., *et al.*,

       Defendants.

## OPINION & ORDER

This matter is before the Court on the Defendants' Motion for Judgment on the Pleadings (doc. 9). For the reasons that follow, the Court GRANTS IN PART AND DENIES IN PART the Defendants' Motion.

## I.      Background

The Plaintiff, Jonathan Waters, is the former Ohio State University Marching Band director. The Defendants are: Michael Drake, the President of the Ohio State University; Joseph Steinmetz, Executive Vice President and Provost of the Ohio State University; and the Ohio State University. After serving as the Interim Director of the OSU Marching and Athletic Bands during the 2012 football season, Compl. at ¶ 23, doc. 1, the Plaintiff became the full-time Director of the Band on February 1, 2013, id. at ¶¶ 1, 23. In 2014, the Plaintiff received a positive performance review based on the Band's on-field performance during the 2013-14 season. Id. at ¶ 24. Off the field, the Plaintiff worked to improve the Band's culture. Id. at ¶ 25. This effort included the development of policies prohibiting demeaning or inappropriate

behavior and instituting extensive training for Band members to educate them regarding alcohol and drug abuse, sexual harassment, and hazing. Id. at ¶¶ 25–55.

More than a year after the Plaintiff began his tenure as full-time Director, the United States Department of Education Office of Civil Rights announced that it was investigating OSU, along with 54 other colleges and universities, for possible violations of federal law based on their handling of sexual violence and harassment complaints. Id. at ¶ 3. Shortly after the Department of Education's announcement, the mother of a former Band member complained to the University's Office of Integrity and Compliance about the Band's allegedly "sexualized" culture and requested an investigation of those allegations. Id.

Chris Glaros, Assistant Vice President of Compliance Operations and Investigations for the University's Office of Compliance, led the subsequent investigation of the Band and its culture. Id. at ¶ 4. Upon completion of the investigation, Glaros issued a report (the Glaros Report) detailing the Office's findings, id., which was published on the University's website on July 24, 2014, Answer at ¶ 107, doc. 8. That report served as the basis for the University's decision to terminate the Plaintiff's employment as Band Director. Compl. at ¶ 4.

In late May 2014, Glaros contacted the Plaintiff and informed him that a Title IX complaint had been filed against him Id. at ¶ 93. An associate of Glaros, Jessica Tobias, conducted two subsequent interviews with the Plaintiff. Id. at ¶¶ 94–96. At the conclusion of the second interview, Tobias directed the Plaintiff to submit a written report of his efforts to rehabilitate the Band's culture since he became the Director. Id. at ¶ 97.

After completing and submitting that report on July 14, 2014, id., the Plaintiff met with Defendant Steinmetz about the Title IX complaint, id. at ¶ 98. Defendant Steinmetz informed the Plaintiff that he had two options in response to the Title IX Complaint—he could resign or adopt

a zero tolerance policy and agree to an assessment of the Band's culture by an outside firm, the Sports Conflict Institute. Id. The Plaintiff agreed to the latter option. Id.

One week later, on July 23, 2014, the Plaintiff met with Defendant Steinmetz again. Id. at ¶ 100. Defendant Steinmetz issued an "ultimatum" to the Plaintiff, stating that the Plaintiff could resign by 5:00 PM or he would be fired. Id. at ¶ 11. The Plaintiff then received a copy of the Glaros Report for the first time. Id. at ¶ 100. The Plaintiff did not resign, and the next morning, the University sent the Plaintiff a letter terminating his employment as Director of the Marching Band. Id. at ¶¶ 100–01.

Prior to his termination, the Defendants did not provide the Plaintiff "notice and a meaningful opportunity to be heard on the contents of the Glaros Report." Id. at ¶ 102. Nor, according to the Plaintiff, have the Defendants provided him any meaningful opportunity to be heard following his termination. Id. at ¶ 103. Shortly after his termination, on August 27, 2014, the Plaintiff's counsel sent the University's counsel a request that they provide the Plaintiff with a public name-clearing hearing. Id. at ¶ 104. The University denied the Plaintiff's request that same day. Id. at ¶ 105.

Following the Plaintiff's termination, the University defended its decision publicly, releasing the Glaros Report and publishing it on a dedicated website. Id. at ¶ 107. The University also issued a video statement in which Defendant Drake explained the basis for the University's decision. Id. The Plaintiff's termination and the Defendants' public defense of his termination garnered widespread attention in local and national media outlets. Id. at ¶¶ 108–117.

The Plaintiff subsequently filed his two-count Complaint (doc. 1) on September 26, 2014. In his Complaint, the Plaintiff alleges that the Defendants violated his Due Process rights under the Fourteenth Amendment. In Count One of the Complaint, the Plaintiff brings two procedural

due process claims and one substantive due process claim. First, the Plaintiff alleges that he had a constitutionally-protected property interest in his continued employment by the University and that Defendants Drake and Steinmetz violated that property interest when they failed to provide him with notice and a meaningful opportunity to be heard prior to terminating his employment. Id. at 39–41. Second, the Plaintiff alleges that he had a constitutionally-protected liberty interest in his good name and reputation and that Defendants Drake and Steinmetz violated that liberty interest when they failed to provide him with a public name-clearing hearing following his termination. Id. Third, the Plaintiff alleges that the Defendants' actions leading up to and following his termination were "so unjust that it shocks the conscience" in violation of his substantive due process rights. Id.

Count Two of the Complaint alleges that the Defendants violated Title IX when they discriminated against the Plaintiff on account of his gender. Id. at 41–44. The Plaintiff alleges that similarly-situated female employees were treated more favorably than him despite leading programs that also had cultures of sexual harassment and hazing.

The Plaintiff asks that the Court:

(1) declare that the Defendants have violated the Fourteenth Amendment and 42 U.S.C. § 1983;

(2) order a meaningful name-clearing opportunity, which shall require that OSU (i) fully comply with all public records requests prior to the date of the hearing; (ii) provide Waters with two full eight-hour days at which he can present evidence and testimony; (iii) make OSU officials, including Defendant Drake, available for testimony and subject to cross-examination; (iv) limit any statements made by OSU during to the duration of the name-clearing hearing strictly to the confines of the hearing; (v) provide notice of the hearing to all local and national media; and (vi) make available such resources necessary for the live broadcasting and recording of the hearing;

(3) order that the Plaintiff be reinstated as Director of the OSU Marching Band; and

(4) award Plaintiff compensatory damages in an amount in excess of $1 million, punitive damages in an amount to be determined at trial; prejudgment and post-judgment interest, and reasonable attorneys' fees and costs.

Id. at 44.

The Defendants filed their Answer (doc. 8) and Motion for Judgment on the Pleadings (doc. 9) on October 23, 2014. The parties completed their initial briefing on the Defendants' Motion on December 4, 2014. On January 20, 2015, the Court scheduled a hearing on the Defendants' Motion. Due to a conflict, the Court subsequently rescheduled the hearing for April 10, 2015. On March 23, 2015, the Court entered an Order (doc. 23) requesting supplemental briefing on the Defendants' Motion. After receiving the parties' supplemental briefs, the Court heard oral arguments on the Defendants' Motion on April 10, 2015.

The parties have submitted their briefs, and with the aid of oral argument, the Defendants' Motion is now ripe for resolution.


II.     **Standard of Review**

Courts apply the same analysis to motions for judgment on the pleadings under Rule 12(c) as they apply to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). See Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n, 623 F.3d 281, 284 (6th Cir. 2010). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." JPMorgan Chase Bank, N.A. v. Winget, 510 F.3d 577, 582 (6th Cir. 2007) (internal citation and quotation marks omitted). However, the court need not accept as true legal conclusions or unwarranted factual inferences. Id. (citing Mixon v. Ohio, 193 F.3d 389, 400 (6th Cir. 1999)).

To withstand a Rule 12(c) motion for judgment on the pleadings, "a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." Commercial Money Ctr., Inc. v. Ill. Union Ins. Co., 508 F.3d 327, 336 (6th Cir. 2007). "The factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 722 (6th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). A "legal conclusion couched as a factual allegation" need not be accepted as true, nor are recitations of the elements of a cause of action sufficient. Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 609 (6th Cir. 2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In considering a motion for judgment on the pleadings, a court considers the pleadings, which consist of the complaint, the answer, and any written instruments attached as exhibits. See Fed. R. Civ. P. 12(c); Fed. R. Civ. P. 7(a) (defining "pleadings" to include both the complaint and the answer); Fed. R. Civ. P. 10(c) (stating that "[a] copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes"); N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 452 (7th Cir. 1998). While the allegations in the complaint are the primary focus in assessing a Rule 12(c) motion, "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint[ ] also may be taken into account." Barany–Snyder v. Weiner, 539 F.3d 327, 332 (6th Cir. 2008) (quoting Amini v. Oberlin Coll., 259 F.3d 493, 502 (6th Cir. 2001)). In addition, a court may consider exhibits attached to a motion for judgment on the pleadings "so long as they are referred

to in the Complaint and are central to the claims contained therein." <u>Bassett v. Nat'l Collegiate Athletic Ass'n</u>, 528 F.3d 426, 430 (6th Cir. 2008).

## III.    Discussion

The Defendants maintain that they are entitled to judgment on the pleadings as to each of the Plaintiff's claims. Before considering these claims, the Court notes that the Defendants have attached exhibits to their Answer and filings. As the Sixth Circuit has made clear, failure to exclude extrinsic evidence presented by the parties requires a court to convert a motion for judgment on the pleadings to a motion for summary judgment. <u>Max Arnold & Sons, LLC v. W.L. Hailey & Co.</u>, 452 F.3d 494, 503 (6th Cir. 2006). Here, unless explicitly noted otherwise, the Court excludes from its consideration of the Motion for Judgment on the Pleadings any exhibits submitted by the Defendants.

### A.    *Due Process*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The due process clause has both procedural and substantive components." <u>Range v. Douglas</u>, 763 F.3d 573, 588 (6th Cir. 2014) (citing <u>EJS Props., LLC v. City of Toledo</u>, 698 F.3d 845, 855 (6th Cir. 2012)). Here, the Plaintiff raises both procedural and substantive due process claims under 42 U.S.C. § 1983.

1.    Procedural Due Process – Property Interest

The Defendants argue that the Plaintiff's first procedural due process claim fails because he did not have a protected property interest in his continued employment with the University. According to the Defendants, the Plaintiff was an unclassified, at-will employee subject to termination at any time. To support this assertion, the Defendants point to the employment letter the University sent the Plaintiff when he became Director of the Band, which states, "The position offered is an unclassified position, not subject to the provisions of section 124.34 of the Ohio Revised Code. Accordingly, your employment is at-will, and may be ended at any time by either you or the university." Jan. 30, 2013 Employment Letter, doc. 8-1. Citing Sixth Circuit precedent, the Defendants maintain that an at-will employee cannot claim a protected property interest in his job.

In response, the Plaintiff concedes that his position as Band Director was *initially* an unclassified, at-will position. However, the Plaintiff argues "that an employee may have an implied contract that alters the terms of an otherwise at-will relationship." Pl.'s Resp. at 15, doc. 11. The Plaintiff alleges that "through [the] policies, practices, and procedures of OSU, Waters has a constitutionally protected property interest in his employment by OSU." Compl. at ¶ 130. In the Plaintiff's view, the University's "policies, practices, and procedures" altered the terms of his employment to the equivalent of a faculty member, providing him with a legitimate expectation of continued employment with the University.

In reply, the Defendants reject the Plaintiff's argument that the parties modified the employment relationship between them. The Defendants contend that, because the language of the employment letter was unambiguous, the Plaintiff cannot establish the existence of an implied contract. Quoting Lane v. Terminal Freight Handling Co., the Defendant insists that "[a]lthough an implied contract or promissory estoppel may take a case out of the employment at

8

will doctrine, this does not hold true where there is an unambiguous written contract to the contrary." 775 F. Supp. 1101, 1105 (S.D. Ohio 1991) aff'd, 944 F.2d 905 (6th Cir. 1991) (internal citation omitted).

"Procedural due process is traditionally viewed as the requirement that the government provide a 'fair procedure' when depriving someone of life, liberty, or property." EJS Props., LLC, 698 F.3d at 855 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992)). "To establish a procedural due process claim, a plaintiff must show that (1) [he] had a life, liberty, or property interest protected by the Due Process Clause; (2) [he] was deprived of this protected interest; and (3) the state did not afford [him] adequate procedural rights." Daily Servs., LLC v. Valentino, 756 F.3d 893, 904 (6th Cir. 2014) (citing Women's Med. Prof'l Corp. v. Baird, 438 F.3d 595, 611 (6th Cir. 2006)).

A public employee alleging a procedural due process violation as a result of his termination "must first establish that he had a protectable property interest in his position." Kuhn v. Washtenaw Cnty., 709 F.3d 612, 620 (6th Cir. 2013) (citing Miller v. Admin. Office of the Courts, 448 F.3d 887, 895 (6th Cir. 2006)). An individual claiming to have a protected property interest in his position "must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). A legitimate claim of entitlement "must be grounded in some statute, rule, or policy." Hughlett v. Romer–Sensky, 497 F.3d 557, 567 (6th Cir. 2006). "Whether a person has a 'property' interest is traditionally a question of state law." EJS Props., LLC, 698 F.3d at 855 (citing Logan v. Zimmerman Brush Co., 455 U.S. 422, 430 (1982)). See also Roth, 408 U.S. at 577 ("Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state

law[.]"). Under state law, "[a] property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances." Ludwig v. Bd. of Trs. of Ferris State Univ., 123 F.3d 404, 409 (6th Cir. 1997) (citing Perry v. Sindermann, 408 U.S. 593, 602 (1972); Bailey v. Floyd Cnty. Bd. of Educ. By & Through Towler, 106 F.3d 135, 141 (6th Cir. 1997); Woolsey v. Hunt, 932 F.2d 555, 564 (6th Cir. 1991)).

"In the context of university employment, the Supreme Court has held that 'rules and understandings, promulgated and fostered by state officials' can form the foundation of a protected property interest." Gunasekera v. Irwin, 551 F.3d 461, 467 (6th Cir. 2009) (quoting Perry, 408 U.S. at 602–03). See also Gunasekera, 551 F.3d at 467 ("an employer's custom and practice can form the basis for a protected property interest"). Ultimately, to establish a constitutionally-protected property interest in their position, a public employee must demonstrate "a legitimate expectation of continued employment." Roth, 408 U.S. at 577. Such a claim of entitlement to continued employment must be determined by reference to state law. Bishop v. Wood, 426 U.S. 341, 344–45 (1976).

Here, the Plaintiff does not point to any state statute or formal contract as the source of his claim of entitlement to continued employment. Nor can he. The Plaintiff's employment letter from the University set out the explicit terms of his employment: "The position offered is an unclassified position, not subject to the provisions of section 124.34 of the Ohio Revised Code. Accordingly, your employment is at-will, and may be ended at any time by either you or the university." Jan. 30, 2013 Employment Letter, doc. 8-1.[1] The Plaintiff signed the letter, acknowledging his receipt of the letter and accepting the position offered. Id. The explicit terms

---

[1] The Defendants attached the employment letter to their Answer. At oral argument, the Plaintiff conceded that the Court could consider the letter. See Oral Hr'g Tr. at 9. Regardless of the Plaintiff's concession, the employment letter is a contract, and, as such, can be considered under Federal Rule of Civil Procedure 10(c) as a "written instrument," N. Ind. Gun & Outdoor Shows, Inc., 163 F.3d at 452.

of the employment letter exclude the Plaintiff from statutory entitlement to continued employment under the Ohio Revised Code.[2] Moreover, by the terms of the agreement, the Plaintiff was an at-will employee, and an at-will employment contract does not create a property interest protected by the Due Process Clause. See Bailey, 106 F.3d at 141; Chilingirian v. Boris, 882 F.2d 200, 204 (6th Cir. 1989).

Nonetheless, the Plaintiff argues that the University's policies and procedures form the basis of an implied contract that modified his written at-will employment agreement. Under Ohio law, "[t]he interests created by contracts are . . . property interests." EJS Props., LLC, 698 F.3d at 855 (citing Joseph Bros. v. Brown, 415 N.E.2d 987, 990 (Ohio 1979)). See also Leary v. Daeschner, 228 F.3d 729, 741 (6th Cir. 2000) ("A contract . . . may create a property interest"). In Mers v. Dispatch Printing Co., the Supreme Court of Ohio recognized two exceptions to the employment-at-will doctrine. 483 N.E.2d 150, 153–55 (Ohio 1985). First, the Court recognized that an oral at-will employment agreement could be altered by implied or express contractual provisions. Id. at 154. Second, the Court recognized that such an agreement could be limited by the doctrine of promissory estoppel. Id. The Mers court was silent as to whether these exceptions applied to a *written* at-will employment agreement. Courts are split on this issue. Compare Lane v. Terminal Freight Handling Co., 775 F. Supp. 1101, 1105 (S.D. Ohio 1991) (Holschuh, J.) (holding that "[a]lthough an implied contract or promissory estoppel may take a case out of the employment at will doctrine, . . . this does not hold true where there is an unambiguous written contract to the contrary" (internal citations omitted)), aff'd, 944 F.2d 905 (6th Cir. 1991) with DeSanzo v. Titanium Metals Corp., 351 F. Supp. 2d 769, 778 (S.D. Ohio 2005) (Sargus, J.)

---

[2] The relevant provision of the Revised Code states, "The tenure of every officer or employee in the classified service of the state . . . holding a position under this chapter, shall be during good behavior and efficient service." O.R.C. § 124.34(A).

(collecting Ohio cases and recognizing that the implied contract and promissory estoppel exceptions applied to written, as well as oral, at-will employment agreements).

Assuming *arguendo* that a written contract for at-will employment can be modified by an implied contract, the Court must determine whether the Plaintiff has alleged sufficient facts to establish the existence of such an implied contract. Under Ohio law:

> [u]nlike express contracts, implied contracts are not created or evidenced by explicit agreement of the parties; rather, they are implied by law as a matter of reason and justice. An implied-in-fact contract arises from the conduct of the parties or circumstances surrounding the transaction that make it clear that the parties have entered into a contractual relationship despite the absence of any formal agreement. In contracts implied in fact the meeting of the minds, manifested in express contracts by offer and acceptance, is shown by the surrounding circumstances which make it inferable that the contract exists as a matter of tacit understanding.

Nexus Commc'ns, Inc. v. Qwest Commc'ns Corp., 953 N.E.2d 340, 348 (Ohio Ct. App. 2011).

At oral argument, the Plaintiff clarified his position concerning the alleged implied-in-fact contract. See Oral Hr'g Tr. at 11–17. According to the Plaintiff, the circumstances surrounding his employment—the University's practices and procedures—support the conclusion that he had a legitimate expectation of continued employment with the University. Specifically, the Plaintiff alleges that: (1) he taught the Marching Band as a University-approved course for which students received grades and academic credit; (2) *The Ohio State University Marching Band Statement of Policies and Procedures*, which is attached to the Complaint, stated that the Band Director "is a faculty member assigned to the Marching Band," 2012 Statement of Policies & Procedures, doc. 1-3 at 166; (3) the University's website described him as a faculty member; and (4) the Plaintiff's predecessors and successors were faculty members. Based on these patterns and practices, the Plaintiff concludes that the parties formed an implied-in-fact contract by which he had a legitimate expectation in continued employment with the University.

The Court disagrees. First, the Court notes that many of the policies and procedures relied on by the Plaintiff predate his hiring for the position of Band Director on February 1, 2013. The Plaintiff has failed to present any legal authority supporting the proposition that the University's prior practices and procedures, including the 2012 *Marching Band Statement of Policies and Procedures*, could modify, much less negate, the express terms of the parties' subsequent written employment contract. Those express terms memorialized the parties' agreement that the Plaintiff's employment was at-will. Ohio's parol evidence rule prohibits a party from contradicting the express terms of a contract with reference to prior alleged understandings or agreements. Galmish v. Cicchini, 734 N.E.2d 782, 788 (Ohio 2000). Plaintiff has not argued that any exception to the rule, such as fraud or mistake, applies.

Second, the Plaintiff's teaching of the Marching Band as a University-approved course for which members received grades and academic credit provides little, if any, support for the assertion that he had a legitimate expectation of continued employment in his position. That the Plaintiff instructed students and assigned grades is not inconsistent with his written agreement for at-will employment. Though the Plaintiff asserts that in so instructing students and assigning grades, he "functioned in the same way as his predecessors had," Oral Hr'g Tr. at 18, evidence of prior practice again cannot override the express terms of the Plaintiff's at-will contract.

Third, to the extent the Plaintiff relies on alleged conduct and practices post-dating the at-will agreement, the Complaint still fails to support a reasonable inference that the parties had an implied contract. The Plaintiff argues that the University has treated his successors as faculty members and that it "held out to the public during fund-raising" and on a website that the Plaintiff was a faculty member. Oral Hr'g Tr. at 16-17. However, the Complaint contains no such allegations; these are factual assertions raised by counsel in legal argument, and the Court

13

need not consider them. See Johnson v. Scott Co., No. 2:11-cv-20, 2011 WL 6415521, at *5 (S.D. Ohio Dec. 21, 2011).

Even if the Court were to consider these factual allegations, they are insufficient to establish an implied contract because they do not support a reasonable inference that the parties had a meeting of the minds. The University's alleged treatment of the Plaintiff's successors, after his termination, is not conduct to which the Plaintiff was a party and cannot plausibly form the basis of a mutual understanding between the University and the Plaintiff. And the allegation that the University held the Plaintiff out to the public as a faculty member supports no more than an inference that the University directed its statements to the public, not that the University and the Plaintiff reached a meeting of the minds, particularly when the written contract in existence told Plaintiff that he was an at-will employee.

Assuming *arguendo* that the Plaintiff had pled sufficient facts to establish the existence of an implied-in-fact contract, Sixth Circuit precedent prevents the Plaintiff's property interest claim from advancing any further. The Plaintiff's theory is not that the alleged implied contract made him a faculty member. See Oral Hr'g Tr. at 13 ("Our argument is not that he was a faculty member.") Rather, the Plaintiff argues that in being treated as something akin to a faculty member, he derived a legitimate expectation in continued employment. See id. at 15 ("[A]gain, I am not arguing faculty in the sense of formal faculty where he was tenured or anything like that[.] [I] am arguing that he was treated in such a way . . . [that] he acquired, at least, some property interest.") However, in Edinger v. Bd. of Regents of Morehead State Univ., the Sixth Circuit held that "'the existence of a formal code governing the granting of tenure precludes a reasonable expectation of continued employment absent extraordinary circumstances.'" 906 F.2d 1136, 1140 (6th Cir. 1990) (quoting Haimowitz v. Univ. of Nev., 579 F.2d 526, 528 (9th Cir.

14

1978)). See also Lovelace v. Se. Mass. Univ., 793 F.2d 419, 423 (1st Cir. 1986) ("Where a college or university has a written, formalized tenure procedure, courts have generally rejected claims that a plaintiff has somehow acquired de facto tenure or a legitimate expectation of continued employment outside of and apart from the codified process"); McElearney v. Univ. of Ill., 612 F.2d 285, 287, 290–91 (7th Cir. 1979) (same). Ohio courts are in agreement with this statement of the law. See Omlor v. Cleveland State Univ., 543 N.E.2d 1238, 1240 (Ohio 1989) (holding that "a nontenured faculty member of a university has no entitlement to tenure on a de facto basis, where the university has a formal tenure system which provides that tenure may be obtained only by formal grant of such privilege"). It is undisputed that the University has a formal code governing the awarding of tenure, see O.A.C. § 3335-6, and the Plaintiff offers no allegations of "extraordinary circumstances" that would support his claim to an expectation of continued employment outside of the tenure system.

Instead, as evidence of his alleged legitimate expectation in continued employment, the Plaintiff cites the procedural protections afforded to faculty members prior to their termination by the Ohio Administrative Code § 3335-5-04 and *Rules of the University Faculty*. Even if the Plaintiff were afforded these procedural protections, they are of no avail to him as an unclassified employee alleging a constitutionally-protected property interest. An unclassified public employee "does not acquire a property interest in continued employment merely by virtue of procedural protections afforded to him." Blazy v. Jefferson Cnty. Reg'l Planning Com'n, 438 F. App'x 408, 414 (6th Cir. 2011) (collecting cases).

For the foregoing reasons, the Court will grant the Defendants' Motion with respect to the Plaintiff's property interest claim.

2.      Procedural Due Process – Liberty Interest

The Plaintiff brings a second procedural due process claim based on his liberty interest in his good name and reputation. According to him, the Defendants infringed that liberty interest by disseminating false and stigmatizing information about him in connection with his termination. The Plaintiff maintains that he was entitled to a public, name-clearing hearing following his termination, and that the Defendants denied him such a hearing.

The Defendants' initial argument is straightforward. According to them, they offered the Plaintiff a public name-clearing hearing, which the Plaintiff declined. Instead of accepting the public name-clearing hearing offered by the Defendants, the Plaintiff waged a public relations campaign in the national media in an effort to clear his name. Because the Plaintiff declined the public name-clearing hearing, he cannot now claim that his procedural due process rights were violated.

In response, the Plaintiff, too, offers a straightforward argument. The Plaintiff emphasizes that, in his Complaint, he explicitly alleges that the Defendants denied him a name-clearing hearing. Because the Court must treat his allegations as true for purposes of a motion for judgment on the pleadings, the Plaintiff argues, the Defendants' contrary assertions are irrelevant at this stage of litigation. Even if the Court were to take the Defendants' averments as true, the Plaintiff asserts that Defendants have still failed to offer him a sufficient name-clearing hearing.

An individual's good name and reputation are liberty interests protected by the Fourteenth Amendment's Due Process clause. Quinn v. Shirey, 293 F.3d 315, 319 (6th Cir. 2002) (quoting Chilingirian, 882 F.2d at 205). "'[I]njury to a person's reputation, good name, honor, or integrity constitutes the deprivation of a liberty interest when the injury occurs in connection with an employee's termination.'" Machisa v. Columbus City Bd. of Educ., 563 F.

App'x 458, 463 n.6 (6th Cir. 2014) (quoting Ludwig v. Bd. of Trs. of Ferris State Univ., 123 F.3d 404, 410 (6th Cir. 1997)). Allegations of defamation alone are insufficient to state a claim for a due process violation. Quinn, 293 F.3d at 319 (citing Paul v. Davis, 424 U.S. 693, 711 (1976)). When a "nontenured employee shows that he has been stigmatized by the voluntary, public dissemination of false information in the course of a decision to terminate his employment, the employer is required to afford him an opportunity to clear his name." Chilingirian, 882 F.2d at 205.

The Sixth Circuit employs a five-factor test to determine whether a plaintiff has been deprived of a liberty interest and is entitled to a name-clearing hearing:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment. . . . Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance. . . . Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him were false. Lastly, the public dissemination must have been voluntary.

Brown v. City of Niota, 214 F.3d 718, 722–23 (6th Cir. 2000) (citing Ludwig, 123 F.3d at 410). "Once a plaintiff has established the existence of all five elements, he is entitled to a name-clearing hearing if he requests one." Brown, 214 F.3d at 723 (citing Ludwig, 123 F.3d at 410). Ultimately, "[i]t is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process." Quinn, 293 F.3d at 320 (citing Brown, 214 F.3d at 723).

Here, the Defendants do not challenge the Plaintiff's ability to satisfy the five-factor test. Instead, they offer two arguments in support of their assertion that the Plaintiff has failed to state a claim upon which relief may be granted. First, the Defendants contend, the Plaintiff has failed to allege unconstitutional behavior on the part of Defendants Drake and Steinmetz. Absent such allegations, the Defendants argue, the Plaintiff has failed to establish their individual liability for

the Plaintiff's liberty interest claim, and, consequently, the Plaintiff's liberty interest claim must fail. Second, the Defendants maintain that, despite the initial denial of the Plaintiff's request, the University subsequently offered the Plaintiff a name-clearing hearing. Because the University offered the Plaintiff a name-clearing hearing, the Defendants insist that the Plaintiff's liberty interest claim fails.

The Court agrees with the Defendants. "Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior." Heyerman v. Cnty. of Calhoun, 680 F.3d 642, 647 (6th Cir. 2012) (citations omitted). A theory of respondeat superior does not provide a basis for § 1983 liability. Id. (citing Hays v. Jefferson Cnty., 668 F.2d 869, 872 (6th Cir. 1982)). A supervisory official is not individually liable for a constitutional violation unless he "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." Heyerman, 680 F.3d at 647 (quoting Hays, 668 F.3d at 874) (internal quotation marks omitted). "[S]imple awareness of employees' misconduct does not lead to supervisor liability." Leary v. Daeschner, 349 F.3d 888, 903 (6th Cir. 2003) (citing Lillard v. Shelby Cnty. Bd. of Educ., 76 F.3d 716, 728 (6th Cir. 1996)).

Here, there are sufficient factual allegations in the Complaint to establish Defendants Drake's and Steinmetz's involvement in the decision to terminate the Plaintiff's employment. However, the Complaint does not include any allegations regarding Defendants Drake's or Steinmetz's involvement in the alleged decision to deny him a name-clearing hearing. Instead, the Plaintiff's Complaint alleges that the "University," and not the individual defendants, denied the Plaintiff's request for a name-clearing hearing. Compl. at ¶ 105. The Complaint further

18

alleges that the University's Assistant Vice President for Media & Public Relations publicized the denial of the Plaintiff's request. Id. The Complaint also alleges that the University later "backtracked" from its initial denial, referring to a letter from the University's Associate Vice President and Deputy General Counsel, Alexandra Schimmer. Id. at ¶ 106. Based on these allegations, the Court cannot infer that Defendants Drake and Steinmetz directly participated in or knowingly acquiesced to the denial of the Plaintiff's request for a name-clearing hearing. Consequently, the Plaintiff has not pled a basis for a finding of individual liability against Defendants Drake and Steinmetz.

Another serious flaw in the Plaintiff's Complaint became apparent during oral argument. The Complaint alleges the following facts:

104.  On August 27, 2014, Waters' counsel sent OSU's counsel a letter requesting that OSU provide Waters with a public name-clearing hearing.

105.  OSU denied Waters the opportunity for a name-clearing hearing that same day, on August 27, 2014. Specifically, OSU stated, "In response to the letter that Jon Waters' lawyer David Axelrod sent today demanding a 'Public Name-Clearing Hearing,' here is a statement from Chris Davey, OSU Assistant Vice President, Media & Public Relations . . . We will not be revising this decision. It is closed, and it is time to move on."

106.  Later communications from OSU have backtracked from the refusal for a name clearing hearing, but OSU has still not offered Waters a constitutionally sufficient hearing.

Compl. at ¶¶ 104–06. The Plaintiff, in addressing the viability of his liberty interest claim, emphasizes the importance of paragraphs 104 and 105, while the Defendants stress the importance of paragraph 106.

In the Defendants' view, paragraph 106 is a concession by the Plaintiff that the Defendants did in fact offer the Plaintiff a name-clearing hearing after his termination. The Court agrees. While Paragraphs 104 and 105 of the Complaint allege that the University initially

denied the request for a hearing, paragraph 106 states that the University "backtracked" or withdrew its denial. See Oxford English Dictionary (2d ed. 1989). It is the denial of a requested name-clearing hearing that constitutes a due process violation. See Quinn, 293 F.3d at 320 ("It is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process." (citing Brown, 214 F.3d at 723). Paragraph 106 does not allege the denial of a name-clearing hearing; rather, it states a legal conclusion that the offered hearing was not "constitutionally sufficient." The Complaint contains no factual allegations as to what made the offered hearing insufficient, such as that it would not be public or not be at a reasonable time and location. In the absence of any supporting factual allegations, the Court need not accept as true the Complaint's legal conclusion as to the sufficiency of the offered hearing.

The Defendants submit a letter from their Deputy General Counsel to the Plaintiff's counsel, in which the University agreed to provide the Plaintiff with a public forum for a name-clearing hearing. See September 11, 2014 Letter from Alexandra Schimmer, doc. 8-22 at 3. Relevant to the Plaintiff's request for a name-clearing hearing, the letter states:

> Furthermore, in response to your letter dated August 27, Mr. Waters has of course had numerous opportunities to state his position with respect to the Marching Band's culture both before and after his termination, and on stages both local and national. Nonetheless, the University will provide Mr. Waters with a "name clearing" forum.
>
> The opportunity is for Mr. Waters to speak in a public setting, though as both the President and Board of Trustees have previously stated, the decision to terminate Mr. Waters will not be reconsidered. Because this is a non-adversarial forum, a number of your requests in the August 27 letter are not applicable.
>
> We will provide an open forum for Mr. Waters and invite you to contact us so that we can confirm the date, location, and other logistical details.

Id.

At oral argument, the parties disputed whether this letter, an exhibit attached to the Defendants' Answer and incorporated by reference in the Motion for Judgment on the Pleadings,

could be considered at this stage of litigation. Though not disputing the authenticity of the letter, the Plaintiff argued that it could not be considered, asserting that "[t]he letter that the defendants have provided is central to their defense, but it is not central to our complaint." Oral Hr'g Tr. at 32–33. Upon further questioning, the Plaintiff conceded that the letter was what the Complaint referred to when it asserted that "[l]ater communications from OSU have backtracked from the refusal for a name clearing hearing," Compl. at ¶ 106. Oral Hr'g Tr. at 42–43. However, the Plaintiff emphasized that he did not quote the letter in the Complaint.

When ruling on a motion for judgment on the pleadings, a court may consider exhibits attached to that motion "so long as they are referred to in the Complaint and are central to the claims contained therein." Bassett, 528 F.3d at 430. Here, the Plaintiff has acknowledged that he referred to the letter from the Defendants' Deputy General Counsel in paragraph 106 of his Complaint:

> The Court: Let's look at this letter that Mr. Carpenter has pointed out and which he says offered Mr. Waters a fairness hearing. First of all, can the Court consider the document?
>
> Pl.'s Counsel: I do not believe so.
>
> . . .
>
> The Court: All right. Well, don't you mention the University modifying its denial in your complaint?
>
> Pl.'s Counsel: We mentioned the University backtracking somewhat on its denial —
>
> The Court: Is that what you were referring to, was this letter?
>
> Pl.'s Counsel: Your Honor, yes, it is what we were referring to, but we don't quote it.

Oral Hr'g Tr. at 42–43. Although the Plaintiff maintains that the letter is central only to the University's defense, a cause of action does not arise until the denial of a request for a name-

clearing hearing. See Quinn, 293 F.3d at 320 (citing Brown, 214 F.3d at 723) ("It is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process"). Thus, the letter responding to the Plaintiff's request is central to a fundamental element of the Plaintiff's cause of action, and the Court finds that it may consider the letter in resolving the Defendants' Motion. See also 27A Fed. Proc., L. Ed. § 62:466 (2015) (citing In re Colonial Mortg. Bankers Corp., 324 F.3d 12 (1st Cir. 2003)) (noting that courts may consider "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading").

As the letter from the Defendants' Deputy General Counsel makes clear, despite its earlier denial, on September 11, 2014, the University agreed to provide the Plaintiff with public forum for a name-clearing hearing and encouraged the Plaintiff to contact the University to discuss the details of that hearing. At the time the Plaintiff filed his Complaint on September 26, 2014, the Defendants had not denied his request for a name-clearing hearing. Absent the denial of a request for the name-clearing hearing, the Plaintiff's claim fails. See Quinn, 293 F.3d at 320.

According to the Plaintiff, Gunasekera v. Irwin, 678 F. Supp. 2d 653 (S.D. Ohio 2010), provides a basis for permitting his liberty interest claim to move forward. In Gunasekera, the plaintiff was a professor at Ohio University in the College of Engineering and Technology. Id. at 656. Following a complaint of rampant plagiarism among masters and doctoral students in the College of Engineering and Technology, administrators initiated an investigation into those allegations. Id. A report was submitted to the defendants, which implicated the plaintiff in the plagiarism scandal. Id. Specifically, the report alleged that the Plaintiff ignored his ethical responsibilities and contributed to an atmosphere in which academic misconduct was permitted. Id. After receiving the report, the defendants held a press conference during which they

22

discussed the plaintiff's role as a participant in the scandal. Id. Following the press conference and public release of the report, the plaintiff requested a name-clearing hearing. Id. at 657. The parties disagreed as to the substantive requirements of that hearing, and the plaintiff rejected the defendants' offer, characterizing their proposed name-clearing hearing as a "sham proceeding." Id.

After the plaintiff filed his lawsuit claiming, *inter alia*, that the defendants violated his liberty interest in a name-clearing hearing, the defendants filed a motion to dismiss. Gunasekera, 678 F. Supp. 2d at 657. The district court dismissed the plaintiff's liberty interest claim, finding that the hearing offered by the defendants was adequate. Id. Relevant here, on appeal the Sixth Circuit reversed as to the dismissal of the plaintiff's liberty interest claim, holding that the plaintiff was entitled to a *public* name-clearing hearing, which the defendants had not offered to him. 551 F.3d 461, 470 (6th Cir. 2009). The case was remanded with instruction for the district court to determine "the exact parameters of the name-clearing hearing." Id. at 471. Following the Sixth Circuit's decision, the defendants offered the plaintiff a second name-clearing hearing, which the plaintiff rejected. 678 F. Supp. 2d at 657–58. The district court found the defendants' second offer to be satisfactory and rejected the plaintiff's contention that the hearing include an adversarial component in which he could cross-examine University officials. Id. at 663–64.

Here, the Plaintiff argues that his claim, like the plaintiff's claim in Gunasekera, should survive a Rule 12 motion. In the Plaintiff's view, the "Defendants failed to offer to publicize the hearing, or [offer] anything more than an on-campus forum," Pl.'s Resp. at 23, and, as a result, he was entitled to request that the Court "determine the parameters of a name-clearing hearing" before actually participating in the hearing, id. at 21.

In the Court's view, the Plaintiff's position is unsupported by <u>Gunasekera</u>. Unlike <u>Gunasekera</u>, here, the University offered the Plaintiff a *public* name-clearing hearing and invited the Plaintiff to contact the University to discuss "the date, location, and other logistical details" of the hearing. The Complaint does not allege that the Plaintiff did in fact follow up on the letter, such that the University's demands as to date, location and logistics were unreasonable. <u>See</u> Oral Hr'g Tr. at 45 (the Plaintiff admitting that he did not further discuss the matter with the University after receiving the letter). Rather, in response to the University's offer to provide a public hearing, the Plaintiff quickly filed this lawsuit. Unlike the defendants' first offer in <u>Gunasekera</u>, the offer here is not alleged to be a functional denial of the Plaintiff's request for a hearing.

Therefore, the Court will grant the Defendants' Motion with respect to the Plaintiff's liberty interest claim.


3.      Substantive Due Process – Shocks the Conscience

The Plaintiff alleges that the Defendants' actions in investigating the Plaintiff and terminating his employment were so unjust that they shock the conscience in violation of his right to substantive due process. Compl. at ¶ 135.

The Defendants move for judgment on the pleadings as to the Plaintiff's substantive due process claim. In support of their motion, the Defendants offer two arguments: (1) the Sixth Circuit is "reluctant" to apply the shock the conscience standard in cases that do not involve the use of physical force, and (2) in the context of public employment, an employee's termination does not shock the conscience unless it involves an underlying violation of some fundamental right. Because the Plaintiff does not allege any use of physical of force by the Defendants or the

violation of a fundamental right in connection with the termination of his employment, the Defendants assert that they are entitled to judgment on the pleadings with respect to the Plaintiff's substantive due process claim.

In response, the Plaintiff argues that the Defendants incorrectly state the law. First, the Plaintiff emphasizes, the Court can find a violation of substantive due process based on conduct that shocks the conscience regardless of whether that conduct violates a fundamental right. Second, the Plaintiff argues, the Sixth Circuit does not limit the application of the shock the conscience standard to situations involving the use of physical force. In the Plaintiff's view, he has alleged conduct on the part of the Defendants that is "egregious and shocking."

 "[S]ubstantive due process 'protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them.'" EJS Props., LLC, 698 F.3d at 855 (quoting Collins, 503 U.S. at 125). "It protects a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.'" Range, 763 F.3d at 588 (citing Bell v. Ohio State Univ., 351 F.3d 240, 249–50 (6th Cir. 2003)). "Where government action does not deprive a plaintiff of a particular constitutional guarantee or shock the conscience, that action survives the scythe of substantive due process so long as it is rationally related to a legitimate state interest." Valot v. Se. Local Sch. Dist. Bd. of Educ., 107 F.3d 1220, 1228 (6th Cir. 1997) (citations omitted).

Here, the Plaintiff alleges that the Defendants' conduct was so egregious that it shocks the conscience.

> Conduct shocks the conscience if it violates the decencies of civilized conduct. Such conduct includes actions so brutal and offensive that they do not comport with traditional ideas of fair play and decency. These are subjective standards, to be sure, but they make clear that the "shocks the conscience" standard is not a

font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation.

Range, 763 F.3d at 589–90 (internal citations and quotations omitted). Determining whether government conduct "shocks the conscience" is a fact-specific inquiry. Ewolski v. City of Brunswick, 287 F.3d 492, 510 (6th Cir. 2002).

The parties disagree as to whether government use of force is a requirement for a "shocks the conscience" claim in the Sixth Circuit. From a review of the case law, it is clear that the Sixth Circuit is hesitant to apply the "shock the conscience" standard to government conduct that does not involve the use of physical force. See Choate's Air Conditioning & Heating, Inc. v. Light, Gas & Water Div. of the City of Memphis, 16 F. App'x 323, 329 (6th Cir. 2001) ("While we have questioned the continued vitality of [the 'shocks the conscience'] strand of substantive due process jurisprudence, we nevertheless continue to recognize it in the exclusive context of cases involving physical abuse"); Callihan v. Sudimack, 117 F.3d 1420 (6th Cir. 1997) ("This Circuit has resisted application of the 'shocks the conscience' standard to § 1983 cases not involving physical force"); Mansfield Apartment Owners Ass'n v. City of Mansfield, 988 F.2d 1469, 1478 (6th Cir. 1993) (stating that the court was "reluctant to apply the 'shock the conscience' standard," because "the present case does not concern physical abuse"); Cassady v. Tackett, 938 F.2d 693, 698 (6th Cir. 1991) ("Since the present case . . . does not concern physical abuse, we are reluctant to apply the 'shock the conscience' standard"); Braley v. Pontiac, 906 F.2d 220, 225 (6th Cir. 1990) ("Applying the 'shock the conscience' test in an area other than excessive force . . . is problematic. . . . We doubt the utility of such a standard outside the realm of physical abuse[.]"). Outside the context of physical force, the Sixth Circuit has applied the "shocks the conscience" standard in the zoning context "to emphasize the degree of arbitrariness required to

26

set aside a zoning decision by a local authority." EJS Props., LLC, 698 F.3d at 861–62 (citing Pearson v. City of Grand Blanc, 961 F.2d 1211, 1216 (6th Cir. 1992))

The Court has previously characterized the Sixth Circuit's decision in Mansfield as standing for the proposition that the "'shocks the conscience' standard only applies to physical abuse." Miller v. City of Columbus, 920 F. Supp. 807, 819 (S.D. Ohio 1996) (Graham, J.). In the Court's view, given the inherently subjective nature of the "shocks the conscience" standard, restricting application of this standard to the cases involving the use of physical force is an appropriate limitation on substantive due process claims. Because the Plaintiff does not allege the use of physical force as part of his substantive due process claim, the Plaintiff has failed to state a claim upon which relief may be granted.

Nonetheless, the Plaintiff points to two Southern District of Ohio cases in which a court applied the "shocks the conscience" standard and found that government conduct not involving the use of physical force rose to the level of a substantive due process violation. See, e.g, Peterson v. Ne. Local Sch. Dist., No. 3:13-CV-187, 2014 WL 2095380, at *11 (S.D. Ohio May 20, 2014) (concluding that the plaintiff stated a substantive due process claim under the "shocks the conscience" standard where the defendants were deliberately indifferent to ongoing racial harassment of school children despite parents' repeated reports of said harassment) report and recommendation adopted, No. 3:13-CV-187, 2014 WL 4628544 (S.D. Ohio Sept. 15, 2014); Myers v. Delaware Cnty., Ohio, No. 2:07-CV-844, 2008 WL 4862512, at *11 (S.D. Ohio Nov. 7, 2008) (concluding that the plaintiff stated a substantive due process claim under the "shocks the conscience" standard where the defendant's publication of defamatory statements about the plaintiff were part of a "personal, unwarranted attack" on the plaintiff's reputation and character). The Court is not persuaded that either of these cases should alter its conclusion in the

27

present case. Neither of these cases addressed the Sixth Circuit precedent advising that the "shocks the conscience" standard should be limited to the exclusive context of cases involving the use of physical force.

Moreover, the conduct complained of in <u>Peterson</u> and <u>Myers</u> was more egregious in nature than that alleged in this case. In <u>Peterson</u>, the plaintiffs, both African-American female high school students, alleged that they were subject of continuous racial harassment, which "school officials failed to prevent, stop, or correct . . . but instead expelled the victim-students without taking disciplinary actions against the student perpetrators." 2014 WL 2095380, at *1. Among other instances of racial harassment, a white, male classmate attached a drawing of the plaintiff being hung from a tree with text, stating, "Imma hang yo ass dum ... n[-word]" and "get ready [illegible symbol] die!! Sincerly, your friend." <u>Id</u>. Despite being made aware of the ongoing harassment, the defendants did not discipline the perpetrators or take any corrective action. <u>Id.</u> at *6. The court concluded that the defendants were deliberately indifferent to the ongoing racial harassment of the plaintiffs, and that this deliberate indifference was sufficient to satisfy the shocks the conscience standard. In the Court's view, the ongoing racial harassment of the plaintiffs in <u>Peterson</u>, particularly the threat of physical force against students, is sufficient to distinguish that case from the allegations presently before the Court.

In <u>Myers</u>, the plaintiff, the recently resigned Sheriff of Delaware County, accused the Acting Sheriff, the defendant, of falsely and publicly accusing him of criminal conduct, namely the possession of child pornography. 2008 WL 4862512, at *1–2. After the plaintiff's resignation, the defendant found child pornography on the office computer formerly used by the plaintiff as part of an official investigation. <u>Id</u>. Contrary to the advice of the county prosecutor and a 2003 memorandum making clear that the child pornography was part of an official

investigation, the defendant subsequently issued a press release "detailing his 'horrific discovery'" and stating that "[i]t appears that the files located on [the plaintiff's] computer were *not* used in an investigatory nature." Id. The Myers court concluded:

> If Wolfe [the defendant] knew that the child pornography found on Plaintiff's computer was, in fact, related to an official investigation and yet, against the advice of the county prosecutor, in a personal, unwarranted attack on Plaintiff's character and reputation, used his position as the county sheriff to issue a press release branding Plaintiff as a "child pornographer," such egregious conduct would, in this Court's view, shock the conscience. Such an abuse of power by a government official for the purpose of oppression rises to the level of a constitutional violation.

Id. at *11. As previously noted, the Myers court did not discuss the Sixth Circuit precedent that suggests that the "shocks the conscience" standard should be limited to the exclusive context of cases involving the use of physical force. To the extent the Plaintiff emphasizes the similarities between Myers and the present case, the Court notes that the defendant's alleged conduct in Myers involved making knowingly false accusations of criminal conduct against the plaintiff; no such allegations are present in the instant case. As the following discussion will show, the public statements the Plaintiff relies upon in this case are readily distinguishable from the press release in Myers.

Assuming *arguendo* that the use of physical force is not a requirement for a "shocks the conscience" claim, the Court finds that the Plaintiff's allegations do not rise to a conscience-shocking level. At the heart of the Plaintiff's substantive due process claim are his assertions regarding the Glaros Report, a document issued and made available to the public by the Office of University Compliance and Integrity following its investigation of the Title IX complaint concerning the Marching Band.[3] The Plaintiff alleges that the Report "made [him] a scapegoat . .

---

[3] The Court may consider the Glaros Report because the Plaintiff repeatedly refers to and quotes it in his Complaint, and it is central to the Plaintiff's substantive due process claim. See Bassett, 528 F.3d at 430.

. for a culture that existed decades before he became a Director or even a member of the band." Oral Hr'g Tr. at 47. He denies the Report's finding that he knew or should have known of a Band culture that facilitated acts of sexual harassment, and he refutes its conclusion that he "failed eliminate the sexual harassment, prevent its recurrence, and address its effects." Glaros Report at 21. He further alleges that it was conscience-shocking for President Drake to terminate[4] his employment based on the Glaros Report despite acknowledging publically that the conduct described in the Report was "largely historical" and "not reflective of the band in the modern era." Pl'.s Resp. at 26; Oral Hr'g Tr. at 47; Compl. at ¶¶ 70-74.

The Plaintiff's substantive process theory ignores context. The Supreme Court requires courts to exercise "judicial self-restraint" whenever they confront a substantive due process claim, Collins, 503 U.S. at 125 (1992), and the context of the defendants' actions is critical. O'Connor v. Pierson, 426 F.3d 187, 203 (2d Cir. 2005). This is not a situation in which the allegedly false accusations were issued without explanation. In discharging its obligations under federal law, see 34 C.F.R. § 106.8, the Office of Compliance investigated the Title IX complaint and issued its Report detailing the basis for the Office's findings and conclusions. In systematic fashion, the Report sets forth witness statements and evidence regarding each category of Band misbehavior. The evidence is analyzed and the Plaintiff's own comments are quoted and considered. The applicable rules are laid out, and the Report's conclusions are explained. The Report recounts the Plaintiff's lengthy involvement with the Band since 1995 as a student member, graduate assistant, Assistant Director, and ultimately as Director. It recites a litany of lurid details of a sexually-charged atmosphere which permeated the Band for decades, much of

---

[4] The Plaintiff does not allege that his termination itself violated his right to substantive due process. Even if he did, "[t]he termination of public employment does not constitute a denial of substantive due process unless there has been an infringement of some fundamental right." McKenna v. Bowling Green State Univ., 568 F. App'x 450, 456 (6th Cir. 2014) (internal citations, alterations and quotations omitted). No such violation of a fundamental right has been alleged in this case.

which the Plaintiff does not dispute. The Plaintiff may contend that the Report makes an incomplete and sometimes incorrect factual presentation, mischaracterizes his level of knowledge or understates his efforts to change Band culture; he may contend that the facts do not support the inferences drawn and conclusions made by the Report. But ultimately the Plaintiff's contentions reflect his disagreements with the Report and its methodology. That the Report makes findings and conclusions on matters which may be in dispute and which may be subject to different interpretations and reasonable disagreement does not shock the conscience.

Similarly unavailing is the Plaintiff's theory that it shocked the conscience for the University to terminate Plaintiff's employment based upon the Glaros Report even while President Drake acknowledged that the Band's allegedly sexualized culture existed before he became Director. A university's President and Executive Vice President should take seriously the reports prepared by its Office of Compliance. Again, the Report did not come in the form of a baseless tabloid. The Plaintiff may contend that Defendants overreacted, that they were ill-advised in assigning blame to him for alleged practices for which he could not have been fully responsible. But this is a question of degree, a balancing of considerations by University decisionmakers exercising their discretion, in the face of a Title IX investigation, on how to treat an at-will employee. Even if misguided, a university's attempts to apportion responsibility – and its decision to place primary responsibility on the individual in the head leadership position following a Title IX investigation that found a factual and legal basis for allegations of a failure by the Band's leadership to eliminate sexually-hostile conduct – is hardly the grist of substantive due process.

The Court thus finds that the Plaintiff's allegations concerning the issuance of the Glaros Report and the Defendants' reliance on the Report in terminating him do not support a

reasonable inference of conduct so egregious as to rise to the level of conscience-shocking. The Court grants the Defendants' Motion with respect to the Plaintiff's substantive due process claim.

### B.    *Title IX – Reverse Sex Discrimination*

In his Complaint, the Plaintiff alleges that the University discriminated against him on the basis of his gender in violation of Title IX. Compl. at ¶ 144. According to the Plaintiff, Title IX requires fair and impartial investigations of complaints of sexual harassment and basic due process protections for all employees who are the subject of an investigation. Id. at ¶ 143. In this case, the Plaintiff alleges, he was not provided those due process protections despite the University routinely extending those protections to female employees. Id. at ¶ 144. Further, the Plaintiff alleges, the University subjected him to gender discrimination when it terminated his employment. Id. at ¶ 145. According to the Plaintiff, in the past, similarly-situated female employees of the University were treated more favorably than him. Id. at ¶¶ 146–47.

The Defendants move for judgment on the pleadings on the Plaintiff's Title IX claims because: (1) the Plaintiff cannot satisfy the heightened pleading standard for reverse discrimination claims; (2) the Plaintiff was not performing his job at a level which met the employer's legitimate expectations; (3) the Plaintiff has not identified a similarly-situated female employee as a comparator; and (4) the Plaintiff's termination was not pretextual. The Plaintiff contests each of these assertions.

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial

assistance." 20 U.S.C. § 1681(a). Courts analyze Title IX discrimination and retaliation claims using the same standards as Title VII. Nelson v. Christian Bros. Univ., 226 F. App'x 448, 454 (6th Cir. 2007).

When a plaintiff seeks to prove discrimination based on circumstantial, or indirect evidence, courts apply the burden shifting framework adopted in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In this case, because the Plaintiff is a male employee asserting a claim of reverse sex discrimination, the first and fourth prongs of the McDonnell-Douglas framework are modified. Under this modified framework, a male plaintiff can establish a prima facie case of reverse sex discrimination if he demonstrates: (1) background circumstances to support the suspicion that his employer is that unusual employer who discriminates against the majority; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) that his employer treated differently employees who were similarly situated but not members of the protected class. Simpson v. Vanderbilty Univ., 359 F. App'x 562, 568 (6th Cir. 2009).

Although the parties dedicate significant attention to whether the Plaintiff has satisfied the McDonnell Douglas standard, "McDonnell Douglas . . . is an evidentiary standard, *not a pleading requirement*." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002) (emphasis added). The Supreme Court "has never indicated that the requirements for establishing a prima facie case under McDonnell Douglas also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." Id. at 511. See also id. at 512 ("Given that the prima facie case operates as a flexible evidentiary standard, it should not be transposed into a rigid pleading standard for discrimination cases"). Instead, a complaint must contain only a short and plain statement of the claim showing that the pleading is entitled to relief. Id. at 513–14.

33

To be sure, the pleading standard announced in <u>Twombly</u> and <u>Iqbal</u> applies in Title VII cases. However, as the Court made clear in <u>Twombly</u>, that pleading standard does not run counter to <u>Swierkiewicz</u>, 550 U.S. at 569–70, and the Sixth Circuit has recognized that <u>Swierkiewicz</u> remains good law after <u>Twombly</u> and <u>Iqbal</u>. <u>See</u> <u>Serrano v. Cintas Corp.</u>, 699 F.3d 884, 897 (6th Cir. 2012) (citing <u>Keys v. Humana, Inc.</u>, 684 F.3d 605, 609 (6th Cir. 2012)). Consequently, so long as a plaintiff's complaint provides a defendant with "fair notice of the basis [of his] claims," <u>Swierkiewicz</u>, 534 U.S. at 514, and an "adequate factual basis for those claims," <u>Serrano</u>, 699 F.3d at 897, a plaintiff's claim of employment discrimination will survive a motion to dismiss or, in this case, a motion for judgment on the pleadings.

Here, the Plaintiff has provided the Defendants with fair notice of the basis of his claim. The Complaint is clear that the Plaintiff is asserting a claim of reverse sex discrimination against the University based on the University's investigation of him and the termination of his employment, all in violation of Title IX. The remaining question is whether, regardless of the <u>McDonnell-Douglas</u> elements, the Plaintiff has alleged an adequate factual basis for those claims in his Complaint. The Plaintiff asserts that:

(1)     Title IX requires fair and impartial investigation and basic due process protections when an employee is the subject of a Title IX investigation;

(2)     Although the University routinely provides those protections to female employees subject to Title IX investigation, it did not provide those same protections to the Plaintiff;

(3)     The University discriminated against the Plaintiff on the basis of his sex when they terminated his employment;

(4)     Specifically, but for his sex, the Plaintiff "would have been permitted to continue working under the terms of a performance improvement program, in accordance with existing OSU policy";

34

(5)     The University applies a "harsher and more punitive standard" when investigating and disciplining male employees accused of sexual harassment or discrimination;

(6)     When female employees are accused of similar misconduct, they are "treated leniently" or the accusations are "disregarded";

(7)     In 2013, a female cheerleading coach was the subject of a Title IX investigation after allegations of "sexualized behavior" on the cheerleading team;

(8)     The female cheerleading coach was "determined to be responsible for alleged wrongdoing similar to that identified in the Glaros Report";

(9)     Rather than terminating the female coach's employment, the University provided her with an opportunity to correct the concerns identified in the investigation and resulting report.

Compl. at ¶¶ 143–47.

Given Swierkiewicz's undemanding standard for stating an employment discrimination claim, the Court concludes that these allegations provide an "adequate factual basis," Serrano, 699 F.3d at 897, for the Plaintiff's reverse sex discrimination claim. They support a reasonable inference that the Plaintiff was terminated from his employment while similarly-situated female employees were treated more leniently and permitted to retain their employment despite condoning misconduct similar to that the Plaintiff is alleged to have condoned. At this stage of litigation, nothing more is required of the Plaintiff. Therefore, the Court will deny the Defendants' Motion with respect to the Plaintiff's reverse sex discrimination claim.


**IV.     Conclusion**

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART the Defendants' Motion for Judgment on the Pleadings (doc. 9). The Court GRANTS the

Defendants' Motion with respect to the Plaintiff's Due Process claims and DENIES the Defendants' Motion with respect to the Plaintiff's Title IX sex discrimination claim.

The Court SETS an in-person scheduling conference for May 1, 2015 at 10:00 AM at the Joseph P. Kinneary United States Courthouse, 85 Marconi Blvd., Columbus, OH 43215.

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: April 24, 2015