```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                          EASTERN DIVISION

Jonathan N. Waters,             :
        Plaintiff,              :
    v.                          :       Case No.  2:14-cv-1704
                                :
Michael V. Drake, M.D., et al.: :       JUDGE JAMES L. GRAHAM
        Defendants.             :       Magistrate Judge Kemp
```

                                 ORDER

    This Order issues as a result of Plaintiff Jonathan Waters' request for the Court to review documents for which The Ohio State University has claimed a privilege and, as a result, has declined to produce during discovery.  The Court has now reviewed the documents submitted *in camera* under the terms of the Court's November 3, 2015 order (Doc. 85).  The purpose of this order is to advise the parties about the results of that review.

    The Court begins with a short description of the claims in this case which survived the Defendants' Motion for Judgment on the Pleadings.  Judge Graham's Opinion and Order of April 24, 2015 (Doc. 27), <u>Waters v. Drake</u>, __ F.Supp.3d. __, 2015 WL 1885887 (S.D. Ohio 2015), sets forth the background of the case in detail, noting that it arises out of the termination of Plaintiff Jonathan Waters as the Director of The Ohio State University Marching Band.  Mr. Waters was fired on July 24, 2014, after Ohio State had conducted an investigation and prepared a report outlining "sexualized" culture within the marching band. The report was published on the University's website the same day.  Mr. Waters sued, pleading one count (but three separate claims, two procedural and one substantive) grounded in the Due Process Clause of the Fourteenth Amendment, and one count

alleging reverse employment discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a).

Judge Graham first determined that Mr. Waters did not have a property interest in continued employment as the Director and he was not improperly denied a name-clearing hearing.  That holding disposed of his two procedural due process claims.  Judge Graham also concluded that the facts pleaded in the complaint did not support a reasonable inference that Defendants' conduct "shocked the conscience" in a way that triggered substantive due process protections.  The only claim which survived the motion was Mr. Waters' Title IX claim, which alleged that the University applied different standards and procedures in his case than it did when similar allegations were made against a female employee.  As Judge Graham's Opinion and Order succinctly describes this claim, it is based on an assertion that "Plaintiff was terminated from his employment while similarly-situated female employees were treated more leniently and permitted to retain their employment despite condoning misconduct similar to that the Plaintiff is alleged to have condoned."  Waters v. Drake, supra, at *21.

Mr. Waters served a comprehensive document request which prompted Ohio State to respond, in part, with a privilege log identifying a large number of documents as subject to either the attorney-client privilege or the work product doctrine.  Mr. Waters then filed a motion to compel an in camera review, making a number of points about the sufficiency of the description of the claims of privilege which appear on the privilege log, and also raising some substantive issues based on the information which does appear there.  The Court's review does, to a great extent, cure issues about how specific the log's descriptions are; the Court has now been able to review each logged document in its entirety and can determine the reasons why each was claimed to be privileged even if the log was less than precise on

that question. What remains is Mr. Waters' challenge to some of the substantive components of the University's claim of privilege.

One of these issues involves the University's retention of a public relations firm to assist it in crafting its public announcements about the investigation which led to the termination of Mr. Waters' employment. A number of documents were either sent to or prepared by that firm. As this Court has observed in another case, it is "generally true" that sharing attorney-client privileged communications with a public relations firm is a waiver of the privilege. See DRFP, LLC v. Republica Bolivariana de Venezuela, 2015 WL 6122988, *2 (S.D. Ohio Oct. 19, 2015), citing Egiazaryan v. Zalmayev, 290 F.R.D. 421, 431 (S.D.N.Y. 2013). In its memorandum (Doc. 62), the University addresses the issue with both legal arguments and an affidavit. The Court will examine each.

The affidavit, sworn to by Christopher Culley, Senior Vice President and General Counsel to the University, says the following. Mr. Culley first states that the University reasonably anticipated litigation as early as May 23, 2014, when he and the Office of Legal Affairs began to counsel the University about certain Title IX complaints which implicated Mr. Waters or the marching band. As part of that process, the University "retained consultants, including" The Edelman Company and The Curtis Media Group. Their responsibilities "included closely monitoring the situation and providing feedback in order to assist myself and the Office of Legal Affairs in providing the University with legal advice." Culley Affidavit, at ¶7. Later, the University retained the Sports Conflict Institute to help assess the band program and to assist the Office of Legal Counsel to advise administrators and the Trustees about "compliance with applicable laws and regulations, in anticipation of litigation."

-3-

Id. at 9.  Ohio State's legal argument can be capsulized in this sentence in its memorandum: "Communications involving the consultants are also protected by the attorney-client privilege when the consultants are retained 'for the express purpose of assisting its counsel in providing legal advice.'" Doc. 62, at 12, citing Graff v. Haverhill North Coke Company, 2012 WL 5495514 (S.D. Ohio Nov. 13, 2012).

Graff was a case in which four plaintiffs sued a coke processing company, asserting claims under various environmental statutes.  During the course of discovery, a dispute arose over some allegedly privileged documents.  The Court held that certain audit reports prepared in order to facilitate the giving of legal advice were covered by the attorney-client privilege, noting that the key question was, once a client seeks legal advice from its attorney, "whether the communications [with the consultant] were related to the request for legal advice ...."  Finding that at least some of the audit reports met that test, the Court refused to order their production.

Graff is of limited applicability here because there is a large factual difference between environmental audit reports prepared by an engineering consultant and public relations advice given to a university which is fully aware that a decision it is about to make will spark great public and media interest.  As the Egiazaryan court noted, "[c]ase law makes clear that '[a] media campaign is not a litigation strategy.' Haugh v. Schroder Inv. Mgmt. N. Am. Inc., 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003) ('Some attorneys may feel it is desirable at times to conduct a media campaign, but that does not transform their coordination of a campaign into legal advice.')." Egiazaryan, 290 F.R.D. at 431.  If Mr. Culley, even though he was legal counsel, involved the public relations firms not as part of his effort to provide legal advice to the University, but as part of

-4-

an effort to craft announcements which would be more palatable to the media or the public, he was not using the consultants in order to help him as a lawyer, but to help the University as a public institution anticipating a public relations campaign. Under that scenario, sharing otherwise privileged documents with the consultant is a waiver of the attorney-client privilege, and communications directly with the consultant are not privileged at all.

 Having reviewed the various communications with the public relations firms, it seems likely that most of them did not involve those firms' assisting Mr. Culley or his office in providing legal advice.  That is not the consultants' area of expertise, and advising a client on matters like the timing of its announcement of a decision or the content of its press releases or speeches is not legal advice.  On the current state of the record, it would be difficult for the Court to conclude that all of these communications were protected by the attorney-client privilege or that providing the public relations firms with otherwise privileged documents was not a waiver.

 That does not necessarily determine the question of the documents' discoverability, however.  The reason that the Court began its analysis with a recap of the current status of Mr. Waters' legal claims is to highlight the fact that, to be discoverable, information must, in the language of Fed.R.Civ.P. 26(b)(1), be "relevant to any party's claim or defense...."  Even if the documents were improperly withheld on privilege grounds, there is still a question about whether any of these public relations communications are relevant to Mr. Waters' Title IX claim.  For the following reasons, the Court holds that they are not.

 The Title IX claim involves comparing the way in which the University meted out sanctions to male and female employees

accused of similar misconduct.  There is no dispute that Mr. Waters was fired.  There is similarly no dispute about the nature of the misconduct the University has attributed to him.  The real issues underlying the Title IX claim are whether the University was (1) faced with similar allegations in other circumstances, (2) addressed such allegations with female employees, and (3) treated them differently.  The University's communications with its public relations or media consultants do not even remotely address these subjects.  None of them relate to the time frame in which the allegedly similar allegations were made against female employees, nor do they discuss those allegations or the University's discipline of those employees.  They are, as one might expect, exactly the type of communications which a public relations firm would make in this situation.  They counsel the University and its personnel about how to put the best spin on its decision, especially once the University made the decision to terminate Mr. Waters' employment and it was clear that a public announcement had to be provided.  The Court cannot conceive of how the release of any of these documents would assist Mr. Waters in proving his Title IX claim, or lead him to the discovery of evidence which might do so.  Consequently, although the Court does not necessarily agree with Ohio State that all of its communications with these various consultants are privileged, it sees no basis upon which to compel their release.

   Next, there are a number of documents which contain communications from one non-attorney to another.  Some of them are communications between the University's Board of Trustees and either the President, Dr. Drake, or with James B. (Blake) Thompson, who does not appear from the record either to be an attorney or to have been functioning in that capacity.  There are also a number of communications between the Board of Trustees and President Drake, or among members of the Board.  Perhaps the most

significant is a memorandum from President Drake to the Board of Trustees dated July 24, 2014, the day that Mr. Waters' employment was terminated.  Ohio State argues that because Mr. Culley was copied on these communications, they are also privileged.

Although the parameters of the attorney-client privilege are well-known, it bears repeating here what this Court said in Escue v. Sequent, Inc., 2012 WL 220204, *4 (S.D. Ohio Jan. 25, 2012):

> The purpose of the attorney-client privilege is to encourage clients to communicate freely and completely with their attorney. Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); Fisher v. United States, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1975). The privilege also serves the purpose of promoting "broader public interests in the observance of law and administration of justice." 449 U.S. at 389. The privilege, however, is not absolute. It applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice. 425 U.S. at 403.

There is no question that certain communications among employees or officers of a corporate client which do not directly involve an attorney may be privileged; otherwise, the client would be severely hampered in its efforts to obtain information needed for the attorney to render legal advice.  Cf. In re Behr Dayton Thermal Products, LLC, 298 F.R.D. 369, 375 (S.D. Ohio 2013)(a "communication between non-lawyers is generally not protected under the attorney-client privilege unless the 'dominant intent is to prepare the information in order to get legal advice from the lawyer.' Comtide Holdings, LLC v. Booth Creek Mgmt. Corp., No. 2:07-cv-1190, 2010 WL 5014483, at *2-3, 2010 U.S. Dist. LEXIS 127903, at *7 (S.D. Ohio Dec. 3, 2010).").  The group of documents provided for *in camera* inspection in this case contain some of these types of communications.  On the other hand, where the dominant purpose of such communications is not to secure legal advice or information requested by counsel, but to make

some type of policy or business decision, the communication cannot be insulated from discovery just by sending a copy of it to a lawyer. See Humphries v. Pennsylvania R. Co., 144 F.R.D. 177, 178 (N.D. Ohio 1953)("it is axiomatic that one cannot render privileged that which is otherwise not privileged merely by placing it in the hands of his attorney"); see also Andritz Sprout-Bauer, Inc. v. Beazer E., Inc., 174 F.R.D. 609, 633 (M.D. Pa. 1997) ("[w]hat would otherwise be routine, non-privileged communications between corporate officers or employees transacting the general business of the company do not attain privileged status solely because in-house or outside counsel is 'copied in' on correspondence or memoranda").

The Court concludes that the communications involving President Drake and the Board of Trustees on July 24, 2014, are not privileged. Document 3778 and its attachment, document 3779, simply do not involve the gathering of information at the request of counsel, or providing information to the President or the Board for the purpose of seeking legal advice. Further, although their relevance to the Title IX claim is tangential, they appear to be relevant enough to be discoverable. The Court will therefore order those documents to be produced. The Court has examined other such documents, including document 3794, in some detail, and has concluded that those documents do have the seeking of legal advice as a dominant purpose, and the privilege does apply to them.

The last category of documents to be addressed in this Order are documents which appear to have been either sent or received by Mr. Waters himself. Perhaps they are on the log because they were attached to attorney-client communications, but it is difficult to tell that from the way in which the documents have been arranged. Document 3846 is one example. Counsel for the University should review any documents which Mr. Waters either

-8-

wrote or received a copy of to make sure that a privilege has not been inadvertently claimed with respect to them.

The Court makes a final observation. The documents submitted for *in camera* review do not appear to have been "de-duplicated," and many copies of the same documents were separately logged, stamped, and included in the review set. This made the Court's task more difficult than it needed to be.

Based on the foregoing, Defendants are ordered, within fourteen days, to produce a copy of documents 3778 and 3779. The motion filed by Mr. Waters with respect to the privilege log (Doc. 58) is denied in all other respects. Mr. Waters' motion (Doc. 65) for leave to file a corrected amended privilege log is granted.

## MOTION FOR RECONSIDERATION

Any party may, within fourteen days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge. 28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 14-01, pt. IV(C)(3)(a). The motion must specifically designate the order or part in question and the basis for any objection. Responses to objections are due fourteen days after objections are filed and replies by the objecting party are due seven days thereafter. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This order is in full force and effect even if a motion for reconsideration has been filed unless it is stayed by either the Magistrate Judge or District Judge. S.D. Ohio L.R. 72.3.

/s/ Terence P. Kemp
United States Magistrate Judge