IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JONATHAN N. WATERS,

             Plaintiff,

    v.

MICHAEL V. DRAKE, M.D., *et al.*,

             Defendants.

Case No: 2:14-cv-1704

Judge Graham

Magistrate Judge Kemp

Opinion and Order

Plaintiff Jonathan Waters brings this employment discrimination action against his former employer, defendant The Ohio State University. Waters asserts a claim under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, alleging that Ohio State discriminated against him by terminating him from his position as Director of The Ohio State University Marching and Athletic Band because he is a man.

Ohio State moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. It argues that the evidence produced during discovery conclusively shows that Ohio State terminated Waters for legitimate, non-discriminatory reasons and not because of his gender. In response, Waters argues that Ohio State's discriminatory animus against him can be inferred from Ohio State's more favorable treatment of an allegedly similarly-situated female coach of the Spirit Squad and from the allegedly flawed and unfair investigation that Ohio State conducted regarding Waters. Waters further seeks relief under Rule 56(d) to conduct additional discovery.

For the reasons set forth below, the court denies Waters's request for Rule 56(d) relief and grants Ohio State's motion for summary judgment.

## I. Background

### A. Waters, Director of the Band

From 1995 to 1999, Waters was a student member of the Ohio State Marching Band. (Waters Dep. at 99-100, Doc. #79). He worked as a graduate assistant with the Band from 2000 to 2002 and then served as an Assistant Director from 2002 to 2012. (Id. at 100-102). Waters was

named interim Director of the Band in late June or early July 2012 and became the full-time Director in February 2013. (Waters Dep. at 103; Jan 30, 2013 Offer of Employment, Doc. #81-1 at PAGEID 4086-87).

In his position as Director of the Band, Waters was an unclassified employee in the School of Music, a department of the College of Arts and Sciences. (Jan 30, 2013 Offer of Employment). His employment with Ohio State was at-will. (Id.) Waters reported to Richard Blatti, Director of the School of Music, and Blatti was responsible for conducting annual evaluations of Waters's job performance. (Id.; 2013/14 Performance Review, Doc. #81-1 at PAGEID 4089).

The duties of Director of the Band had three components: administration, outreach and teaching. (Position Description, Doc. #81-1 at PAGEID 4095). The Director oversaw "all aspects of" the Band, including planning and overseeing Band performances, creating field show concepts, supervising and directing Band staff, overseeing the Band's finances and budget, serving as a liaison to other University departments (including the Department of Athletics) and to Ohio State alumni groups and donors, promoting the Band and supervising contacts with the media and public, coordinating the recruitment of high school students to the Band, and teaching Marching Band and Athletic Band classes. (Id.) The Marching Band has 225 student members each year, and the Athletic Band has between 250 and 300 members. (July 22, 2014 Investigation Report at 2 n.1, Doc. #8-8; Waters Dep. at 49).

**B.  Title IX Complaints and Investigation Report**

In May 2014, Ohio State's Office of University Compliance and Integrity ("OUCI") received two related Title IX complaints. The first was made by a female student member of the Marching Band. She claimed that Waters had retaliated against her after she reported having been raped by another member of the Band in the Fall of 2013. (Glaros Dep. at 115, 117, Doc. #80-4). The second complaint was made by the parent of the first complainant. The parent expressed concerns that the Marching Band had a culture of objectionable traditions and practices, many of which were "sexualized." (Investigation Report at 3).

OUCI then began investigating each Title IX complaint, as required by federal law and University policy, with a 60-day period in which to complete the investigations. (Glaros Dep. at 115, 221; 34 C.F.R. § 106.8; U.S. Dep't of Educ., Office of Civil Rights Apr. 4, 2011 Guidance Documents, Doc. #80-6 at PAGEID 3989-4060; University Policy 1.15 on Sexual Misconduct, Sexual Harassment, and Relationship Violence, Doc. #80-6 at PAGEID 3967). The investigations were conducted by Compliance Investigator Jessica Tobias and overseen by Assistant Vice President

of Compliance and Investigations, Christopher Glaros, who also served as interim Title IX Coordinator.[1]  (Glaros Dep. at 28, 246; Tobias Dep. at 23, Doc. #118).  Glaros and Tobias testified that no one exerted influence or control over how they conducted the investigation.  (Glaros Dep. at 245-46; Tobias Dep. at 24).  In accord with their standard practice, Glaros and Tobias "review[ed] each complaint and develop[ed] a strategy [and] investigation plan" and conducted interviews. (Tobias Dep. at 24-25).

OUCI's investigation of the first complaint concluded with a finding that the available evidence did not substantiate the student's claim of retaliation by Waters.  (Glaros Dep. at 161). Glaros informed Waters of this finding on July 22, 2014.  (July 22, 2014 Letter, Doc. #80-6 at PAGEID 4083).

Regarding the parent's complaint of a sexualized culture in the Band, OUIC interviewed Waters three times and received a written statement from him.  (Waters Dep. at 130; Glaros Dep. at 220-21; Tobias Dep. at 159-60; Written Statement (undated), Doc. #81-1 at PAGEID 4109).  In the written statement, Waters stated that he was "not insinuating that the culture of the Marching Band is in a 'good place' currently," and he acknowledged his awareness of Midnight Ramp, "tremendously offensive" and "inappropriate" nicknames, and "vulgar and inappropriate" Trip Tics. (Written Statement at PAGEID 4109, 4113, 4114).

OUCI interviewed two witnesses suggested by Waters, both of whom were on the staff of the Band.  OUCI also interviewed the two complainants, Blatti, a physical therapist who had traveled with the Band, and nine current and former members of the Band.  (Glaros Dep. at 220; Investigation Report at 3-4).

OUCI's investigation culminated in an Investigation Report dated July 22, 2014.[2]  The 23-page Investigation Report made the finding that the Marching Band's culture "facilitated acts of sexual harassment, creating a hostile environment for students."  (Investigation Report at 1).  The Report described numerous Band practices, the existence of which the Report said had been corroborated by multiple witnesses.  These practices included: "Fesler Night," an evening event

---

[1]  The position of Title IX Coordinator was under the supervision of Glaros.  (Glaros Dep. at 35). At the time of OUCI's investigations into the complaints relating to Waters, the prior Title IX Coordinator, Andrea Goldblum, had recently resigned and Glaros acted as interim Coordinator.  (Id. at 16-17).  Goldblum herself filed a complaint of gender discrimination against OUCI, alleging that OUCI mistreated her because she was a woman – a claim that an independent investigator found to be unsubstantiated.  (Apr. 25, 2014 Memo, Doc. #144-1 at PAGEID 6624).

[2]  The Investigation Report has also been referred to as the Glaros Report in court documents.

where new members learned about Band traditions; "Midnight Ramp," where members marched into the football stadium in their underwear after attending Fesler Night; nicknames, assigned by upperclassmen to new Band members and often sexually related; "Tricks" that members were expected to perform, sometimes related to their nicknames and involving reference to or simulation of sexual acts; "Rookie Introductions," where new Band members were sometimes subjected to sexually explicit questioning and dirty jokes while on buses travelling to away football games; "Rookie Midterms" and challenges, where members were given written questions and physical challenges that were sexually related, such as drawing a picture of a sexual position or act; "Trip Tic," a newsletter for away game trips that contained sexually related content, sometimes about members of the Band; and "Songbook," which contained sexually related, alternate lyrics to over 120 collegiate and various other songs.  (Id. at 4-10).  Attached as exhibits to the Report were examples of a Rookie Midterm and a Songbook.  (Id., Exs. A, B).

The Report also made the finding that Waters "knew or reasonably should have known about this culture but failed to eliminate the sexual harassment, prevent its recurrence, and address its effects." (Investigation Report at 1).  The Report noted the practices that Waters acknowledged having at least some knowledge of (or for which there was evidence that he knew), including Midnight Ramp, nicknames, tricks and Trip Tics.  (Id. at 17).

The Report recited the applicable University policy on sexual harassment and the applicable guidance from the Department of Education's Office of Civil Rights.  Under these standards, individuals who know or reasonably should know about sexual harassment that creates a hostile environment should act to eliminate the harassment, prevent its recurrence and address its effects. (Investigation Report at 15-16).  The Report concluded that Waters did not satisfy the applicable standards regarding a university official's response to reports of sexual harassment or a hostile environment.  (Id. at 19).  Noting that the standards require prompt corrective action from faculty and directors, the Report faulted Waters for taking an "evolving" approach to changing the Band's sexualized culture and for stating that the initiative for change should come from student leaders. (Id.)  For instance, Waters allowed Midnight Ramp to occur under his direction for two years (2012 and 2013) before deciding in June 2014 to end the practice.  (Id.)  Though Waters had claimed to be making efforts to change the Band's culture, witnesses "did not, however, report any significant change, or effort to change." (Id.)

The Report recommended that a course of training, counseling, and ongoing oversight be implemented for the Band's leaders and members in order to bring the Band program into

compliance with Title IX and University policies.  The Report made no recommendations as to disciplinary action that might be taken against Waters.

### C.  President Drake's Decision to Terminate Waters's Employment

Dr. Michael Drake became President of Ohio State on June 30, 2014.  He had previously served as Chancellor of the University of California, Irvine.  Shortly after arriving at Ohio State, he was informed of "an investigation into behaviors and the culture in the marching band."  (Drake Dep. at 21, Doc. #80-1).  He received a draft version of the Investigation Report and later received the final version of the Report, as well as a copy of the Songbook.  (Id. at 21, 23).  Drake read through the Report and found its findings to be "convincing."  (Id. at 22).  He believed that the practices described in the Report reflected a "hostile" and "hazing type" environment.  (Id. at 23).  He believed that the lyrics in the Songbook would be "extraordinarily offensive to many people."  (Id.)

Because he received the information about Waters and the Band shortly after becoming President, Drake tried to "develop a context to weigh" the information by speaking with senior-level individuals at the University, including the Vice President, members of the Board of Trustees, and General Legal Counsel.  (Drake Dep. at 24-25, 33-34, 36-37, 52-53).  Through these discussions, Drake learned of, or learned more about, certain issues within the Band during Waters's time as Director.  (Id. at 22 (stating that he confined his considerations to "things that occurred during [Waters's] time as Director")).

Drake became aware of an assault reported by a female Athletic Band member to Waters in March 2013.[3]  The alleged assailant was a male member of the Athletic Band.  Waters decided not to allow the female student and male student to make an upcoming Band trip.  (Glaros Dep. at 113; Waters Dep. at 111-13).  Concerned that Waters's decision would constitute retaliation against the female student, the Office of Legal Affairs intervened to ensure that she would be allowed to make the trip.  (Glaros Dep. at 113-14; Waters Dep. at 112-13).  Drake spoke to certain individuals at the University about the matter, and he reached the conclusion that Waters handled the situation in the "wrong" fashion.  (Drake Dep. at 32-33 (stating his belief that "a negative response" to an individual reporting to be the victim of a sexual assault "could be seen as being punishment or dissuading someone from coming forward")).

---

[3]  This incident is mentioned in a footnote to the Report.  (Investigation Report at 12 n.7).

Based on his discussions with other individuals at the University, Drake formed the impression that Waters had been "slow to respond" to issues involving sexual assault.[4] Drake believed that Waters had displayed "at least a reluctance to address these issues in a forthright and immediate fashion which . . . they deserved or needed to be done." (Id. at 25). Drake was advised by the Vice President of Student Life that Waters had been reluctant to schedule Title IX training for the Band – that there were "promises of training" but no "real definitive steps taken" to address how Title IX issues should be handled. (Id. at 32, 34).

Moreover, Drake testified that he received information which led him to believe that Waters was not acting honestly in denying the existence of problems within the Band. Drake became aware of a meeting in October 2013 between Waters and a former communications employee at Ohio State who confronted Waters about the existence of a culture of misbehavior in the Band. (Drake Dep. at 101). Waters denied that such a culture existed, both to the employee and in an email to a public relations employee at Ohio State. (Id.; Oct. 31, 2013 email, Doc. #81-1 at PAGEID 4098 (Waters stating that an employee "shared with me that there are perhaps some concerns from the Board of Trustees and Administration regarding a culture within the band. I [am] exceptionally surprised about the rumors . . . .")). Drake understood Waters's statements to reflect a position that "there's not a problem in the band." (Drake Dep. at 101).

Drake also spoke to Provost Joseph Steinmetz, who had spoken with Waters in November 2013 about the culture issues and October 2013 rape. (Waters Dep. at 118-19). Waters stated to Steinmetz that "the band was not the band it was 10 or 20 years ago in terms of its culture" and that he was "working on culture issues within the band." (Id. at 120). Steinmetz told Drake about his conversation with Waters. Drake was troubled that Waters characterized the Band's problems as primarily a thing of the past and had not, in Drake's view, properly addressed those problems. (Drake Dep. at 68-69).

Drake also became aware of an incident in which Waters verbally attacked a student drum major. The student had recorded the incident and Drake listened to the audio recording.[5] In Drake's description, Waters used expletives "throughout the conversation" and was "very harsh," "offensive," "demeaning" and "threatening" toward the student. (Drake Dep. at 28-29). Waters

---

[4]  In October 2013, a male Band member committed a rape that resulted in his suspension and eventual expulsion from the University. (Waters Dep. at 118-19).

[5]  The incident is mentioned in the Investigation Report as an issue that was raised by a witness during the investigation. (Investigation Report at 20).

was asked about the incident during one of the interviews for the Investigation Report, but he denied ever having yelled or cursed at a student.[6] (Investigation Report at 20). Drake believed that Waters made a "false" and "dishonest" statement when he denied having knowledge of the incident. (Id. at 24).

In determining his response to the information provided to him, Drake weighed the evidence and "wanted to be careful and thoughtful in approaching it in getting to the right outcome." (Drake Dep. at 39). He viewed the matter as one that was for him to decide. (Id. at 65 ("This felt like a decision that was mine to make. That was my approach from the very beginning.")).

Drake considered the option of taking disciplinary action short of termination – of requiring training or a performance improvement plan.[7] Drake determined that a performance improvement plan was not the appropriate course of action because he did not view the situation as "correctable" as long as Waters remained as the Director. (Drake Dep. at 71 (stating that improvement plans are frequently used where there is a "particular thing" that can be corrected), 22 ("I believe that a change in leadership was necessary to change that culture.")). In Drake's experience, such plans were not suited for situations where there is "dishonesty involved, where we have been engaged with a senior leader who has misrepresented material facts to us." (Id.) Drake added, "I find that to be something that's extraordinarily difficult to deal with because we have done a lot to destroy the trust that we need to move forward." (Id. at 72). Drake found that Waters had made denials of a sexually hostile and harassing culture, the existence of which the University had developed a "record of." (Id.)

Drake acknowledged Waters's effort to stop Midnight Ramp and to curb the use of nicknames. (Drake Dep. at 100, 103). But he concluded that the efforts were "insufficient," particularly in light of Waters's leadership position and the reports of continued issues under Waters's time as Director. (Id. at 43, 101). In Drake's view, "the job of the Director wasn't to attempt. The job was to correct these things and make it a safe place for our students . . . ." (Id. at 101; see also id. at 26 ("[I]t was really the response of the person in charge, the Director, that was

_____

[6] It is now undisputed that Waters was the individual who can be heard talking to the student in the recording. (Waters Dep. at 141).

[7] Drake testified that, at the time he decided to terminate Waters's employment, he was not yet familiar with Ohio State's "Performance Improvement Plan" policy specifically, but he was familiar with the performance improvement concept from his time serving in the University of California system. (Drake Dep. at 72-73).

what led me to the decision that the Director needed to be replaced.")).  Drake concluded that there were "many things that . . . reflected a failure of leadership . . . [and issues] were time and time again not addressed in an appropriate fashion."  (Id at 68).  Drake testified that Waters's gender "played no part" in his decision to terminate Waters's employment.  (Id. at 115-17, 284).

On July 24, 2014 Waters was notified by letter that his employment had been terminated. (July 24, 2014 Termination Letter, Doc. #80-2 at PAGEID 2701).

**D.  Lenee Buchman, the Alleged Similarly-Situated Individual**

Lenee Buchman, a female, became the Head Coach of the Spirit Program at Ohio State in 2009.  (Buchman Dep. at 13, Doc. #128).  Her position was an unclassified, at-will position in the Department of Athletics.  (July 1, 2009 Offer of Employment, Doc. #144-1 at PAGEID 6602). During her 4 years at Ohio State, Buchman reported to several different individuals, including to the Director of Fan Experience at first and later to Martin Jarmond, an Associate Athletics Director. (Buchman Dep. at 23, 30).  Her supervisors ultimately reported to Director of Athletics Eugene Smith.  (Id. at 191).

Buchman directed the cheer, dance and mascot programs and her duties included: coaching students; supervising staff; managing the program's budget; assisting students with their schedules, academic responsibilities and medical needs; coordinating travel; and attending meetings regarding sporting events, such as football and basketball games.  (Buchman Dep. at 20-21).  She had approximately 60 students in her program each year.  (Id. at 238).

In July 2012, a male cheerleader reported to Buchman that he was "concerned" about a text message he received from assistant cheerleading coach Eddie Hollins.  (Buchman Dep. at 111). Buchman did not see the text or know the nature of its content.  (Id. at 111, 133, 168).  The student asked Buchman not to say anything or do anything about the matter.  (Id. at 111, 169).  Buchman was aware that her coaches employed a variety of motivational tactics and could leave students "feeling as if we're pushing too hard."  (Id. at 169).  Buchman had not previously been aware of Hollins privately sending text messages to students.  (Id. at 168).  She held a staff meeting with her coaches and told them to "keep all communications public" and be "respectful" and "think before you are pushing somebody."  (Id. at 169).

Buchman later learned that the University's Office of Human Resources was investigating Hollins and another assistant cheerleading coach, Dana Bumbrey.  (Buchman Dep. at 130, 170; Glaros Dep. at 97).  In April 2013, complaints were made against Hollins and Bumbrey alleging that each of them had made sexually harassing comments to students and had engaged in sexual touching

of students.  (Smith Supp. Aff. at ¶ 6, Doc. #86-1; Buchman Dep. at 130-36).  The investigation substantiated the allegations, and Hollins and Bumbrey were terminated on May 23, 2013.  (Smith Supp. Aff. at ¶ 7).

Buchman was not the subject of the April 2013 complaints or the ensuing investigation, but the investigation revealed that the male cheerleader had advised Buchman of his having received a text message from Hollins.  The investigation further revealed that the text message which Hollins sent to the male cheerleader was sexual in nature.  (Smith Supp. Aff. at ¶ 8; Buchman Dep. at 109, 133; Jarmond Dep. at 52, Doc. #124).

This discovery caused Jarmond, in consultation with Kim Heaton, the Human Resources Director within the Athletics Department, to place Buchman on a performance improvement plan.[8] (Jarmond Dep. at 46; Performance Improvement Plan, Doc. #144-1 at PAGEID 6604).  According to Jarmond, under University policy Buchman should have promptly notified her superior or Human Resources of the student's report of an inappropriate text message from Hollins.  (Jarmond Dep. at 42).  Buchman instead tried to handle it herself, internally with her staff.  (Id. at 41-42). Heaton issued a letter of reprimand to Buchman on June 20, 2013.  The letter stated that Buchman "did not follow the proper channels" and instead "tried to resolve the issue on [her] own."  (June 20, 2013 Letter of Reprimand, Doc. #144-1 at PAGEID 6603).  The letter further stated, "As a coach you are required to report any complaints that a reasonable person would believe to be sexual harassment to human resources."[9]  (Id.)  The letter notified Buchman that she and her staff would be required to attend sexual harassment training in July 2013.  (Id.)

Jarmond testified that the reasons for placing Buchman on a performance improvement plan were two-fold.  The first was to provide her with guidance, in light of her failure to report the text message to her supervisor or to Human Resources.  (Jamond Dep. at 47).  The second was to properly educate the coaching staff on sexual harassment issues, in light of the findings made against the assistant coaches.  (Id.)  Under the performance improvement plan, Jarmond and Buchman were to meet biweekly for six months to discuss plans for improvement and to evaluate progress in the

---

[8] Jarmond was not directly familiar with the University's formal guidelines pertaining to performance improvement plans and relied on Heaton's expertise in crafting the terms of the plan.  (Jarmond Dep. at 49, 73).

[9] Human Resources did not make a finding as to whether Buchman knew that the text was sexual in nature.  Again, Buchman testified that she did not.  (Buchman Dep. at 111, 133, 168).

areas of communication, culture, leadership and recruiting. (Performance Improvement Plan; Jarmond Dep. at 54-55).

Jarmond did not contemplate terminating Buchman's employment because the April 2013 complaints were not made against her and she was not the subject of the investigation. (Jarmond Dep. at 52, 54 (stating that the performance improvement plan was not a condition for Buchman's continued employment – "It had nothing to do with firing. It was all about improving her program and performance.")). Jarmond had no reason to believe that Buchman knew anything about the misconduct in which Hollins and Bumbrey had engaged. (Jarmond Dep. at 57, 83-84). Jarmond testified that Buchman's gender played no role in his decision to place her on a performance improvement plan. (Id. at 84).

In August 2013, a cheerleading student filed a complaint of retaliation against Buchman, alleging that he was excluded from the cheerleading team because he participated in the investigation of Hollins and Bumbrey. (Buchman Dep. at 184; Jarmond Dep. at 55). An investigation cleared Buchman of the charge of retaliation. (Buchman Dep. at 185; Jarmond Dep. at 55, 81). However, the investigation revealed that Buchman had participated in a cheerleading camp run by Bumbrey in August 2013, after Ohio State had terminated his employment. (Buchman Dep. at 185; Jarmond Dep. at 81). And it revealed that in September 2013, Hollins unexpectedly appeared at a cheerleading team practice and Buchman did not approach him or ask him to leave. (Id.) In October 2013, Human Resources prepared an investigation report on these two incidents, and Gene Smith terminated Buchman's employment a month later. (Nov. 22, 2013 email, Doc. #144-1 at PAGEID 6607; Nov. 25, 2013 Termination Letter, Doc. #144-1 at PAGEID 6609). Smith terminated Buchman on the grounds that she had not demonstrated the leadership expected of a head coach when she "aligned" herself and Ohio State with Bumbrey at his camp and when she failed to eject Hollins from the team's practice. (Nov. 22, 2013 email).

E.    **Interaction Between the Band and Spirit Program**

The Band and the Spirit Squad routinely appeared at the same events, including football and basketball games, fundraisers, alumni events and events surrounding football bowl games. (Buchman Dep. at 73-74, 76-77, 79, 81-82, 84-85, 89-93; Waters Dep. at 250). Each program controlled its own performances, such that Waters did not participate in determining the content or design of the Spirit Squad's performances, nor did Buchman participate in determining the content or design of the Band's performances. (Buchman Dep. at 202, 211-13, 216). The Band and Spirit Squad did not practice together. (Id. at 213-14).

In preparation for home football games, Waters and Buchman both attended operations meetings in which representatives of law enforcement, parking services, concessions and food services, stadium facilities, the University's Department of Fan Experience and others were in attendance. (Buchman Dep. at 200-02). About 50 people attended these meetings, the purpose of which was to plan for the logistics and timing of what happens during the course of a game day. (Id. at 201-07). During games, Waters and Buchman both wore headsets, as did members of the television crew, sound crew, light crew and Fan Experience. (Id. at 59-60). As a group, they kept in communication as to what would occur during timeouts, such as the Band playing, the cheerleaders performing and so forth. (Id. at 59-60, 209-10).

On occasion, the Band and Spirit Squad traveled together to an away football game, bowl game or NCAA tournament basketball game. (Buchman Dep. at 41-42, 45-46, 86-106; Waters Dep. at 250). Such travel, particularly to bowl games, included joint travel arrangements for the entire University party, including University officials, donors and parents. (Buchman Dep. at 216-18). The Athletics Department handled the travel arrangements and paid per diems, including to members of the Band and the Spirit Squad. (Id. at 42, 46-47, 49-50, 218). Though Buchman and Waters sometimes communicated with each other concerning the logistics of travel, they each were responsible for the members of their own program in regards to travel. (Id. at 43-44, 48, 50 ("I took care of my personnel. He took care of his.")).

### F.    Office of Civil Rights Compliance Review

In July 2010, the United States Department of Education's Office of Civil Rights ("OCR") initiated a compliance review of Ohio State's Title IX program. (Glaros Dep. at 111). OCR did not conduct the review based on any complaint, but rather initiated it as a proactive measure to "survey the landscape" of the Title IX program in "expansive and comprehensive fashion" to ensure its compliance with the law. (Id. at 146-47).

In May 2013, OCR informed Ohio State that its review was nearly complete. (Glaros Dep. at 148-49). OCR provided Ohio State with "positive" feedback and made only "minor" recommendations about changes that it should implement. (Id. at 149-50). In August 2013, OCR sent Ohio State a draft resolution agreement. (Id. at 151; Aug. 5, 2013 email, Doc. #132-1 at PAGEID 6233). Ohio State was "surprised" by the need to execute a resolution agreement, given the "very positive feedback" it had received from OCR, and set up a meeting in December 2013 with OCR to further discuss the matter. (Glaros Dep. at 151-52).

11

At the December 2013 meeting, OCR explained that the resolution agreement was necessary to formally bring a conclusion to the compliance review.  (Glaros Dep. at 156).  OCR directed Ohio State to provide updated information for inclusion in a revised version of the draft resolution agreement.  (Id. at 156-57 (stating that OCR "wanted to update the information that they had been collecting to date" so they had "fresh information as they finalized and tweaked" the agreement)).

Among the updates Ohio State provided was informing OCR of the actions it had taken regarding the coaches in the Spirit Program.  Ohio State reported that complaints had been filed against Hollins and Bumbrey for sexually harassing behaviors and that Ohio State had terminated their employment after an investigation substantiated the complaints' allegations.  (Feb. 28, 2014 letter, Doc. #132-1 at PAGEID 6248).  Ohio State further reported that Buchman had been given a performance improvement plan for failing to respond effectively to a student telling her of his receipt of a private text message from an assistant coach.  (Id.)  Ohio State also reported that Buchman was later terminated for her "failures of leadership" in continuing to associate with the terminated assistant coaches.  (Id.)

On July 24, 2014, shortly after Ohio State terminated Waters's employment, General Legal Counsel for Ohio State called OCR to communicate that "significant Title IX problems" had been found with the Marching Band.  (Glaros Dep. at 158, 162).  OCR accepted the General Counsel's offer to make staff available to discuss the Marching Band investigation, and a meeting between University officials and OCR took place on August 13, 2014.  (Id. at 158-60).  Glaros and Tobias attended the meeting, as did the new Title IX Coordinator at Ohio State and a Deputy General Counsel.  The meeting lasted about one hour, and the representatives from Ohio State told OCR about:

> our investigation, the nature of the complaints that we received, the process that we used to investigate these issues, the facts that we found, the analysis of those facts under University policy and Title IX, the findings that we made and the recommended corrective actions to address the systemic culture problems that we discovered in the marching band.  We also told them that we had investigated the retaliation complaint against Mr. Waters comprehensively, and based on the available evidence, [we were] not able to substantiate that complaint.

(Id. at 161; see also Tobias Dep. at 172 (testifying that they discussed "the culture of the band at length")).

OCR had already reviewed the Investigation Report and, at the meeting, indicated its agreement with the Report's analysis and findings.  (Glaros Dep. at 162).  OCR came to the meeting with a revised version of the resolution agreement in hand.  (Id. at 163).  The revised agreement

included a section entitled "University's Investigation of Marching Band."  (Sept. 8, 2014 Resolution Agreement at § VII, Doc. #144-1 at PAGEID at 6713).  The revised agreement incorporated the language which appeared in the Investigation Report concerning the corrective action that was to be taken by the Ohio State.[10]  The corrective action included strengthening the Band's leadership, updating the Band's policies and procedures to ensure Title IX compliance, training Band staff on Title IX issues, providing counseling for victims of sexual harassment, distributing written materials on sexual harassment and sexual violence to Band staff and members, and conducting assessments of the effectiveness of efforts to change the Band's culture.  (Id.)

President Drake, on behalf of Ohio State, signed the revised resolution agreement on September 8, 2014.  OCR issued a letter to Drake on September 11, 2014 advising that OCR had formally concluded its compliance review and would monitor Ohio State's compliance with the agreement.  (Sept. 11, 2014 Letter, Doc. #144-1 at PAGEID at 6717).

### G.    New Director of the Band Named

In February 2016, Ohio State announced that Dr. Christopher Hoch had been named as Director of the Band.  (Feb. 24, 2016 Press Release, Doc. #144-1 at PAGEID at 6747).  Dr. Hoch, a man, became the first permanent Director since Waters was terminated.


## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009).  The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)

---

[10]  In the Investigation Report, the steps of corrective action were listed as recommendations and were stated to be modeled upon resolution agreements that OCR had made with other educational institutions.  (Investigation Report at 21).  In the revised resolution agreement, the corrective steps were listed as requirements that Ohio State had to fulfill and provide quarterly progress reports on.

(emphasis in original); see also Longaberger, 586 F.3d at 465.  "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment."  Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248).  Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations.  Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).  Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.  The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III.    Discussion

### A.    *Prima Facie* Case of Reverse Gender Discrimination

#### 1.    Elements

Title IX provides that no person on the basis of sex shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  "Title IX proscribes gender discrimination [against employees and students] in education programs or activities receiving federal financial assistance."  North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 514 (1982).

"Because Title IX does not provide an analytical framework for claims of gender discrimination by an educational institution, [most courts] have applied the McDonnell Douglas burden-shifting framework used in analyzing discrimination claims arising under Title VII."  Arceneaux v. Vanderbilt Univ., 25 Fed. App'x 345, 347 (6th Cir. 2001) (citing cases).  In the absence of direct evidence of discrimination, McDonnell Douglas requires a plaintiff to establish a *prima facie*

case of discrimination by demonstrating that he (1) was a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position; and (4) that "a comparable non-protected person was treated better." Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992) (citing McDonnell Douglas v. Green, 411 U.S. 792, 802 (1972)).

Ohio State makes two arguments as to why Waters cannot establish a *prima facie* case. The court will limit its decision to the second argument.

Ohio State's first argument, which pertains to the first McDonnell Douglas factor, is that a plaintiff in a reverse discrimination case must satisfy a heightened standard of establishing that "'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6th Cir. 1985) (quoting Parker v. Baltimore and Ohio R.R. Co., 652 F.2d 1012, 1017 (D.C. Cir. 1981)). Ohio State's position has some support in the case law. See Sutherland v. Michigan Dep't of Treasury, 344 F.3d 603, 614 (6th Cir. 2003) (applying Murray). In response, Waters argues that the court should reject imposing a heightened standard in reverse discrimination cases. This position too has some support in the case law. See Zambetti v. Cuyahoga Cmty. Coll., 314 F.3d 249, 257 (6th Cir. 2002) ("[W]e note that the 'background circumstances' prong, only required of 'reverse discrimination' plaintiffs, may impermissibly impose a heightened pleading standard on majority victims of discrimination.") (citing cases); Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 801 n.7 (6th Cir. 1994) ("We have serious misgivings about the soundness of a test which imposes a more onerous standard for plaintiffs who are white or male than for their non-white or female counterparts."). Because Ohio State has so clearly demonstrated that it is entitled to summary judgment on the basis of its second argument (concerning the absence of a similarly-situated individual), the court declines to decide whether it believes the heightened "background circumstances" standard remains good law in reverse discrimination cases in the Sixth Circuit.

## 2.    Similarly-Situated Individual

Ohio State's other argument is that Waters has failed to establish the existence of a similarly-situated female at Ohio State who received more favorable treatment than he did. In order to satisfy the fourth prong of McDonnell Douglas, a plaintiff must "demonstrate that he or she is similarly-situated to the non-protected employee in all relevant respects." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998). Although the relevance of various aspects of an employment situation will depend on the circumstances of each case, courts generally consider such factors as whether the plaintiff and his proposed comparator dealt with the same supervisor or

decisionmaker, were subjected to the same standards and "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Mitchell, 964 F.2d at 583; Ercegovich, 154 F.3d at 352 (noting that these factors are relevant "in cases alleging differential disciplinary action"); McMillan v. Castro, 405 F.3d 405, 414 (6th Cir. 2005).  "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the relevant aspects.'"  Ercegovich, 154 F.3d at 352 (quoting Pierce, 40 F.3d at 802) (emphasis omitted).

Waters argues that Lenee Buchman is a suitable comparator because both of them were employed by Ohio State in unclassified positions and both held the title of "Director."  He emphasizes that Ohio State's sexual harassment policy applies to all departments within the University.  He further argues that "[i]t is common sense that marching bands and cheerleaders are similar units," given that they commonly appear at the same events, including athletic events, fundraisers and alumni events.  (Pl.'s Mem. in Opp'n at 22, Doc. #144).  Waters contends that the Band and Spirit Squad were both overseen by the Fan Experience Department on football game days.  He argues that Ohio State treated Buchman more favorably than him because when acts of sexual harassment and misconduct were discovered to have occurred in the Spirit Squad, Buchman was given a performance improvement plan instead of terminated.

The court finds as a matter of law that Waters and Lenee Buchman were not similarly situated in all relevant respects.  As discussed below, the court concurs with Ohio State's assessment that Waters and Buchman "do not share in common any relevant employment aspects."  (Defs.' Mot. for Summ. J. at 33, Doc. #132).

The court begins with the undisputed fact that Waters and Buchman were employed in separate departments at Ohio State.  Waters held a position in the School of Music, within the College of Arts and Science, while Buchman's position was within the Department of Athletics.  They reported to different supervisors – Waters to Blatti and Buchman to Jarmond and Smith.

Also undisputed is that different decisionmakers made the respective decisions to discipline Waters and Buchman.  In Waters's case, Drake made the decision to terminate his employment.  Drake did not consult with Jarmond, Heaton, Smith or any representative of the Athletics Department in deciding to terminate Waters's employment.  (Drake Dep. at 138 (stating that his conversations about the Band were "with the Provost to whom the School of Music reported

because that was the proper reporting relationship")).  In Buchman's case, Jarmond placed her on a performance improvement plan after consulting with Heaton, the Athletics Department's Human Resources Director.  That Waters and Buchman worked in different departments and received discipline from different supervisors strongly indicates that they were not similarly situated.  See Mitchell, 964 F.2d at 584; Radue v. Kimberly-Clark Corp., 219 F.3d 612, 618 (7th Cir. 2000) ("Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently.").

Ohio State has also shown that Drake was not aware of the Buchman situation when he decided to terminate Waters.  Buchman's placement on a performance improvement plan and her later termination predated Drake's arrival at Ohio State.  (Drake Dep. at 285).  And Drake did not learn about Buchman or the nature of her situation until the summer of 2015, one year after the termination of Waters.  (Id. at 122-23, 142-43).  Thus, Drake did not know about or consider Buchman's situation or the discipline she received when he was evaluating what action he would take in regards to Waters.  Cf. Seay v. Tennessee Valley Auth., 339 F.3d 454, 480 (6th Cir. 2003) (holding that plaintiff and comparator, who worked in different departments for different supervisors, could still be similarly situated if plaintiff could establish that his supervisor was "well-aware of the discipline meted out to past violators" by the employer).

Waters points out that Drake may have initially thought Waters worked for the Athletics Department.  When Drake first arrived at Ohio State and learned of the Waters investigation, he approached Smith to check to see if the Band was part of the Athletics Department.  (Drake Dep. at 123-25, 130).  However, Smith informed him that the Band was not, and by the time Drake considered whether to terminate Waters, he knew that Waters was not employed by the Athletics Department.  (Id. at 125; Smith Supp. Aff. at ¶ 14).  The evidence establishes beyond dispute that Drake did not treat Waters as though he were an Athletics Department employee at the time of the decision to terminate and that Smith did not provide any input to Drake about how to handle the situation regarding Waters and the Band.  (Drake Dep. at 139 (stating that his conversation with Smith about Waters and the Band situation was "very brief" and limited to "the reporting structure"); Smith Supp. Aff. at ¶ 14 ("I did not speak to President Drake regarding the decision to terminate Mr. Waters and I was not involved in the decision to terminate Mr. Waters.")).

Waters also points out that he and Buchman both were unclassified employees who held the title of Director.  But without more, these similarities are superficial, particularly for an institution as

large as Ohio State.  Waters has not articulated what significance these similarities have in the context of this case.  If anything, that he and Buchman were at-will employees who held leadership positions over programs in different departments suggests that each were subject to their own supervisors' discretionary evaluations of their leadership skills, and likely less subject to any common set of criteria regarding their job performance.

Discovery indeed has established that Drake and Jarmond were not applying the same criteria, standard or policy in making their respective decisions.  Cf. White v. Duke Energy-Kentucky, Inc., 603 Fed. App'x 442, 448 (6th Cir. 2015) (finding that managerial employee and non-managerial employee could be similarly situated if a uniform company policy applied the same to both).  Though Waters correctly notes that Ohio State has sexual harassment policies applicable to all University departments, Drake testified at length that the decision to terminate was uniquely his own and not pursuant to any policy.  (Drake Dep. at 29-30, 39, 65, 72-73).  Drake had just arrived at Ohio State when he received a draft version of the Investigation Report, and he was unfamiliar with specific University policies.  Through conversations with senior-level individuals at Ohio State, he attempted to gain a sense of context, not about University policy, but about recent incidents and issues concerning Waters and the Band.  Drake reached the opinion that the Investigation Report had a substantial basis in fact and he personally concluded that Waters had failed to act in a timely and forthright manner in response to the issues concerning the Band.  Drake's decision to terminate stemmed from his view of the seriousness of the Band's culture problems and his belief that Waters had acted dishonesty and failed in leadership.

In Buchman's case, by contrast, Jarmond consulted with a Human Resources Director who advised him of the University's policies regarding performance improvement plans and a coach's obligations to report inappropriate conduct between a student and staff.  Jarmond's decision thus resulted from his application of University policy to a situation for which he believed education and training, rather than discipline, was the primary need.

The court further finds as a matter of law that Waters and Buchman did not engage in the same or substantially similar conduct.  "In order for the conduct of a comparable employee and the Title VII plaintiff to be considered the 'same conduct,' it must be similar in kind and severity." Barry v. Noble Metal Processing, Inc., 276 Fed. App'x 477, 483 (6th Cir. 2008) (citing Clayton v. Meijer, Inc., 281 F.3d 605, 611 (6th Cir. 2002)).  It should be noted from the outset that the posture in which the respective actions of Waters and Buchman came under review differed greatly.  Unlike

Buchman, Waters was the subject of two Title IX complaints, one of which led to the Investigation Report.

Several key factors readily distinguish Waters's conduct from that of Buchman. The court starts with knowledge. Waters admitted he had knowledge of Midnight Ramp, "tremendously offensive" nicknames and "vulgar" Trip Tics. (Investigation Report at 17; Written Statement at PAGEID 4113, 4114); Waters Dep. at 277-79 (acknowledging that he attended Midnight Ramp after he became Director and describing it as "Undie Run type [of] antics"); id. at 233 ("I don't disagree that there were culture issues in the band.")). He knew of an assault reported by a female Athletic Band member to him in March 2013 and of a rape committed by a male Band member in October 2013. Steinmetz and a communications employee had both confronted Waters about culture problems within the Band. In contrast, Buchman knew only of the fact that one of her students had received a private text message from an assistant coach. She did not know or have reason to know of the message's content and the student expressly asked her not to do anything further about the matter.

Next, Waters had a much greater level of involvement in the conduct at issue than did Buchman. Waters was present at Midnight Ramp and possessed a copy of a Band directory (updated June 2014) listing "sexually explicit nicknames, including some given to new members in 2013." (Investigation Report at 17). Witnesses stated that Waters had copies of Trip Tics and was present in September 2013 on a bus where students engaged in sexually suggestive conduct. (Id.). It was Waters who verbally attacked a student drum major in a recorded conversation and Waters who attempted to prevent a female member from traveling with the Band after she reported being the victim of sexual assault. In contrast, there is no evidence that Buchman ever participated in inappropriate conduct or witnessed such conduct by her staff or students prior to her placement on a performance improvement plan. The nature of misconduct on Buchman's part was in failing to report the text message to a superior or Human Resources. It is important to note that later when Buchman did have knowledge of what her assistants had done and chose to continue to associate them, she received the same disciplinary action as Waters did – termination of her employment.

The slow and evasive responses of Waters to the Band's issues distinguish him from Buchman as well. Even prior to the filing of the Title IX complaints in May 2014, Waters had a record of being reluctant to address Title IX issues, failing to schedule Title IX training and denying to other University officials that the Band had a current culture problem. Drake saw those same tendencies continue as Waters responded to the investigation of the Title IX complaints. Waters

preferred an "evolving" approach to changing the Band's sexualized culture and believed the initiative for change should come from student leaders.  He pledged to end Midnight Ramp and the use of nicknames only after OUCI began its investigation.  (Investigation Report at 19; Written Statement at PAGEID 4114).  And Waters denied to an investigator that he had yelled or cursed at a student, despite the audio recording of his verbal attack of the drum major.  By comparison, Buchman responded immediately to the report of the text message – calling a staff meeting and admonishing her coaches to "keep all communications public" and "think before you are pushing somebody," though she did not further report the text to the proper channels.

Finally, the court rejects plaintiff's argument that it is "common sense that marching bands and cheerleaders are similar units."  The public appearances that the Band and Spirit Squad made at football games and other such events have no relevance to the conduct at issue in this case.  This is not a case, for instance, about the Band and Spirit Squad both failing to follow instructions from the Fan Experience Director during a game and Waters receiving more severe discipline than Buchman did.  Nor is it a case where Waters and Buchman both falsified travel expenses to common events and Buchman was treated more leniently.  Rather, the conduct at issue here – Waters's knowledge of, involvement in, and response to the Band's sexualized culture and Buchman's handling of the report of the text message – does not relate to their appearances at sporting events, fundraisers, and the like.

Accordingly, the court finds that plaintiff has failed to demonstrate the existence of a similarly-situated individual and thus has failed to establish a *prima facie* case of reverse gender discrimination.

### B.    Legitimate, Non-discriminatory Basis for Termination and Pretext

Even if plaintiff could establish a *prima facie* case, Ohio State would still be entitled to summary judgment.  "Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action at issue."  Sutherland v. Michigan Dep't of Treasury, 344 F.3d 603, 614-15 (6th Cir. 2003).  Ohio State has satisfied this burden.  Through the testimony of Drake and the related substantiating evidence, Ohio State has demonstrated beyond material dispute that Drake had a basis for determining that Waters had failed in leadership and destroyed any sense of trust that could have made his failings correctable.

Waters argues that Ohio State's claimed basis for termination is pretext.  When a defendant meets its burden, "then the burden of production shifts back to the plaintiff to demonstrate that the

proffered reason is a pretext." Sutherland, 344 F.3d at 615.  A plaintiff may establish pretext by showing that the proffered reason: "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." Ladd v. Grand Trunk W. R.R., Inc., 552 F.3d 495, 502 (6th Cir. 2009).

Under the third category, Waters argues that Buchman engaged in conduct that was substantially similar to his, yet she received a performance improvement plan.  According to Waters, this shows that his conduct was insufficient to warrant termination.  The court disagrees because, as explained above, the record establishes beyond genuine dispute that Waters engaged in more serious conduct than Buchman did.

Waters next argues that his conduct was insufficient to warrant termination because Dr. Christopher Hoch, who began serving as an Associate Director of the Band in 2012, was equally aware of the Band's sexualized culture yet was retained and named as Waters's replacement.  The record does contain evidence from which an inference could be made that Dr. Hoch had some knowledge of the Band's sexualized culture.  (Investigation Report at 5-6, 10; Waters Dep. at 130-31).  Even so, Drake explained that he terminated Waters because as the Director he had the authority and responsibility to effect prompt change but failed to do so.  (Drake Dep. at 26 ("[I]t was really the response of the person in charge, the Director, that was what led me to the decision that the Director needed to be replaced.").  Dr. Hoch was not in the Director role at the time of the events at issue and thus did not commit the failures in leadership which caused Drake to terminate Waters.  (Id. at 43 ("[W]hat was most important to me was what Mr. Waters himself did as Director."); id. at 101 ("[T]he job of the Director wasn't to attempt.  The job was to correct these things . . . .")).

Finally, turning to the second category of pretext, Waters argues that the actual motivation for his termination was Ohio State's desire to appease the Office of Civil Rights.  Waters contends that the timing of the May 2014 Title IX complaints and ensuing Investigation Report jeopardized the resolution of OCR's compliance review of Ohio State and that Ohio State made Waters into a scapegoat to prove to OCR how swiftly it could respond to Title IX issues.

Plaintiff's theory is not supported by the record.  Glaros testified that no one at OCR said or did anything to influence how OUCI conducted the investigation or what conclusions it reached.  (Glaros Dep. at 245-46, 248).  That is, OCR did not provide any advice on how OUCI should conduct the Waters investigation, nor did it suggest what action Ohio State should take against him.  (Id. at 246, 250).  OCR did not threaten to fine Ohio State or take away funding or otherwise go

easier on Ohio State if it terminated Waters or male employees.  (Id. at 249-50).  Further, no one at OUCI or Ohio State exhibited any concerns about how OCR might react to the Waters investigation or its resolution.  (Id. at 247; Tobias Dep. at 90-91).

Moreover, this theory offers no support to plaintiff as to the ultimate issue in this case – whether Ohio State terminated Waters because he is a man.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000) ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."); Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 751 (6th Cir. 2012).  Even if the real reason that Ohio State terminated Waters was to appease OCR, there is no evidence to support an inference that a discriminatory animus against men motivated the alleged effort to scapegoat Waters.  Drake testified that gender played no role in his decision to terminate Waters.  (Drake Dep. at 115-17, 284).  Glaros testified that he does not have an animus against men and that the Waters investigation was not handled any differently because of Waters's gender.  (Glaros Dep. at 243-44).  And no one at OCR communicated or conveyed to Ohio State that it had an animus against Waters or against men.  (Id. at 250-51).

Waters makes much of Ohio State's decision to wait until after-the-fact to inform OCR of the investigation and his termination.  He contends that Ohio State did this so it could control the narrative of the situation and that it did so successfully, as evidenced by OCR simply accepting Ohio State's findings and recommendations without further scrutiny.  Again, this contention in no way suggests gender-based animus.  The example of the purported comparator, Buchman, is telling.  When Buchman became the subject of a complaint and was terminated after an investigation found that she had continued to associate with Hollins and Bumbrey after she became aware that they had engaged in misconduct, Ohio State did not inform OCR of the matter until after-the-fact.  In other words, Ohio State took the same approach of informing OCR of the terminated female employee as it did of the terminated male employee.

Accordingly, the court finds as a matter of law that plaintiff has failed to carry his burden of demonstrating that the evidence supports an inference that Ohio State's basis for termination was pretext for discrimination.

## C.     Cat's Paw Theory

Plaintiff argues that even if Drake did not act with discriminatory animus, he can show that Drake's decision to terminate was influenced by individuals who did act with such animus.  A cat's paw theory refers to one who uses another to accomplish his improper purposes.  See Staub v.

Proctor Hosp., 562 U.S. 411, 415 n.1 (2011); Arendale v. City of Memphis, 519 F.3d 587, 604 n.13 (6th Cir. 2008).  "When an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, . . . the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability.'"  Arendale, 519 at 604 n.13 (citing Ercegovich, 154 F.3d at 355).  A plaintiff proceeding under a cat's paw theory must show: (1) a supervisor motivated by discriminatory animus; (2) who intended to cause an adverse employment action; and (3) proximately caused the adverse employment action.  Staub, 562 U.S. at 422; Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 351 (6th Cir. 2012).

Ohio State argues that a cat's paw theory, though accepted in Title VII cases, should not be allowed in Title IX cases.  It argues that a theory resting on vicarious liability is not available because Title IX, unlike Title VII, does not include the actions of an "agent" in defining the scope of liability.  See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 283 (1998) ("Title IX contains no comparable reference to an educational institution's 'agents,' and so does not expressly call for application of agency principles.").  In response, Waters contends that Ohio State's distinction regarding agency law makes sense only for harassment claims, as in Gebser, and not for claims based on an adverse disciplinary action by the educational institution.  See David S. Cohen, *Limiting Gebser: Institutional Liability for Non-Harassment Sex Discrimination Under Title IX*, 39 Wake Forest L. Rev. 311 (2004) (arguing that agency principles should be applied to determine institutional liability in non-harassment Title IX cases).  The court declines to address this issue of law because Ohio State has thoroughly established that it is entitled to summary judgment on the facts of the cat's paw theory.

Plaintiff asserts that Glaros and Tobias influenced Drake's decision by way of the Investigation Report they prepared.[11]  There is no dispute that the Investigation Report influenced Drake's decision, even if he did consider other conduct not addressed in the Report.  (Drake Dep. at 21-22).  However, the record is devoid of any evidence to support an inference that either Glaros or Tobias acted with discriminatory animus towards Waters.  Both individuals testified that they did not have gender animus against men and were not motivated by such animus when conducting the investigation or preparing the Investigation Report.  (Glaros Dep. at 243-44, 248, 251; Tobias Dep. at 25, 90, 100, 108, 114-15, 130, 139, 143, 146-47, 149, 204).  Nor did anyone with gender animus influence them.  (Glaros Dep. at 245-46, 248; Tobias Dep. at 25, 90).  Further, Glaros and Tobias

---

[11]  Plaintiff does not assert that Glaros or Tobias communicated with Drake outside of the Investigation Report.  Glaros did not speak to Drake about the Report (Glaros Dep. at 237; Drake Dep. at 65), and Drake did not identify Glaros or Tobias as individuals with whom he spoke as he gathered information about Waters and the Band.

were the same individuals whose investigation cleared Waters of the Title IX claim that he had retaliated against a female student for having reported a rape.  Cf. Voltz v. Erie Cnty., 617 Fed. App'x 417, 425 (6th Cir. 2015) (holding that a cat's paw theory failed where the purported influencer had drafted a report exonerating the plaintiff of wrongdoing).

In the course of discovery, the court ordered Ohio State to produce over 800 pages of draft or "redline" versions of the Investigation Report.  (Doc. #145).  The drafts show the many changes that were made prior to the final Investigation Report.  Plaintiff has not cited any of the changes as constituting evidence of a discriminatory motive.

Instead, Waters contends that the Investigation Report is flawed because it is the product of an "inept investigation" and "faulty methodology."  Waters argues that: Glaros had never before supervised a Title IX investigation; Tobias had never before conducted a Title IX investigation; they improperly confined the number of interviews to a relative handful of witnesses when thousands of current and former Band members could have been interviewed; Tobias failed to record witness interviews; and they included irrelevant and disparaging content in the Investigation Report.

This critique of the Investigation Report does not in any way show a gender-based animus on the part of Glaros or Tobias.  Waters has not demonstrated that the investigation was such a sham that one could conclude that it was pretext for discriminatory animus.  See Fiely v. Essex Healthcare Corp., No. 3:13CV2005, 2015 WL 370093, at *3 (N.D. Ohio Jan. 27, 2015) (rejecting plaintiff's argument that defendants' "incomplete" investigation and "failure to interview" certain individuals supported a cat's paw theory – "[w]hile with hindsight one may identify imperfections in the investigation . . . plaintiff has not shown that the investigation was a sham, much less that it in any way manifested or sought to cover up age discrimination").  Rather, Waters has submitted hearsay statements, in the form of letters addressed to Drake and authored by three individuals who were interviewed by OUCI.  (Doc. #144-1, Exs. N, O, P at PAGE ID 6682, 6688, 6694).  In these letters, one interviewee stated that not all of his comments were included in the Investigation Report (Ex. N at PAGE ID 6682), another stated that she was not asked about the circumstances under which she was assigned a certain nickname, which she was not personally offended by (Ex. O at PAGE ID 6689), and the last stated that she did not feel sexually harassed in the Band (Ex. P at PAGE ID 6695).  Even if considered, these hearsay statements do not disprove the existence of the sexualized culture described in the Investigation Report.  (Ex. N at PAGE ID 6684 ("On the topic of 'nicknames,' these names happen." . . . "The tradition of Midnight Ramp took place in a lighthearted atmosphere.").

In the final analysis, the record contains no genuine dispute that OUCI, in discharging its legal obligation to investigate the Title IX complaint in timely fashion, conducted interviews of the parties involved and others likely to have relevant knowledge, objectively reported its findings on the basis of corroborated evidence and Waters's own admissions, accurately stated the applicable Title IX standards, and made recommendations within a reasonable range of the application of those standards to the findings. The record contains no evidence from which an inference could be made that the Investigation Report was the product of a discriminatory animus against men on the part of Glaros or Tobias.

Accordingly, the court finds that Ohio State is entitled to summary judgment against plaintiff's cat's paw theory.

### D. Summary

Because Waters has not established a *prima facie* case, has not submitted evidence supporting an inference that the legitimate, non-discriminatory basis for his termination was pretext, and has failed to support his cat's paw theory, Ohio State is entitled to summary judgment on plaintiff's Title IX claim for reverse gender discrimination.

## IV. Motion for Rule 56(d) Relief

### A. Prefatory Statement

#### 1. Rule 26(b)

Recently-amended Rule 26(b) provides:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).

The 2015 amendments to the Federal Rules of Civil Procedure "are the product of five years of intense study, debate, and drafting to address the most serious impediments to just, speedy, and efficient resolution of civil disputes." Chief Justice Roberts, 2015 Year-End Report on the Federal Judiciary at 4. They "make express the obligation of judges and lawyers to work cooperatively in controlling the expense and time demands of litigation." Id. at 6. Under amended Rule 1, the Rules

"should be construed, administered, and *employed by the court and the parties* to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1 (emphasis added).

Amended Rule 26(b) brings an end to the days of nearly unlimited discovery and "encourage[s] judges to be more aggressive in identifying and discouraging discovery overuse." Fed. R. Civ. P. 26, Advisory Committee Notes to the 2015 Amendment. The proportionality standard is the instrument by which judges and practitioners are to bring about a change in the culture of discovery, requiring lawyers, with the guidance of involved judges, to "size and shape their discovery requests to the requisites of a case." C.J. Roberts, 2015 Year-End Report at 7; see also Fed. R. Civ. P. 26, Advisory Committee Notes to the 2015 Amendment (encouraging district courts to be actively involved in managing discovery "when the parties are legitimately unable to resolve importance differences").

The proportionality standard is not one behind which lawyers may simply offer boilerplate arguments. See Fed. R. Civ. P. 26, Advisory Committee Notes to the 2015 Amendment. Rather, the parties should explain why the information being sought "is important to resolving the case and why it would be a good use of [resources] to search for it," as well as explain the burden or expense of complying with a discovery request. Wilmington Trust Co. v. AEP Generating Co., No. 2:13-cv-1213, 2016 WL 860693, at *2 (S.D. Ohio Mar. 7, 2016). "The court's responsibility, using all the information provided by the parties, is to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery." Fed. R. Civ. P. 26, Advisory Committee Notes to the 2015 Amendment.

**2.      Applying the New Discovery Principles to the Course of Discovery**

Chief Justice Roberts commented that the "practical implementation of the [2015 civil rule amendments] may require some adaption and innovation." C.J. Roberts, 2015 Year-End Report at 9. This need for adaption and innovation is one that the court has taken to heart. The court believes that implementation of the new discovery rules will require improved case management by district judges, a culture of cooperation among lawyers, and active and early involvement by judges to fashion discovery that is proportional to the needs of the case. The adoption of certain protocols or measures will advance this effort and may include: case management conferences early in the litigation; requiring parties to submit joint discovery plans; the judge being available to timely resolve disputes; regular discovery conferences or hearings; stays of discovery to resolve pure legal issues; the use of affidavits to determine whether more costly avenues of discovery, such as depositions, would be justified; and the rolling submission of information produced during discovery to the court

so that it can better evaluate the need for additional discovery in light of the discovered facts. Below is a review of the tools the court has employed in this action in an effort to implement the new discovery rules, and particularly to tailor discovery so as to make it proportional to the needs of the case.

The court engaged in an early case review, identifying the legal issues implicated by the claims asserted in the complaint. On the same day it filed an answer, Ohio State moved for judgment on the pleadings, which sought to dismiss all of plaintiff's due process claims and his Title IX claim. The court stayed discovery pending consideration of Ohio State's motion, doing so because the motion presented several threshold challenges to plaintiff's due process claims and because plaintiff had made clear his intention to seek wide-ranging discovery. It was apparent that the discovery sought could impose a substantial burden on Ohio State and third parties, not only in terms of time and resources, but also raising attorney-client privilege and privacy concerns. For instance, in his initial Rule 26 disclosures, plaintiff named 40 individuals he claimed might have discoverable evidence, including President Drake's predecessor at Ohio State, the General Legal Counsel and Deputy Legal Counsel, members of the Board of Trustees, and the Title IX complainants and witnesses involved in the investigation.

The court granted the motion for judgment on the pleadings in large part, leaving plaintiff's reverse gender discrimination claim as the sole remaining claim in the case. (Apr. 24, 2015 Opinion and Order, Doc. #27). The court soon thereafter conducted a discovery conference with the parties on May 1, 2015 to determine the proper scope and timeframe for discovery. It was the court's goal to identify and promptly resolve legal issues that would affect the scope of discovery, as well as to tailor discovery to the elements of the remaining claim. See C.J. Roberts, 2015 Year-End Report at 10 (encouraging judges "to take on a stewardship role, managing their cases from the outset rather than allowing parties alone to dictate the scope of discovery and pace of litigation").

At the May 1 discovery conference, the parties staked out positions that reflected a fundamental tension which carried forward though numerous discovery disputes and continues to the pending motion for Rule 56(d) relief. On one hand, Ohio State asserted that it could readily demonstrate that Buchman, the only comparator identified to that point, was not similarly situated to Waters because they worked in different departments and were disciplined by different supervisors. Ohio State argued that targeted, expedited discovery was appropriate. On the other hand, Waters argued that he had a much broader right to discovery, one not bounded by the department Waters worked for or the narrow time period beginning with Drake's arrival at Ohio

27

State and ending with Waters's termination. At a minimum, Waters sought to discover whether there was any direct evidence of discrimination, whether any individuals besides President Drake were involved in the decision to terminate and whether any other potential comparators existed.

The court found that Waters was entitled to initial discovery that was somewhat limited in scope, but which could be expanded should the information gathered point to other relevant areas of inquiry. The court permitted "discovery of direct and circumstantial evidence of reverse gender discrimination related to: (1) Lenee Buchman; (2) the School of Music; (3) adverse employment actions taken by President Drake; and (4) adverse employment actions taken by other departments or entities involved in the decision to terminate the Plaintiff." (May 1, 2015 Order, Doc. #29). These limitations were designed, in light of certain undisputed facts alleged in the complaint and answer, to tie the course of discovery to the elements of plaintiff's disparate treatment claim.

The court sought to monitor the case closely and hold hearings or conferences as needed. To that end, the May 1, 2015 order instructed the parties to promptly seek the court's assistance in resolving any ensuing discovery disputes. The parties also were instructed to submit a joint discovery plan and schedule before June 29, 2015. In so requiring, the court intended to prompt counsel to perform their roles in working cooperatively to control the expense and time demands of litigation.

Several discovery disputes soon arose, each stemming from the "breadth and complexity of plaintiff's initial requests" and the "narrow responses of the defendants." (July 15, 2015 Order at 1, Doc. #42). The court found that the disputes "def[ied] the substance and spirit of the recent amendments to the Federal Rules of Civil Procedure which were intended to simplify and expedite discovery in civil cases" and necessitated the court's being "actively involved in the discovery process in order to ensure that this matter proceed[ed] efficiently, economically and expeditiously." (Id.)

Upon reviewing the plaintiff's requests and defendant's responses, the court reiterated the importance of identifying the decisionmaker[s] involved in terminating Waters's employment:

> . . . Here the defendants' response to the plaintiff's initial discovery requests identifies the decision-maker as the president of the university, Dr. Michael V. Drake. Plaintiff should proceed with Dr. Drake's deposition forthwith. The scope of his examination would, of course, include his reasons for terminating plaintiff's employment, as well as any actions or statements he may have taken or made which would tend to show that he harbors a gender-based animus against men, the identity of anyone he communicated with or received communications from regarding his decision to terminate plaintiff's employment, and the role, if any, those communications had in his decision to terminate plaintiff's employment.

(July 15, 2015 Order at 2).

While allowing plaintiff to depose Drake, the court determined not to allow the depositions of the Board of Trustees. The Board has 15 voting trustees, as well as 2 non-voting student trustees and 3 non-voting charter trustees. Its members include business executives, civic and community leaders, and leaders in the legal community. The court wanted to avoid the potential of numerous depositions becoming a fishing expedition requiring undue time of the witnesses and counsel. The critical initial inquiry was simply whether members of the Board played a role in the decision to terminate. Because early discovery indicated that the decision was one made by Drake and not by an action of the Board, the court found that the inquiry could be addressed by way of producing minutes of the Board and submitting affidavits from the Board members:

> Defendants shall forthwith provide plaintiff with the minutes of the Board of Trustees for the six-month period immediately preceding plaintiff's termination, which shall be accompanied by an affidavit from the secretary of the Board that they are a true and accurate account of what occurred at those meetings, and, if not, an explanation of any discrepancies. . . . Defendant shall also provide an affidavit from each member of the board of trustees describing his or her role, if any, in the termination of plaintiff's employment including any communications he or she may have had with President Drake regarding the termination of plaintiff's employment.

(July 15, 2015 Order at 2). After the filing of the affidavits from these individuals, who stated that they did not participate in the decision to terminate Waters's employment, the court found no rationale to further involve them in discovery.

The court took the same approach with Provost Joseph Steinmetz and Richard Blatti, Director of the School of Music – two individuals who had supervisory authority over Waters and potentially could have participated in the decision to terminate – and ordered that Ohio State produce affidavits in which they described their role, if any, in the termination of Waters's employment. (July 15, 2015 Order at 2-3). The court also instructed Ohio State to produce the affidavit of Athletics Director Gene Smith regarding the discipline and termination of Buchman and what role, if any, he played in the decision to terminate Waters. (July 30, 2015 Order, Doc. #45).

Because of the likely influence that the Investigation Report had on the termination decision, the court permitted the deposition of Christopher Glaros:

> . . . Plaintiff shall proceed with the taking of Mr. Glaros's deposition. Plaintiff may inquire regarding any actions Mr. Glaros may have taken or any statements he may have made which would tend to indicate that he harbors a gender-based animus against men. The scope of the deposition will include any other investigations Mr. Glaros may have been involved with which concerned complaints similar to those lodged against plaintiff. The scope of this deposition shall not include a review or

examination of the findings made in Mr. Glaros's report, the procedures involved in the investigation, or the grounds for those findings.

(July 15, 2015 Order at 3).

Plaintiff soon thereafter moved to expand discovery to include discovery on the existence of cat's paw individuals and "a review and examination of the findings made in the [Investigation Report], the procedures involved in the investigation, and the grounds for those findings." (Pl.'s Aug. 3, 2015 Mot. to Expand the Scope of Discovery at 2, Doc. #46).

As to cat's paw individuals, the court found that it had already directed such discovery – of Drake, the Board of Trustees, Steinmetz, Blatti and Glaros – and would continue to permit such discovery as the discovered facts warranted. (Aug. 14, 2015 Order, Doc. #52). As to the Investigation Report, the court reiterated that Glaros could be examined about his "own attitudes and beliefs, as well as any other investigations of similar allegations that he has been assigned to, specifically any similar investigations involving females and, if there were any investigations involving females, whether there were any differences in his approach or the way he conducted the investigation or the standards that he applied or any other matters that would be related to the issue of whether he treated women differently than men in the course of such investigations." (Id. at 2). However, the court refused to permit plaintiff "to conduct an examination consisting of a line by line review of the [Investigation Report] in an effort to identify every procedural or substantive part of the investigation which the Plaintiff disagrees with or every discrete finding or conclusion which the Plaintiff may dispute." (Id.). Finally, the court set a discovery deadline of September 15, 2015.

On September 15, plaintiff moved to expand the scope of discovery to include, among other things, the production of redline drafts of the Investigation Report, the deposition of Jessica Tobias, the deposition of Lenee Buchman, the deposition of a representative of OCR and communications between Ohio State and OCR. In order to better measure the proportionality of these requests, the court instructed the parties to submit summaries of the depositions of Waters, Drake and Glaros and identify testimony that the parties believed was relevant to the Title IX claim and any defense to that claim. (Sept. 22, 2015 Order, Doc. #69).

The court granted the requests for production of redline drafts and to depose Tobias. (Oct. 21, 2015 Order, Doc. #82). The deposition testimony of Glaros made clear that Tobias had played an important role in conducting the investigation and preparing the Investigation Report and that the Report had undergone numerous revisions by Glaros and Tobias. Thus, the requests were proportional to the needs of the case.

The remainder of plaintiff's requests required further analysis and the court instructed the parties to submit expedited briefing.  (Oct. 21, 2015 Order).  Though Buchman was identified in the May 1 order as a proper subject of discovery, plaintiff did not depose her during the discovery period and did not obtain an affidavit from her.  (Buchman Dep. at 161 (testifying that she refused to sign an affidavit that plaintiff's counsel had presented to her because she "was not comfortable putting something in writing that was not what I said")).  By that stage in the litigation, Ohio State had built a factual basis on which to present a substantial legal argument that Buchman, as a matter of law, was not similarly situated to Waters because they were employed in different department and were disciplined by different supervisors.  The court, however, determined that under the law of the Sixth Circuit, these factors alone were not determinative and that "[w]hether the same supervisor criterion 'is relevant depends upon the facts and circumstances of each individual case.'"  (Jan. 20, 2016 Order at 2, Doc. #110 (quoting McMillan v. Castro, 405 F.3d 405, 414 (6th Cir. 2005)).  Because there had been so little discovery concerning the circumstances and reasons why Buchman had been placed on a performance improvement plan, the court not only permitted plaintiff to take her deposition, but advised that Martin Jarmond (whom Smith identified as the individual who gave Buchman the performance improvement plan) could be deposed as well.  (Id. (citing Smith Supp. Aff. at ¶ 8)).

As to the OCR-related requests, the court noted that Waters had already obtained a substantial number of documents through both a Freedom of Information Act request and Ohio State's production of documents between the date of termination and the date of the final, signed Resolution Agreement.  The court found that further document production by Ohio State and a deposition of a nonparty representative of OCR would not likely lead to relevant evidence or be proportional to the needs of the case.  (Jan. 20, 2016 Order at 3).

### B.    Analysis of the Rule 56(d) Motion

Plaintiff argues that the course of discovery in this case was unduly limited, such that he is unable to properly oppose Ohio State's motion for summary judgment.  Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to a motion for summary judgment, the court may defer consideration of the motion and allow time for the nonmovant to take discovery.  Fed. R. Civ. P. 56(d).  The party seeking Rule 56(d) relief must "indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." Cacevic v. City of Hazel Park, 226 F.3d 483, 488 (6th Cir. 2000).  "Rule 56(d) requires more than

speculation that, if it could obtain more discovery, a party might find some way to support a claim. It requires a specific explanation of what a facts the movant would assert are true and why it cannot yet prove them." Redhawk Glob., LLC v. World Projects Int'l, No. 2:11-CV-666, 2012 WL 2018528, at *5 (S.D. Ohio June 5, 2012).

Plaintiff's motion for relief seeks discovery in three areas:

(1) "all findings of misconduct by assistant cheerleading coaches Eddie Hollins and Dana Bumbrey";

(2) Ohio State's answer to the following interrogatory: "Identify any and all employees to whom OSU issued a performance improvement plan or whom OSU terminated following a discovery of a sexualized culture and/or sexual harassment in an organization overseen, managed, or otherwise supervised by an OSU employee(s) during the five (5) years preceding the termination of Plaintiff's employment"; and

(3) the facts forming the basis for the findings in the Investigation Report, "as well as the methodology and procedures involved in the investigation."

(Pl.'s Mot. for Rule 56(d) Relief at 16, Doc. #143).

### 1.    Hollins and Bumbrey

Plaintiff argues that discovery concerning the misconduct in which Hollins and Bumbrey engaged will assist him in proving that the behavior in the Spirit Squad prior to Buchman's performance improvement plan was similar to that in the Band prior to Waters's termination.  Ohio State counters that the discovery request is untimely and is not relevant or proportional to the needs of the case.

The court agrees with Ohio State that the request is untimely.  Plaintiff, from the beginning of this case, knew of Buchman as a potential comparator and alleged in the complaint the occurrence of "sexualized behavior in the cheerleading crew."  (Compl. at ¶ 147, Doc. #1)).  In a discovery response dated June 8, 2015, Ohio State informed plaintiff that the University had terminated two assistant cheerleading coaches for "inappropriate sexualized conduct."  (Response to Request for Production No. 5, Doc. #143 at PAGEID 6369).  Plaintiff even obtained a declaration from Bumbrey on August 17, 2015.  (Doc. 144-1, Ex. X at PAGEID #6813).  Despite this, and despite the court's May 1, 2015 grant of discovery relating to Buchman, plaintiff failed to seek the information during the discovery period and has also failed to offer a satisfactory explanation for his delay.

The court further agrees that the requested discovery is not appropriate under Rule 26(b). Plaintiff seeks discovery on the "findings of misconduct" committed by Hollins and Bumbrey, but

Ohio State has never disputed (for purposes of this case) that both individuals engaged in sexual misconduct that warranted their immediate terminations.  (Smith Supp. Aff. at ¶¶ 6-7).  At best for plaintiff, further discovery into what exactly these individuals did would only prove an assertion that Ohio State already concedes – that the misconduct was serious.  What plaintiff is not asking for is discovery into the area of inquiry that is critical to his claim: whether Buchman endorsed, participated in or otherwise knew or had reason to know of the misconduct.  Buchman's level of knowledge of the misconduct and response to it are relevant when comparing her situation to that of Waters.  Buchman testified that she did not know of the nature of the misconduct until after she was placed on a performance improvement plan.  Her testimony is unrebutted and the discovery plaintiff now seeks would not create a genuine dispute as to this material fact.[12]

## 2.    Proposed Interrogatory

Plainitiff's proposed interrogatory – concerning individuals at Ohio State who, for a five year period prior to plaintiff's termination, were placed on performance improvement plans following the discovery of sexual harassment or a sexualized culture – is likewise both untimely and not proportional to the needs of the case.  Plaintiff again fails to justify why he waited until after the filing of defendant's motion for summary judgment to propose the interrogatory, particularly when it was well known to plaintiff that a performance improvement plan is what Ohio State used for Buchman.  (Response to Request for Production No. 5 (Ohio State agreeing to produce Buchman's personnel file); Drake Dep. at 70-73 (plaintiff's counsel questioning Drake about performance improvement plans during a September 4, 2015 deposition)).

More importantly, the facts discovered early in the case indicated that Waters was employed by the School of Music and that Drake made the decision to terminate Waters just a few weeks after he took office at Ohio State.   Yet Waters has persisted, including in this latest proposed interrogatory, in seeking University-wide discovery of information that substantially predates the arrival of Drake at Ohio State.  The requested discovery does not bear a reasonably close factual relationship to the undisputed circumstances of Waters's termination and is not proportional to the needs of this case.

---

[12]  Plaintiff does not contend that the misconduct of Hollins and Bumbrey was so pervasive that Buchman must have known of it.  Indeed plaintiff admits that Buchman, even after her termination, "lacked personal knowledge" about the precise conduct in which they engaged.  (Pl.s Reply at 6 n.3, Doc. #153).

### 3.    Methodology and Basis of the Investigation Report

Plaintiff's final request has been presented several times before.  As to methodology, Ohio State correctly observes that plaintiff has received adequate discovery on the matter.  Even though the court's July 15, 2015 Order did not require Glaros to answer questions about the procedures involved in the investigation, Glaros testified to the following: the intake meetings for the Title IX complainants; the timetable for the investigation; the assignment and role of Tobias in the investigation; his own role in the investigation; whether other individuals at Ohio State exerted influence on how he or Tobias conducted the investigation; the selection of witnesses and the witness interview process; the evaluation of witness credibility; the questions asked of Waters; the documents from Waters's personnel file that were, or were not, relied upon; and the drafting and editing of the Report.  (Glaros Dep. at 28-30, 84-86, 116-18, 121-25, 130-37, 192-93, 196-206, 220-22, 226-31).  Tobias offered similar testimony, as well as testimony on the receipt of the written statement from Waters and the efforts OUCI made to corroborate evidence.  (Tobias Dep. at 23-25, 55-61, 65-66, 69, 74-88, 93-164).

In deposing Tobias, plaintiff's counsel prefaced a line of examination by stating, "[I]t is my intention to ask a whole series of questions about the methodology used in the investigation with the intention of inquiring and investigating whether the methodology was influenced by gender based animus."  (Tobias Dep. at 92).  After having examined Glaros and Tobias on the matter, having received 800 pages of drafts of the Investigation Report, and having made a critique of the Report's methodology (described in Section III.C above), plaintiff has been unable to point to a single fact that would support an inference that "the methodology was influenced by gender based animus."  Proportionality demands that no further discovery on the subject be permitted.

Turning to the factual basis for the Report's findings, plaintiff argues that such discovery should be allowed in order to determine whether Ohio State's reasons for termination had no basis in fact and thus were pretext for discrimination.  However, the Sixth Circuit provides that a "plaintiff must allege more than a dispute over the facts upon which his discharge was based.  He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action."  Braithwaite v. Timken Co., 258 F.3d 488, 493-94 (6th Cir. 2001).

Discovery of the factual basis for the Report's findings would add no support to plaintiff's claim that Drake acted with discriminatory animus against men.  Regardless of whether the Report was true or false, plaintiff has failed to submit any evidence that would support an inference that

Drake did not honestly believe the findings stated in the Report.  Drake testified that he found the Report to be "detailed," "consistent" and "convincing."  (Drake Dep. at 21-22).  Drake gathered additional information about the Band's culture (for example, through discussions with senior-level individuals at Ohio State and receipt of a copy of the Songbook) which supported the Report's findings.

Plaintiff has noted that in an August 21, 2014 meeting with squad leaders of the Band, Drake stated, "I believe the report is largely historical."  (Tr. of Aug. 14, 2014 Meeting at 28, Doc. #1-1). Plaintiff interprets this statement as reflecting Drake's belief that many or most of the Band's sexualized practices had roots in the past and as reflecting Drake's belief that the persons to whom he spoke in the meeting had not personally engaged in those practices.  But even accepting this interpretation, it does not undermine the proposition that Drake honestly believed that at least some of the practices continued into Waters's tenure as the Band's Director.  And Ohio State has proved that proposition by uncontroverted evidence.

The requested discovery also would not enable plaintiff to prevail on his cat's paw theory. To make a showing that the proffered reasons for termination had "no basis in fact," a plaintiff "must put forth evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are factually false."  Abdulnour v. Campbell Soup Supply Co., LLC, 502 F.3d 496, 502 (6th Cir. 2007) (internal quotation marks omitted); accord Kline v. Tenn. Valley Auth., 128 F.3d 337, 356-57 (6th Cir. 1997); Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1084 (6th Cir. 1994).  This is an insurmountable hurdle for plaintiff.  Though plaintiff argues that additional discovery could show that the findings were based on false and inaccurate claims by witnesses, Waters's own concessions establish that at least some portion of the findings had some basis in fact and were not factually false.  (Written Statement at PAGEID 4113, 4114 (acknowledging his knowledge of Midnight Ramp, "tremendously offensive" and "inappropriate" nicknames, and "vulgar and inappropriate" Trip Tics); Waters Dep. at 233 ("I don't disagree that there were culture issues in the band."); id. at 277-79 (Midnight Ramp)).  Further, Waters conceded that upon becoming Director, he did not immediately eliminate Midnight Ramp or the use nicknames, and he endeavored to do so only after the OUCI investigation commenced.  (Written Statement at PAGEID 4113, 4114).

The court thus finds that plaintiff is not entitled to the proposed discovery because it would not serve to resolve the issues relating to pretext.

**V.      Conclusion**

For the reasons stated above, Ohio State's motion for summary judgement (Doc. #132) is GRANTED and Waters's motion for Rule 56(d) relief (Doc. #143) is DENIED.  The Clerk of Court shall enter judgment in favor of the defendant.


                                                    s/ James L. Graham
                                                    JAMES L. GRAHAM
                                                    United States District Judge

DATE: August 12, 2016